IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

KHYLE BRISCOE,

          Petitioner,             No. CIV S-04-2175 FCD GGH P

    vs.

A.K. SCRIBNER, et al.,

                      FINDINGS AND RECOMMENDATIONS

          Respondent.

_____/

I. Introduction

        Petitioner is a state prisoner proceeding through counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 1999 conviction for murder, robbery, burglary and the finding that he personally used a firearm in the commission of all three counts. Petitioner was sentenced to life without the possibility of parole after the jury further found as a special circumstance that the murder was committed while petitioner engaged in the commission of robbery and burglary.

        This action is proceeding on the amended petition filed September 15, 2006, as to claims 1-6, 8–11, and 13, 14 and 16 to the extent it is based on appellate counsel's failure to raise claims 13 and 14. Claims 12, 15 and 16, to the extent it concerns appellate counsel's failure to raise claim 12, were dismissed on grounds that they were barred by the statute of limitations. See

1

1   order filed April 5, 2007.  Claim 7 was dismissed as unexhausted.  <u>See</u> order filed April 10,

2   2008.  Several claims were denied evidentiary hearing.

3          For ease of reference, each claim heading is set forth herein, its procedural status,

4   and the pages herein where the claim is discussed.

5   Claim 1   Insufficient Evidence                No Previous Ruling                9

6   Claim 2   Jury Instruction Error               No Previous Ruling                28

7   Claim 3   Jury Instruction Error (Unanimity)   No Previous Ruling                34

8   Claim 4   Jury Instruction Error (Lesser Included)No Previous Ruling             36

9   Claim 5   Right to Present a Defense           No Previous Ruling                40

10  Claim 6   Ineffective Assistance of Counsel    Evidentiary Hearing (EH) Denied Part (d)

11                                                 Parovel/Rozadilla Impeachment (d)–   55

12                                                 Mental State Evidence–               60

13  Claim 7   Miranda Violations                   Dismissed         (No discussion herein)

14  Claim 8   Ineffective Assistance of Counsel (IAC)   EH denied (d) in part

15                                                 Involuntary Confession              79

16                                                 Incorrect Procedure (d)             89

17  Claim 9   Ineffective Assistance (Sentencing)  No Previous Ruling                95

18  Claim 10 Cumulative Error                      (No Previous Ruling)              100

19  Claim 11 Impeachment-Memory Impairment         (EH) denied                       95

20  Claim 12 Jury Inst. Error-Self-defense and Causation-Dismissed, Limitations (No discussion

21  herein)

22  Claim 13 IAC-Impeachment -Pistol Whipping      No Previous Ruling                97

23  Claim 14 IAC-Criminal Investigation of Parovel No Previous Ruling                98

24  Claim 15 IAC Promises of Leniency to Parovel   Dismissed, Limitations (No discussion

25  herein)

26  Claim 16 IAC (appellate) re Claim 13           No Previous Ruling                99

This Findings and Recommendations will repeat portions of previous orders so that the reader will not have to flip between various items in the docket.  Also, because the opinion of the California appellate court must be scrutinized in this AEDPA context, and provocative act murder is a complex theory, much of the explanations of the appellate court are set out herein.   The number of complex issues resolved herein makes this Findings and recommendations necessarily lengthy.

After carefully considering the record, the court recommends that the petition be denied.

II.  Anti-Terrorism and Effective Death Penalty Act (AEDPA)

The Anti-Terrorism and Effective Death Penalty Act (AEDPA) "worked substantial changes to the law of habeas corpus," establishing more deferential standards of review to be used by a federal habeas court in assessing a state court's adjudication of a criminal defendant's claims of constitutional error.  Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly established law applies to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law, or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is, the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue.  Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

1   AEDPA standard of review which directs deference to be paid to state court decisions.  While the

2   deference is not blindly automatic, "the most important point is that an *unreasonable* application

3   of federal law is different from an incorrect application of law....[A] federal habeas court may not

4   issue the writ simply because that court concludes in its independent judgment that the relevant

5   state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

6   that application must also be unreasonable."  Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

7   1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

8   objectively unreasonable nature of the state court decision in light of controlling Supreme Court

9   authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

10      "Clearly established" law is law that has been "squarely addressed" by the United

11  States Supreme Court.  Wright v. Van Patten, 552 U.S. 120, 125, 128 S.Ct. 743, 746 (2008).

12  Thus, extrapolations of settled law to unique situations will not qualify as clearly established.

13  See e.g., Carey v. Musladin, 549 U.S. 70, 76, 127 S.Ct. 649, 653-54 (2006) (established law not

14  permitting state sponsored practices to inject bias into a criminal proceeding by compelling a

15  defendant to wear prison clothing or by unnecessary showing of uniformed guards does not

16  qualify as clearly established law when spectators' conduct is the alleged cause of bias injection).

17      The state courts need not have cited to federal authority, or even have indicated

18  awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

19  Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

20  contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An

21  unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

22  occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the

23  established Supreme Court authority reviewed must be a pronouncement on constitutional

24  principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

25  binding only on federal courts.  Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

26      However, where the state courts have not addressed the constitutional issue in

4

1  dispute in any reasoned opinion, the federal court will independently review the record in

2  adjudication of that issue. "Independent review of the record is not de novo review of the

3  constitutional issue, but rather, the only method by which we can determine whether a silent state

4  court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

5  2003).

6         Petitioner raised claims 1-5 on direct appeal. The California Court of Appeal

7  issued a reasoned opinion addressing affirming petitioner's conviction. Respondent's Exhibit 12.

8  The California Supreme Court denied the petition without comment or citation. Respondent's

9  Exhibit 16. The undersigned will below discuss the relevant AEDPA review standard for these

10  claims. See Shackleford v. Hubbard, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000) (when reviewing

11  a state court's summary denial of a claim, the court "looks through" the summary disposition to

12  the last reasoned decision).

13         Petitioner raised claims 6, 8, 9, 10, 11, 13, 14 and 16 in two separate habeas

14  petitions filed in the California Supreme Court. Respondent's Exhibits 17, 21. The California

15  Supreme Court denied these petitions without comment or citation. Respondent's Exhibit 20, 22.

16  Accordingly, the undersigned conducts an independent review of these claims. Brown v.

17  Ornowski, 503 F.3d 1006, 1010 (9th Cir. 2007)(to the extent that a state court decision is

18  unaccompanied by a rationale for its conclusion, we conduct an independent review of the record

19  to determine whether the state court decision is objectively reasonable).

20  III.  Factual Background

21         The opinion of the California Court of Appeal contains a factual summary.

22  After independently reviewing the record, the court finds this summary to be accurate and adopts

23  it below:

24         On the night of April 2, 1998,[1] Alisha Rozadilla was alone at the Vacaville home
           of her boyfriend Ben Parovel. Shaun Pina and [petitioner] knocked on the door,

25

26      [1] All dates refer to the 1998 calendar year.

                                            5

asking for Parovel. Frightened, Rozadilla armed herself with Parovel's nine-millimeter Beretta while she waited for him to return. When Parovel came home, the two men-acquaintances of his-entered the living room of the house with him. They told Parovel that they wanted to purchase marijuana. They appeared to be unarmed. Parovel-his back to [petitioner] and Pina-took the Beretta from Rozadilla and hid it in his clothing.

Pina and [petitioner] followed Parovel into a bedroom to get the marijuana. As Parovel was weighing out marijuana, Pina pulled out a gun-a .10-millimeter Glock semiautomatic pistol with a red laser beam on it-and relieved Parovel of his Beretta. Pina demanded money. [Petitioner] returned to the living room where Rozadilla had remained, held a .38-caliber handgun to her neck and asked her " 'Where's the gun, Bitch?' " in a very loud tone of voice. When he satisfied himself that she was no longer armed, he asked where to find the money. She told him that she had no idea. He put her in a headlock-his arm underneath her chin-and walked her back to the bedroom where Parovel and Pina were. He had his gun pointed at her head.

In the bedroom, Pina and [petitioner] continued to demand money from Parovel. He handed over about $1,500, but Pina wanted more. Parovel had almost $15,000 in cash hidden in the house-money given him in the form of a cashier's check that he had recently cashed. He induced Pina out of the bedroom on the pretext that he would show him where the money was. Parovel tried to run, but Pina grabbed his hooded shirt and yanked him back. He grabbed at Pina's Glock and the two men struggled for it. The gun fell and flew across the floor.

[Petitioner]-hearing the struggle-left Rozadilla in the bedroom and went to investigate. As Parovel struggled to get up and retrieve the Glock, [petitioner] entered the room holding the .38, then picked up the Glock and struck [Parovel] in the head repeatedly with it. The magazine of the Glock fell out while [petitioner] hit Parovel with it. Pina had Parovel's legs pinned and the three men struggled for several minutes.

Parovel was able to get free of Pina. The front door was open, so he ran outside with [petitioner] on his back. Parovel and [petitioner] continued to struggle over the Glock. [Petitioner] gained control of his .38. Parovel tripped, bringing [petitioner] down with him. He grabbed for the .38 and the gun went off, shooting at the side of the house. When Parovel gained control of the .38, he started shooting, afraid for his life. He believed that Pina still had his Beretta and he was angry that the two men took his money. [Petitioner] was two feet away from him; Pina was on the driveway 13 or 14 feet away from where Parovel lay on the lawn.

Parovel shot Pina twice; the second shot made Pina drop.[2] As [petitioner] approached Pina, Parovel fled to a neighbor's house with the .38 to call the police. Parovel was bleeding from a cut on his head. He set down the .38 inside the neighbor's house. When he went outside again, [petitioner] and Pina were gone.

Vacaville police responded to a report of a gunshot victim and found Pina lying

---

[2] Petitioner was also shot multiple times by Parovel at this time.

on the ground, semi-conscious and with a failing pulse. A wad of money totaling almost $1,400 was removed from his clothing. No marijuana was found in his pockets and no weapon was seen near the body. Pina was declared dead at the scene.

Knowing the police were coming, Parovel threw the marijuana, a scale and a magazine for his Beretta out of the house. He did not touch the Glock. The .38 he had left at his neighbor's house was later recovered by police. It contained five empty casings and one live round of ammunition. Police searched Parovel's house and found a .10-millimeter Glock pistol without a gun magazine and a gun magazine fitting the Glock inside the house. Two bullets were found, one in the driveway and one on the garage floor. They also found a scale.

Parovel first told police that [petitioner] and Pina came to the house to play videotape games. Later, he told police the truth-that he was selling marijuana to them. He told police that he thought Nate Newman-who shared Pina's apartment-had set him up. Newman had sold him a quarter pound of marijuana for $1,300 earlier that day. Parovel had heard that Newman had a Glock handgun.

On the night of April 2, [petitioner]-with multiple gunshot wounds-was taken to a hospital. While lying on a gurney, he told police that he stood on a Vacaville street when an unknown man pulled a gun on him. [Petitioner] said that he wrestled with the man until he broke away and ran from him. The man shot at [petitioner] while he was lying on the ground. [Petitioner] told police that he flagged down a passing vehicle and got a ride to the hospital. A police officer administered a gunshot residue test. After a five- to 10-minute interview, [petitioner] was taken into surgery. The police took his clothing as evidence. They found no weapons or marijuana on his person.

On the afternoon of April 4, [petitioner] gave a second statement to police while in the hospital. A nurse advised a police officer that [petitioner] was not under the influence of any medication that would cause him to be unable to answer questions. [Petitioner] seemed alert. They spoke for 20 to 25 minutes and the statement was tape-recorded.

In this statement, [petitioner] admitted that he and Pina went to the Vacaville house of a man named [Parovel] to purchase marijuana. He told police that [Parovel] tried to rob them and that he shot at them. He learned from police that Pina was dead. [Petitioner] admitted that he had been carrying a .38-caliber revolver and that Pina was also armed with a Glock. He tried to tackle [Parovel], who was armed and whom [petitioner] thought intended to kill him. [Parovel] also tried to wrestle Pina's gun from Pina and [petitioner] felt he had to stop [Parovel]. [Petitioner] tried to help Pina, who was hit and collapsed. After the police told [petitioner] that they knew that he and Pina intended to rob [Parovel], [petitioner] admitted that he knew [Parovel] had money.

[Petitioner] also told police that on the night of the shooting, a car was waiting for him containing Newman and another person. These two people brought him to the hospital. Newman had given [petitioner] the .38 and had given Pina the Glock. [Petitioner] said that Newman wanted the robbery to occur that day. Newman was to get a third of whatever [petitioner] and Pina recovered.

7

[Petitioner] was arrested and ordered held without bail.  At the preliminary hearing, he objected to the admission of the April 4 statement that he gave to police as taken in violation of his Miranda[3] rights and as an involuntary statement. The magistrate denied the motion after conducting a suppression hearing. (See § 1538.5.)

On June 1, [petitioner] was charged by information[4] with first degree murder of Pina, robbery of Parovel and Rozadilla, and burglary of Parovel's dwelling.  The information alleged that the murder of Shaun Pina was committed in the commission of robbery and burglary and that [petitioner] personally used a firearm in the commission of all three offenses.  (See §§ 187, subd. (a), 190.2, subd. (a)(17), 211, 459; see also former §§ 190.2, 12022.5, subd. (a)(1).) [Petitioner] pled not guilty and denied all the enhancement allegations.  His motion to dismiss the information and its special circumstances allegations was heard and denied. (See § 995.)

At trial, a forensic pathologist testified that Pina suffered two gunshot wounds. One of the bullets struck vital organs and proved to be fatal.  A bullet was recovered from Pina's chest during an autopsy.  His blood revealed evidence of marijuana in his system, but no alcohol or other drugs.  [Petitioner's] tape-recorded statement to police was played for the jury.  A criminalist testified that the bullet found in Pina's chest cavity was fired from [petitioner's] .38-caliber revolver.  None of the bullets found at the scene came from Pina's .10-millimeter Glock semiautomatic pistol.

[Petitioner's] motion for acquittal of first degree murder based on insufficiency of evidence was denied.  (See § 1118.1.)  The parties stipulated that there was evidence of marijuana in his bloodstream.  [Petitioner] put on expert evidence of his organic brain damage and argued that he lacked the capacity to form the mens rea required for either robbery or burglary.  He also argued to the jury that Parovel's killing of Pina was not done in response to anything that he did.

Ultimately, the jury found [petitioner] guilty of all three offenses and found all three firearm-use-enhancement allegations to be true.  It also concluded that [petitioner] was engaged in the crimes of robbery and burglary during the commission of the murder.  He moved for a new trial, arguing that the trial court misdirected the jury in a matter of law and that the verdict was contrary to the law and the evidence.  He sought a judgment of acquittal notwithstanding the verdict on the murder charge.  (See § 1181, subd. 5.)  The trial court denied the motion for new trial and the related motion for judgment notwithstanding the verdict. [Petitioner] was sentenced to an indeterminate term of life imprisonment without possibility of parole for the murder.  The trial court also imposed a four-year consecutive term for the firearm use enhancement related to the murder charge. Terms for first degree robbery and first degree burglary and the related firearm-use-enhancement findings were stayed on multiple punishment grounds.

---

[3] Miranda v. Arizona (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

[4] The felony complaint filed April 6 was deemed to be the information by stipulation of the parties.

1    (See § 654.)

2    Respondent's Lodged Document 12, pp. 2-6.

3    IV.  Discussion

4           A.  Claim 1: Insufficient Evidence

5           Petitioner argues that there was insufficient evidence to support his murder

6    conviction.  Amended Petition, p. 30.  The California Court of Appeal denied this claim as

7    follows:

8           II. PROVOCATIVE ACT MURDER

9           A. Legal Principles

10          First, Briscoe contends that he was improperly convicted of special-circumstances
            murder under the provocative act murder doctrine. Under this general claim of
11          error, he raises several discrete issues-a challenge to the sufficiency of evidence; a
            claim that the trial court failed to properly respond to a jury inquiry; challenges to
12          various instructions; a call for the abolition of the provocative act murder
            doctrine; and a claim that the statutory special circumstances found by the jury did
13          not apply to the facts of his case. We consider each issue in turn, but first set forth
            the basic law that applies in cases such as this, when a crime victim shoots and
14          kills an accomplice and the state seeks to hold a defendant responsible for the
            killing.

15
            A provocative act murder case necessarily involves at least three people-in our
16          case, the perpetrator of the underlying offense, an accomplice, and a victim of
            their crime. (See *People v. Superior Court (Shamis)* (1997) 58 Cal.App.4th 833,
17          845-846, 68 Cal.Rptr.2d 388 (*Shamis*).) Under the provocative act murder
            doctrine, the perpetrator of a crime is held vicariously liable for the killing of an
18          accomplice committed by the third party. (See *People v. Gilbert* (1965) 63 Cal.2d
            690, 705, 47 Cal.Rptr. 909, 408 P.2d 365, judg. vacated on other grounds (1967)
19          388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178; see also *Pizano v. Superior Court*
            (1978) 21 Cal.3d 128, 135, 145 Cal.Rptr. 524, 577 P.2d 659; Taylor v. Superior
20          Court (1970) 3 Cal.3d 578, 582-583, 91 Cal.Rptr. 275, 477 P.2d 131, overruled on
            another ground in *People v. Antick* (1975) 15 Cal.3d 79, 92 fn. 12, 123 Cal.Rptr.
21          475, 539 P.2d 43.) By law, the felony-murder rule does not apply when an
            accomplice is killed at the hands of a crime victim rather than by the defendant.
22          As such a killing does not occur in the perpetration of a felony, malice cannot be
            ascribed to the defendant under the felony-murder rule. (*People v. Gilbert, supra*,
23          63 Cal.2d at p. 703, 47 Cal.Rptr. 909, 408 P.2d 365; *People v. Washington* (1965)
            62 Cal.2d 777, 781, 44 Cal.Rptr. 442, 402 P.2d 130; see *People v. Caldwell*
24          (1984) 36 Cal.3d 210, 216, 203 Cal.Rptr. 433, 681 P.2d 274; In re Joe R. (1980)
            27 Cal.3d 496, 503-504, 165 Cal.Rptr. 837, 612 P.2d 927; *Pizano v. Superior
25          Court, supra*, 21 Cal.3d at p. 136, 145 Cal.Rptr. 524, 577 P.2d 659; *Taylor v.
            Superior Court, supra*, 3 Cal.3d at p. 582, 91 Cal.Rptr. 275, 477 P.2d 131; *People
26          v. White* (1995) 35 Cal.App.4th 758, 763-764, 41 Cal.Rptr.2d 510; *In re Aurelio*

9

*R.* (1985) 167 Cal.App.3d 52, 57 fn. 2, 58, 212 Cal.Rptr. 868.) However, when the perpetrator of a crime–with a conscious disregard for life–intentionally commits an act that is likely to result in death and the crime victim kills in reasonable response to that act, the perpetrator is guilty of murder. In this situation, the killing is attributable–not merely to the commission of a felony–but to the intentional act of the perpetrator committed with conscious disregard for life. The victim's killing in self-defense is not deemed to be an independent intervening cause relieving the perpetrator of liability because the killing is a reasonable response to the dilemma thrust on the victim by the perpetrator's intentional act. (*People v. Gilbert, supra,* 63 Cal.2d at pp. 704-705, 47 Cal.Rptr. 909, 408 P.2d 365; *In re Aurelio R., supra,* 167 Cal.App.3d at p. 58, 212 Cal.Rptr. 868; see *People v. Caldwell, supra,* 36 Cal.3d at pp. 216-217 fn. 2, 203 Cal.Rptr. 433, 681 P.2d 274; *In re Joe R., supra,* 27 Cal.3d at pp. 504-505, 165 Cal.Rptr. 837, 612 P.2d 927; *Pizano v. Superior Court, supra,* 21 Cal.3d at pp. 134-135, 145 Cal.Rptr. 524, 577 P.2d 659; *Taylor v. Superior Court, supra,* 3 Cal.3d at pp. 582-583, 91 Cal.Rptr. 275, 477 P.2d 131; *People v. Gallegos* (1997) 54 Cal.App.4th 453, 459, 63 Cal.Rptr.2d 382; *People v. Gardner* (1995) 37 Cal.App.4th 473, 478, 43 Cal.Rptr.2d 603.)

As with most criminal offenses, a provocative act murder has both a physical and a mental element that the prosecution must establish. (See § 20.) To constitute the actus reus of provocative act murder, the defendant must commit an act that provokes a third party to fire a fatal shot. The mens rea element is satisfied if the defendant knows that his or her provocative act has a high probability–not merely a foreseeable possibility–of eliciting a life-threatening response from the person who actually fires the fatal bullet. (*In re Aurelio R., supra,* 167 Cal.App.3d at p. 57, 212 Cal.Rptr. 868; see *People v. Gallegos, supra,* 54 Cal.App.4th at p. 460, 63 Cal.Rptr.2d 382; see also *In re Joe R., supra,* 27 Cal.3d at p. 505, 165 Cal.Rptr. 837, 612 P.2d 927.) Cases often discuss these two elements in terms of whether the defendant committed a provocative act which proximately caused the killing. (See, e.g., *Shamis, supra,* 58 Cal.App.4th at p. 846, 68 Cal.Rptr.2d 388; *People v. Gallegos, supra,* 54 Cal.App.4th at p. 457, 63 Cal.Rptr.2d 382.)

The prosecution must establish that the defendant FN5 committed a provocative act. (See *People v. Garcia* (1999) 69 Cal.App.4th 1324, 1329, 82 Cal.Rptr.2d 254.) In cases in which the underlying crime does not involve an intent to kill-offenses such as robbery FN6 and burglary, the underlying crimes that the jury in Briscoe's case found that he had committed–the mere participation in the underlying criminal offense is not sufficient to invoke the doctrine of provocative act murder. The provocative act must be something beyond that necessary to commit the underlying crime. (*People v. Garcia, supra,* 69 Cal.App.4th at p. 1329, fn. 3, 82 Cal.Rptr.2d 254; *People v. Gallegos, supra,* 54 Cal.App.4th at pp. 456-457, 63 Cal.Rptr.2d 382; *In re Aurelio R., supra,* 167 Cal.App.3d at pp. 59-60, 212 Cal.Rptr. 868; see *In re Joe R., supra,* 27 Cal.3d at p. 504, 165 Cal.Rptr. 837, 612 P.2d 927.) In every robbery, the possibility exists that a victim will resist and kill. The robber has little control over such a killing once the robbery is undertaken. To impose an additional penalty for the killing improperly discriminates between robbers, not on the basis of any difference in their conduct, but solely on the basis of a victim's response that the robber's conduct induced. (*People v. Washington, supra,* 62 Cal.2d at p. 781, 44 Cal.Rptr. 442, 402 P.2d 130; *People v. Gallegos, supra,* 54 Cal.App.4th at p. 457, 63 Cal.Rptr.2d 382.) However, circumstances set in motion by the defendant which are fraught with

grave and inherent danger to life are sufficient to constitute a provocative act that allows a jury to raise an inference of malice. (*People v. Garcia, supra*, 69 Cal.App.4th at pp. 1329-1330, 82 Cal.Rptr.2d 254 [firing weapon into ceiling of occupied room].)

FN5. If a provocative act is committed by an accomplice who is later killed by a crime victim, that act cannot form the basis for a provocative act murder. As the accomplice cannot be guilty of murder in connection with his or her own death, so the defendant–who stands in the shoes of the accomplice–cannot be held vicariously responsible for such a killing. (*People v. Garcia, supra*, 69 Cal.App.4th at pp. 1330-1331, 82 Cal.Rptr.2d 254; see *In re Joe R., supra*, 27 Cal.3d at p. 506 fn. 5, 165 Cal.Rptr. 837, 612 P.2d 927; *People v. White, supra*, 35 Cal.App.4th at p. 765, 41 Cal.Rptr.2d 510; *Shamis, supra*, 58 Cal.App.4th at p. 845, 68 Cal.Rptr.2d 388; People v. Mai (1994) 22 Cal.App.4th 117, 120, 127-128, 27 Cal.Rptr.2d 141, disapproved on other grounds in *People v. Nguyen* (2000) 24 Cal.4th 756, 758, 102 Cal.Rptr.2d 548, 14 P.3d 221.)

The provocative act murder doctrine may also apply if the provocative act was committed by a surviving accomplice. (See *In re Joe R., supra*, 27 Cal.3d at p. 506 fn. 5, 165 Cal.Rptr. 837, 612 P.2d 927; *People v. Garcia, supra*, 69 Cal.App.4th at p. 1331, 82 Cal.Rptr.2d 254; *Shamis, supra*, 58 Cal.App.4th at p. 846, 68 Cal.Rptr.2d 388.) However, as Briscoe's sole accomplice in this case was the murder victim Pina, we need not consider such cases.

FN6. Much of the law of provocative act murder has evolved in robbery cases. (See *People v. Gallegos, supra*, 54 Cal.App.4th at p. 460, 63 Cal.Rptr.2d 382; see also *In re Aurelio R., supra*, 167 Cal.App.3d at pp. 59-60, 212 Cal.Rptr. 868.) In robbery cases, courts have consistently required the defendant to commit a provocative act beyond that necessary to commit the robbery in order to be held liable for a killing committed by a third party. (See, e.g., *In re Joe R., supra*, 27 Cal.3d at p. 506 fn. 6, 165 Cal.Rptr. 837, 612 P.2d 927; *People v. Garcia, supra*, 69 Cal.App.4th at p. 1331, 82 Cal.Rptr.2d 254.)

A prosecution for murder requires a finding of malice. (*Shamis, supra*, 58 Cal.App.4th at p. 844, 68 Cal.Rptr.2d 388; see *Pizano v. Superior Court, supra*, 21 Cal.3d at p. 134, 145 Cal.Rptr. 524, 577 P.2d 659.) The malice necessary for provocative act murder is implied malice. (*People v. Cervantes* (Aug. 27, 2001) 26 Cal.4th 860, 868, 111 Cal.Rptr.2d 148, 29 P.3d 225; *People v. White, supra*, 35 Cal.App.4th at p. 768, 41 Cal.Rptr.2d 510.) Malice may be implied if the defendant commits an act with a high probability that it will result in death and does so with a base antisocial motive or a wanton disregard for human life. (*Pizano v. Superior Court, supra*, 21 Cal.3d at p. 134, 145 Cal.Rptr. 524, 577 P.2d 659; *Shamis, supra*, 58 Cal.App.4th at p. 844, 68 Cal.Rptr.2d 388 [second degree murder].) Unless the defendant's conduct is sufficiently provocative of a lethal response, it cannot support the finding of implied malice necessary for a verdict of guilt on a charge of murder. (*Taylor v. Superior Court, supra*, 3 Cal.3d at pp. 582-584, 91 Cal.Rptr. 275, 477 P.2d 131; *People v. Garcia, supra*, 69 Cal.App.4th at p. 1329, 82 Cal.Rptr.2d 254; *People v. Mai, supra*, 22 Cal.App.4th

at pp. 120, 125, 27 Cal.Rptr.2d 141; see *In re Joe R., supra*, 27 Cal.3d at p. 505, 165 Cal.Rptr. 837, 612 P.2d 927.) Thus, a central inquiry in determining a defendant's criminal liability for a killing committed by a resisting victim is whether the defendant's conduct was sufficiently provocative of lethal resistance to support a finding of implied malice. (See *Taylor v. Superior Court, supra*, 3 Cal.3d at pp. 583-584, 91 Cal.Rptr. 275, 477 P.2d 131; *People v. Kainzrants* (1996) 45 Cal.App.4th 1068, 1078-1079, 53 Cal.Rptr.2d 207.)

The prosecutor must also establish that the defendant's conduct proximately caused the killing. Courts use traditional notions of concurrent and proximate cause in order to determine whether the killing was the result of the defendant's conduct. (See *People v. Cervantes, supra*, 26 Cal.4th at pp. 865, 874, 111 Cal.Rptr.2d 148, 29 P.3d 225; *People v. White, supra*, 35 Cal.App.4th at p. 765, 41 Cal.Rptr.2d 510.) To be considered the proximate cause of the victim's death, the defendant's act must have been a substantial factor contributing to the result, rather than insignificant or merely theoretical.FN7  (*People v. Caldwell, supra*, 36 Cal.3d at p. 220, 203 Cal.Rptr. 433, 681 P.2d 274; People v. White, supra, 35 Cal.App.4th at p. 765, 41 Cal.Rptr.2d 510; *People v. Mai, supra*, 22 Cal.App.4th at pp. 120, 123, 128, 27 Cal.Rptr.2d 141; see *Shamis, supra*, 58 Cal.App.4th at pp. 845-846, 68 Cal.Rptr.2d 388.) A defendant's provocative acts must actually provoke a victim response resulting in an accomplice's death. (See *In re Joe R., supra*, 27 Cal.3d at pp. 505-508, 165 Cal.Rptr. 837, 612 P.2d 927 [sufficiency of evidence case].)

> FN7. As the California Supreme Court has held, the substantial factor test is an application of the general rule of de minimis non curat lex–that is, the law does not recognize trifles. (*People v. Caldwell, supra*, 36 Cal.3d at pp. 220-221, 203 Cal.Rptr. 433, 681 P.2d 274; see Black's Law Dict. (7th ed.1999) p. 443, col. 1; see also Civ.Code, § 3533.)

The timing of the events is critical. By necessity, the provocative act must occur before a victim may make a lethal response. (See, e.g., *In re Joe R., supra*, 27 Cal.3d at p. 507, 165 Cal.Rptr. 837, 612 P.2d 927 [ineffectual blows struck after victim initiated battle are not provocative acts].) There may be more than one act constituting the proximate cause of the killing. (See *People v. Caldwell, supra*, 36 Cal.3d at p. 219, 203 Cal.Rptr. 433, 681 P.2d 274; *Shamis, supra*, 58 Cal.App.4th at p. 846, 68 Cal.Rptr.2d 388.) If the defendant commits several acts but only one of them actually provoked a lethal response, only that act may constitute the provocative act on which culpability for provocative act murder can be based. (See *In re Joe R., supra*, 27 Cal.3d at pp. 507-508, 165 Cal.Rptr. 837, 612 P.2d 927; *People v. Kainzrants, supra*, 45 Cal.App.4th at pp. 1077-1078, 53 Cal.Rptr.2d 207.) When the chain of causation is somewhat attenuated, the jury decides whether murder liability attaches or not. (*People v. Gardner, supra*, 37 Cal.App.4th at p. 479, 43 Cal.Rptr.2d 603; see People v. Roberts (1992) 2 Cal.4th 271, 321, 6 Cal.Rptr.2d 276, 826 P.2d 274, cert. den. 506 U.S. 964, 113 S.Ct. 436, 121 L.Ed.2d 356; see also *People v. Cervantes, supra*, 26 Cal.4th at p. 871-872, 111 Cal.Rptr.2d 148, 29 P.3d 225 [proximate cause is typically jury question].)

B. Sufficiency of Evidence

In the first of his claims of error on appeal, Briscoe [petitioner]argues that there

was insufficient evidence to prove beyond a reasonable doubt that he was liable for Pina's death at Parovel's hand under the provocative act murder doctrine. He argues that neither his handling of Rozadilla nor his pistol-whipping of Parovel constituted a provocative act beyond that necessary to commit the robbery itself. At trial, the court found that there was sufficient evidence to send the case to the jury when it denied his motion for an acquittal of first degree murder for insufficiency of evidence. (See § 1118.1.)

When reviewing a claim of insufficiency of evidence, we must view the evidence in the light most favorable to the verdict and presume in support of the judgment the existence of every fact that the trier of fact could reasonably deduce from that evidence. The test is whether substantial evidence supports the conclusion of the trier of fact, not whether the evidence proves guilt beyond a reasonable doubt. We must determine whether a reasonable trier of fact could have found the prosecution sustained its burden of proof beyond a reasonable doubt of each essential element of the offense. Substantial evidence must be of ponderable legal significance, reasonable in nature, credible and of solid value. (*People v. Cervantes, supra*, 26 Cal.4th at p. 868, 111 Cal.Rptr.2d 148, 29 P.3d 225; *People v. Caldwell, supra*, 36 Cal.3d at p. 217, 203 Cal.Rptr. 433, 681 P.2d 274; **415 *People v. Kainzrants, supra*, 45 Cal.App.4th at p. 1076, 53 Cal.Rptr.2d 207.)

Briscoe argues that the only proper evidence we may consider on the issue of when Parovel was motivated to use lethal force is the direct evidence provided by Parovel's own testimony. The fact that the California Supreme Court needed only a robbery victim's testimony to establish the sequence of events for purposes of determining causation in a provocative act murder case does not compel the conclusion that this is the only evidence that a court may consider to make this determination. (See, e.g., *In re Joe R., supra*, 27 Cal.3d at pp. 506-508, 165 Cal.Rptr. 837, 612 P.2d 927.) We need not limit ourselves to Parovel's testimony alone when considering whether substantial evidence supports the jury's implied finding that Briscoe committed a provocative act that in turn prompted Parovel to kill Pina. We may, of course, consider circumstantial evidence and reasonable inferences that may be drawn from the evidence presented to the jury, as well as direct evidence. (See *People v. Anderson* (1940) 37 Cal.App.2d 615, 619, 100 P.2d 348 [circumstantial evidence]; see also *People v. Ceja* (1993) 4 Cal.4th 1134, 1138-1139, 17 Cal.Rptr.2d 375, 847 P.2d 55.)

On appeal, Briscoe contends that his pistol-whipping of Parovel cannot constitute a provocative act because Parovel's fear for his life arose before the pistol-whipping occurred–when Pina took his weapon while the two men were still in the bedroom. He reasons that Pina's earlier act of relieving Parovel of his weapon while the two men were still inside Parovel's house was the act that provoked Parovel to commit the lethal act–not his subsequent pistol-whipping. The provocative act murder doctrine requires that the perpetrator of a crime intentionally commit an act that is likely to result in death and that prompts the crime victim to kill in response to that conduct. (*People v. Gilbert, supra*, 63 Cal.2d at pp. 704-705, 47 Cal.Rptr. 909, 408 P.2d 365; see *People v. Cervantes, supra*, 26 Cal.4th at p. 874, 111 Cal.Rptr.2d 148, 29 P.3d 225 .) Briscoe argues that there is insufficient evidence to support the conclusion that his conduct led Parovel to fear, prompting him to kill.

13

This argument is flawed, for several reasons. First, the record does not support Briscoe's claim that Parovel testified that "immediately after being stripped of his gun by Pina, he began to fear for his life." At trial, Parovel testified that he was fearful while he was in the bedroom. He told the jury that Pina took his weapon while they were in the bedroom. However, he did not offer specific testimony-as Briscoe seems to suggest-that the loss of his weapon caused him to immediately fear for his life. Parovel testified that when he opened the front door of his house, he was trying to get away from Pina and Briscoe because he feared them. Until this point, Parovel's fear is generalized. It is only after Briscoe pistol-whipped him that Parovel's fear rose to the level of a mortal fear. After being pistol-whipped and regaining control of a weapon, Parovel began to shoot because he was in fear for his life. Thus, the record supports the conclusion that the fear that prompted his lethal act arose as a result of Briscoe's pistol-whipping. These facts allow a jury to properly conclude that Briscoe's conduct was an intentional act that was likely to result in death and that prompted Parovel to kill in response. (See *People v. Gilbert, supra*, 63 Cal.2d at pp. 704-705, 47 Cal.Rptr. 909, 408 P.2d 365.)

Even if Briscoe accurately summarized the factual sequence of events, his argument fails because it incorrectly assumes only one possible cause for Parovel's lethal act. Case law establishes that there may be more than one cause prompting an act of lethal resistance-that is, more than one provocative act. (See *People v. Caldwell, supra*, 36 Cal.3d at p. 219, 203 Cal.Rptr. 433, 681 P.2d 274; *Shamis, supra*, 58 Cal.App.4th at p. 846, 68 Cal.Rptr.2d 388; see also *In re Joe R., supra*, 27 Cal.3d at pp. 507-508, 165 Cal.Rptr. 837, 612 P.2d 927; *People v. Kainzrants, supra*, 45 Cal.App.4th at pp. 1077-1078, 53 Cal.Rptr.2d 207.) The fact that Pina's taking of Parovel's weapon could have been one cause of Parovel's ultimate act of shooting Pina does not preclude the possibility that the later pistol-whipping administered by Briscoe himself was yet another provocative act resulting in Parovel's shooting of Pina.

Briscoe's argument also defies common sense because it assumes that if a relatively minor provocative act occurs causing the victim to be placed in fear, a later and more egregious act may not be considered as a provocative act that caused the victim's subsequent lethal act. We find no support in the case law for such a proposition. Later acts that do not actually provoke lethal resistance are not properly considered provocative acts, but cases that hold this are not also authority for the different proposition that later acts escalating a victim's fear and increasing the desire to resist also cannot be a proximate cause of the lethal act. (See *People v. White, supra*, 35 Cal.App.4th at p. 766, 41 Cal.Rptr.2d 510 [second act provokes response although first act does not]; see also *In re Joe R., supra*, 27 Cal.3d at p. 507, 165 Cal.Rptr. 837, 612 P.2d 927 [victim testified that he barely noticed later punch].) Logic suggests that while losing one's weapon may make one uneasy about one's safety, being repeatedly beaten about the head with a pistol would likely escalate that uneasiness into a fear that might prompt a lethal response at the first available opportunity.

A pistol-whipping is also more likely than the simple act of relieving a victim of his or her own weapon to satisfy the requirement that a provocative act be a malicious act taken in conscious disregard for life. (See *In re Joe R., supra*, 27 Cal.3d at p. 507, 165 Cal.Rptr. 837, 612 P.2d 927 [life-threatening act required].) In our case, Briscoe's pistol-whipping was also closer in time to the lethal act than

14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

the initial loss of Parovel's weapon. The pistol-whipping occurred immediately before Parovel's shooting of Pina. This suggests that Briscoe's later act was more likely to have prompted the immediate response leading to Pina's death. Parovel himself testified that he feared for his life when he was on the front lawn of his house. Once he gained control of a weapon after being pistol-whipped, he started shooting because he was in fear of his life. This evidence satisfies us that there is substantial evidence to support the jury's implied conclusion that Briscoe's life-threatening conduct provoked Parovel to commit a lethal act.

Briscoe also argues that his act of pistol-whipping Parovel could not constitute a provocative act because it was not an act beyond that inherent in the underlying crime of robbery itself. A provocative act must be one that goes beyond conduct that is inherent in the underlying felony. (*People v. White, supra*, 35 Cal.App.4th at p. 765, 41 Cal.Rptr.2d 510.) In a provocative act murder case, we review whether the defendant committed an act in furtherance of the underlying crime that was life-threatening and that went beyond those acts necessary to accomplish the underlying offense. ( Ibid. [robbery case].) It has long been established in provocative act murder cases that when the underlying offense is robbery, any conduct beyond that essential to the commission of the robbery may be a provocative act. Typically, robbery involves an oral or visual demand for money. A physical assault on the victim or an actual discharge of a weapon is not an element of the offense, but is an act beyond that necessary to complete a robbery. The beating of a robbery victim with a deadly weapon can constitute a provocative act if it was a life-threatening act. (*People v. White, supra*, 35 Cal.App.4th at pp. 766, 768, 41 Cal.Rptr.2d 510 [beating with baseball bat]; see *People v. Gallegos, supra*, 54 Cal.App.4th at p. 461, 63 Cal.Rptr.2d 382.) We are convinced that Briscoe's act of pistol-whipping Parovel could likewise be a provocative act beyond that inherent in the crime of robbery alone. Thus, we are satisfied that substantial evidence supports the jury's finding of a provocative act sufficient to satisfy the provocative act murder doctrine.

Briscoe also contends that his handling of Rozadilla did not constitute a provocative act. He argues that there was no evidence that Briscoe verbally threatened Parovel or that Parovel was sufficiently aware of Briscoe's conduct toward Rozadilla such that those acts might provoke Parovel to a lethal response. We find to the contrary, that his actions were an implied threat to harm Rozadilla if Parovel did not cooperate with Briscoe and Pina.  Briscoe placed Rozadilla in a headlock, pressed a gun to her head and took her into the bedroom where Parovel was. He held her in this manner while he and Pina demanded money of Parovel. Clearly, Briscoe used Rozadilla-then Parovel's girlfriend-as an implied hostage. A jury could properly find that he committed a provocative act when Briscoe pointed a weapon to Rozadilla's head and demanded that Parovel acquiesce to his demands. In so doing, he dramatically increased the risk to Rozadilla of injury or death by the manner in which he held her in a headlock and by the proximity of the weapon to her head. (See *People v. Kainzrants, supra*, 45 Cal.App.4th at p. 1077, 53 Cal.Rptr.2d 207.) Thus, the jury had substantial evidence to support a finding that Briscoe committed not one, but two provocative acts.

Respondent's Lodged Document 12, pp. 6-16.

While the California Court of Appeal did not recite the Supreme Court cases

15

1    pertinent to this claim, it applied the elements of the constitutional standard when it analyzed the

2    claim.  As in Early v. Packer, supra, the state court analyzed the claim using state-law principles

3    analogous to the constitutional standards.  Accordingly, the undersigned must defer to that ruling

4    unless it is objectively unreasonable.

5                When a challenge is brought alleging insufficient evidence, federal habeas corpus

6    relief is available if it is found that upon the record evidence adduced at trial, viewed in the light

7    most favorable to the prosecution, no rational trier of fact could have found "the essential

8    elements of the crime" proven beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307,

9    319, 99 S. Ct. 2781 (1979).  Jackson established a two-step inquiry for considering a challenge to

10   a conviction based on sufficiency of the evidence.  U.S. v. Nevils, No. 06-50458, 2010 WL

11   986790 at *3 (9th Cir. March 19, 2010) (en banc).  First, the court considers the evidence at trial

12   in the light most favorable to the prosecution. Id.,citing Jackson, 443 U.S. at 319, 99 S.Ct. 2781.

13   "'[W]hen faced with a record of historical facts that supports conflicting inferences," a reviewing

14   court 'must presume–even if it does not affirmatively appear in the record–that the trier of fact

15   resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" Id.,

16   quoting Jackson, 443 U.S. at 326, 99 S.Ct. 2781.

17               "Second, after viewing the evidence in the light most favorable to the prosecution,

18   a reviewing court must determine whether this evidence, so viewed is adequate to allow 'any

19   rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt.'" Id.

20   at * 4, quoting Jackson, 443 U.S. at 319, 99 S.Ct. 2781.  "At this second step, we must reverse

21   the verdict if the evidence of innocence, or lack of evidence of guilt, is such that all rational fact

22   finders would have to conclude that the evidence of guilt fails to establish every element of the

23   crime beyond a reasonable doubt."  Id.

24               Superimposed on these already stringent insufficiency standards is the AEDPA

25   requirement that even if a federal court were to initially find on its own that no reasonable jury

26   should have arrived at its conclusion, the federal court must also determine that the state

16

1  appellate court not have affirmed the verdict under the <u>Jackson</u> standard in the absence of an

2  unreasonable determination.  <u>Juan H. v. Allen</u>, 408 F.3d 1262 (9th Cir. 2005).

3        Petitioner argues that there was insufficient evidence of the three intentional

4  provocative acts identified by the prosecution: his use of a firearm to commit the burglary, his

5  holding a gun to Rozadilla in petitioner's presence, and his pistol whipping of Parovel.

6  Amended Petition, p. 31.

7        Citing <u>People v. Slaughter</u>, 27 Cal.4th 1187, 120 Cal.Rptr.2d 477 (2002),

8  petitioner argues that the mere use of a firearm to commit a burglary or robbery is not an

9  intentional provocative act.  Amended Petition, p. 32.  Petitioner cites pages 461 and 474 of the

10  reporter's transcript as evidence of the prosecutor's argument that his "mere" use of the firearm

11  constituted a provocative act. Amended Petition, p. 31.  The undersigned has reviewed the record

12  and does not find that the prosecutor argued that the mere use of a firearm constituted a

13  provocative act.  Rather, the prosecutor argued only that petitioner's holding a gun to Rozadilla's

14  head and pistol whipping Parovel constituted provocative acts:

15        And the law says, not because I say it's so, the law says that if Mr. Briscoe's
          provocative acts–and the People submit his conduct in leveraging Alisha
16        Rozadilla when he brought her in before her boyfriend with that gun to her head
          and pistol-whipping Mr. Parovel are both provocative acts–if the death of Mr.
17        Pina is as a result, was caused by that provocative act, then Mr. Briscoe is
          responsible for that conduct.
18  RT at 459.

19        The prosecutor later argued,

20        An intentional provocative act is defined as follows: The act was intentional.  The
          natural consequences of the act were dangerous to human life, and the act was
21        deliberately performed with knowledge of the danger to and with conscious
          disregard for human life.
22
          And that's what I was talking to you earlier about how they came there armed, and
23        the difference between committing that kind of conduct and why that went above
          and beyond the usual robbery, and how that evidence on Mr. Briscoe's part,
24        knowledge of the danger, conscious disregard for the human lives of people inside
          there, and especially when he menaced Miss Rozadilla with that gun.
25

26  RT at 474.

1    The prosecutor again made clear that petitioner's provocative acts were his

2  holding a gun to Rozadilla's head and pistol whipping of Parovel:

3           The conduct that he did was intentional provocative acts and those are the putting
            the gun to Miss Rozadilla's head and bringing her to where her boyfriend could
4           see her.  Ben saw that, bringing her to his presence, and then pistol-whipping Mr.
            Parovel.  And only one act is required under law.

5

6  RT at 476.

7    Accordingly, petitioner's argument that the prosecutor argued that his mere use of

8  a firearm to commit the burglary/robbery constituted a provocative act is without merit.

9    Petitioner argues that his holding of a gun to Rozadilla's head was insufficient to

10  constitute an intentional provocative act because, assuming it was done, there was no evidence

11  presented from which it could even be inferred that Parovel's decision to escape, resist and

12  ultimately shoot was responsive to anything done to Rozadilla.   Amended Petition, p. 32.

13  Petitioner also contends that his handling of Rozadilla was "essentially" out of the view of

14  Parovel.  Amended Petition, p. 32; brief on appeal.

15    The undersigned first considers petitioner's argument that Pina did not see him

16  hold a gun to Rozadilla.  At trial, Parovel testified that when he was in the bedroom with Pina,

17  petitioner entered the bedroom with Rozadilla.  RT at 100.  Parovel testified that at that time,

18  petitioner had his gun pointed at Rozadilla.  RT at 100.  Parovel testified that when he and Pina

19  left the bedroom, petitioner followed with his gun still pointed at Rozadilla.  RT at 103.  Parovel

20  then walked to the front door and tried to take a step out because he was fearful for his life.  RT

21  at 104.

22    Parovel's testimony regarding when he saw petitioner with the gun to Rozadilla's

23  head is consistent with Rozadilla's testimony regarding this matter.  Rozadilla testified that

24  petitioner put her in a headlock and put the gun to her head while they were in the living room

25  and Parovel and Pina were in the bedroom.  RT at 68-70.  Petitioner then walked her into the

26  bedroom with the gun still to her head.  RT at 72.  When Parovel and Pina left the bedroom,

18

petitioner released her from the headlock but kept the gun pointed at her.  RT at 75-76.

Parovel's testimony clearly demonstrates that he saw petitioner holding the gun to Rozadilla.  Petitioner argues that Parovel did not testify that he saw petitioner holding Rozadilla in a headlock with a gun pointed at her head while they were all in the bedroom.  While Parovel did not testify that he saw Rozadilla in a headlock with the gun pointed at her head, he did not testify that this did not occur.  Rather, he was not specifically asked whether she was in a headlock with the gun pointed at her head.  His testimony that he saw her in the bedroom and as they left the bedroom with the gun pointed at her is not inconsistent with her testimony.  It was not unreasonable for the jury to infer that Parovel saw petitioner pointing the gun at Rozadilla's head.

In the reply, petitioner argues that in an interview with Detective Hamer, Parovel stated that he did not know what petitioner was doing to Rozadilla.  A copy of the transcript from this interview is attached as exhibit C to the amended petition.  In considering a claim for insufficiency of the evidence, a court considers only evidence that was presented to the jury.  See McDaniel v. Brown, ___ U.S. ___, 130 S.Ct. 665, 671-672 (2010).  The jury did not see this interview nor did they review the transcript.  In any event, petitioner has taken Parovel's statements during the interview out of context.  Parovel stated as follows:

> Parovel: So, I said, the money's in here, I'll get it for you, you don't have to worry about it so we go back to the room, not the master bedroom but the on the left hand side and I go in the drawer and get him like $2000 in cash I just got a settlement from pop's death from asbestos.  He died four years ago and I had inherited and I was running my mouth and, that's how it all started.

> Detective: What was Chris doing when Sean did that?

> Parovel: I don't know.  I don't know what he was doing to my girl, I was just focused on the gun and I was in the living room and he was in the back room where the money's at, where's the money at.  The gun is still on the bed Jason's, it's a 9mm Beretta, it's still on the bed at this point.  I don't grab it or nothing.  I'm in the back room and Chris brings my girlfriend in the room, we're all four in the room.  He's like "Where's the rest of it?  Where's the rest of it?" I said, "Oh, this way." I was going out the front door and he grabbed by my neck like this and pulled me back in, so I seen the gun, I grabbed it, we wrestled and I fall down the he's hitting me so many times with the gun that the clip falls out of the gun with

1       the beam. The clip falls out.

2  Amended Petition, Exhibit C, p. 7.

3          Clearly, when Parovel stated that he did not know what petitioner was doing to

4  Rozadilla he was referring to when he and Pina first went into the bedroom.  Parovel went on to

5  state that petitioner and Rozadilla went into the bedroom with him and Pina, which is consistent

6  with his trial testimony.  Later in this statement, Parovel stated that he saw petitioner holding the

7  gun to Rozadilla's face.  Amended Petition, Exhibit C, p. 29.  Petitioner's reliance on this

8  statement in support of his insufficient evidence claim is misplaced.

9          The undersigned next considers petitioner's argument that petitioner's handling of

10  Rozadilla was not a sufficient provocative act because there was no evidence presented from

11  which it could even be inferred that Parovel's decision to escape, resist and ultimately shoot was

12  responsive to anything done to Rozadilla.  Amended Petition, p. 33.  The undersigned agrees

13  with the California Court of Appeal regarding this issue.  The state appellate court found that

14  petitioner's actions were an implied threat to hurt Rozadilla if petitioner did not cooperate with

15  him and Pina.  "A jury could properly find that he committed a provocative act when [petitioner]

16  pointed a weapon to Rozadilla's head and demanded that Parovel acquiesce to his demands.  In

17  doing so, he dramatically increased the risk to Rozadilla of injury or death by the manner in

18  which he held her in a headlock and by the proximity of the weapon to her head."  Respondent's

19  Lodged Document 12, p. 16.

20          Petitioner's main argument seems to be that Parovel did not testify that he was

21  afraid of what they would do to Rozadilla.  Rather, Parovel's testimony was that he was afraid of

22  what petitioner and Pina would do to him.  Parovel testified that after he left the bedroom, he

23  tried to walk out of his apartment because he was afraid.  RT at 104.  Parovel testified that he

24  wanted to get out "[b]ecause they had guns, and I was just fearful for my life basically."  RT at

25  104.

26          While petitioner did not directly testify that he was concerned for Rozadilla, a

20

reasonable jury could have inferred from his testimony and the circumstances that he was afraid that petitioner and Pina would further injure or kill Rozadilla.  In addition, although not discussed by the California Court of Appeal, the holding of the gun to Rozadilla obviously contributed to Parovel's fear for his *own* safety.  A reasonable jury could have inferred that Parovel was afraid that petitioner would shoot him based on his pointing of the weapon at Rozadilla.

Petitioner next argues that the pistol-whipping conduct was insufficient to constitute a provocative act, assuming Parovel was subject to such conduct and that it was inflicted by petitioner and not Pina, because there was no link between that conduct and Parovel's decision to resist and kill.  Amended Petition, p. 33.  In his state appeal, petitioner further argued that the pistol-whipping incident was overblown as shown by Parovel's insignificant injuries.  In his state appeal, petitioner also argued that the evidence demonstrated that Parovel shot at him and Pina out of anger and a desire to be rid of them rather than out of fear.

The undersigned first considers petitioner's argument that there was insufficient evidence that petitioner pistol-whipped Parovel.  Parovel testified that as he tried to walk out, Pina grabbed him and they fell to the ground.  RT at 104.  As he and Pina struggled on the floor, petitioner came up and started pistol-whipping him.  RT at 106.  Parovel testified that petitioner hit him on the head four or five times.  RT at 106.  Based on this testimony, the undersigned finds that there was sufficient evidence on which a reasonable jury could base a finding that petitioner pistol-whipped Parovel.

Petitioner also suggests that petitioner actually pistol-whipped Pina because his head injuries were much more severe than Parovel's minor injuries.  However, the doctor who performed Pina's autopsy testified that his facial injury was a "very discrete linear injury, and I would doubt that the butt of the gun would cause something like that." RT at 212.  Based on this testimony, a reasonable jury could have rejected the argument that petitioner actually pistol

1   whipped Pina and not Parovel.   For these reasons, the undersigned rejects petitioner's argument

2   that there was insufficient evidence of the pistol-whipping.

3          Petitioner argues that there was insufficient evidence that the pistol-whipping

4   caused Parovel to shoot Pina.  Petitioner argues that petitioner shot Pina because he was angry at

5   them for stealing his money rather than because he was in fear for his life.

6          Parovel testified that when he got outside and got the gun, he began shooting

7   because "I was in fear of my life."  RT at 111.  On cross-examination, Parovel testified that he

8   was glad to "get rid of those guys" and that he was angry because they had tried to take his

9   money.  RT at 140-141.  Based on this testimony, a reasonable jury could have found that

10  Parovel shot Pina because he was in fear for his life.  While it is not surprising that Pina felt

11  anger toward petitioner and Pina, especially at the time of trial when time had passed to reflect on

12  the incident, the testimony demonstrates that at the time he fired the shots at Pina, he felt in fear

13  for his life.

14         Petitioner also argues that Parovel did not shoot in response to any act by

15  petitioner because he testified that the decision to shoot was made "spur of the moment."

16  Parovel testified that when he got the gun, he did not have a plan in his mind.  RT at 148.  He

17  testified that when he got the gun, he just started shooting.  Id.  Petitioner's argument ignores the

18  evidence that led Parovel to shoot in the first place, evidence which included petitioner's

19  provocative acts, which could well have formed the basis for any spur of the moment decision.

20  The argument that petitioner's provocative acts did not cause Parovel to shoot because he made

21  the decision "spur of the moment" is without merit.

22         On appeal, petitioner also argued that Parovel's fear for his life arose before the

23  pistol-whipping occurred, when Pina took his weapon while the two men were still in the

24  bedroom.  Petitioner argues that this act of taking his weapon was the act that provoked Parovel

25  to shoot.  The undersigned agrees with the California Court of Appeal regarding this issue.  The

26  state appellate court observed that there may be more than one provocative act.  Respondent's

22

1   Lodged Document 12, p. 14.  "The fact that Pina's taking of Parovel's weapon could have been

2   one cause of Parovel's ultimate act of shooting Pina does not preclude the possibility that the

3   later pistol-whipping administered by Briscoe himself was yet another provocative act resulting

4   in Parovel's shooting of Pina."  Id.  "Logic suggests that while losing one's weapon may make

5   one uneasy about one's safety, being repeatedly beaten about the head with a pistol would likely

6   escalate that uneasiness into a fear that might prompt a lethal response at the first available

7   opportunity."  Id.

8           On appeal, petitioner also argued that the act of pistol-whipping could not

9   constitute a provocative act because it was not an act beyond that inherent in the underlying

10   crime of robbery.  For the reasons found by the California Court of Appeal, this argument is

11   without merit:

12           A physical assault on the victim or an actual discharge of a weapon is not an
             element of the offense, but is an act beyond that necessary to complete a robbery.
13           The beating of a robbery victim with a deadly weapon can constitute a provocative
             act if it was a life-threatening act. (*People v. White, supra*, 35 Cal.App.4th at pp.
14           766, 768, 41 Cal.Rptr.2d 510 [beating with baseball bat]; see *People v. Gallegos,
             supra*, 54 Cal.App.4th at p. 461, 63 Cal.Rptr.2d 382.) We are convinced that
15           Briscoe's act of pistol-whipping Parovel could likewise be a provocative act
             beyond that inherent in the crime of robbery alone.

16

17   Respondent's Lodged Document 12, p. 15.

18           In the reply to the answer, petitioner argues that when Parovel was interviewed by

19   Detective Hamers shortly after the shooting, he did not describe a desire to protect Rozadilla,

20   rage over petitioner's handling of her, or a fear of his life that was tied to the pistol-whipping that

21   motivated him to shoot Pina.  Petitioner argues that during this interview, Parovel states that he

22   shot Pina because he was angry about the robbery of his money.  Petitioner cites pages 8 and 9 of

23   his exhibit C attached to the amended petition in support of this argument which is the transcript

24   from this interview.  This argument is flawed because in reviewing a sufficiency of the evidence

25   claim, the court reviews the evidence before the jury.  As discussed above, the transcript from

26   this interview was not admitted into evidence and nor was Parovel questioned about the specific

1   statements cited by petitioner.

2   In any event, the undersigned has reviewed Parovel's statements during the
3   interview and finds that they are consistent with his trial testimony.  After describing the events
4   leading up to the shooting, Parovel stated, "And I turned around and I just, I just started, I was in
5   fear for my life and I just started shooting."  Amended Petition, Exhibit C, p. 8. Later, in a
6   response to a question regarding how his father died, Parovel stated, "Asbestos cancer.  He died
7   for that money so I figured I would do the same.  I was going to die.  It was stupid."  Id., p. 20.
8   The statement that he was going to die for the money does not undermine his statement in the
9   interview and trial testimony that he fired the gun because he was scared for his life.

10   In the reply, petitioner also argues that the opinion of the California Court of
11   Appeal is fatally flawed because it concedes that Pina's act of robbing Parovel at gun point was
12   one of the acts that likely prompted Parovel to use deadly force.  Citing the opinion at page 14,
13   petitioner argues that the state appellate court thus incorrectly found that petitioner could be
14   vicariously liable for Pina's murder even though the murder was provoked by Pina.

15   The undersigned has reviewed page 14 of the state appellate court opinion and
16   finds that petitioner has taken the opinion out of context.  The California Court of Appeal stated,
17   "[t]he fact that Pina's taking of Parovel's weapon could have been *one* cause of Parovel's
18   ultimate act of shooting Pina does not preclude the possibility that the later pistol whipping
19   administered by Briscoe himself was yet *another* provocative act resulting in Parovel's shooting
20   of Pina."  Respondent's Lodged Document 12, p. 14 (emphasis in original).  In this statement, the
21   California Court of Appeal was clearly *not* suggesting that petitioner could be vicariously liable
22   for Pinas's murder based on Pinas's taking of Parovel's weapon.  Rather, the California Court of
23   Appeal was stating that Pina's taking of the weapon did not preclude the possibility that
24   petitioner's later acts prompted Parovel's shooting of Pina.

25   Petitioner next argues that there was insufficient evidence to support the special
26   circumstance finding.  Amended Petition, p. 32.  In particular, petitioner argues that the special

1    circumstances on which his sentence of life without parole are based do not apply in this case.

2    The California Court of Appeal denied this claim for the following reasons:

3            F. Statutory Special Circumstances

4            1. Not Felony Murder

5            Briscoe also contends that two special circumstances set forth in former section
        190.2 do not apply to his case. (See former § 190.2.) First, he argues that the
6        felony-murder special circumstances codified in subdivision (a) (17) FN14 of
        former section 190.2 does not apply to a provocative act murder case as a matter
7        of law. Noting that the United States and California Supreme Courts have referred
        to former section 190.2, subdivision (a)(17) as a "felony-murder statute" and that
8        the felony-murder doctrine does not apply in a case of provocative act murder,
        Briscoe argues that felony-murder statutes such as former section 190.2,
9        subdivisions (a)(17) and (d) FN15 cannot apply in his case. (See *People v.*
        *Washington, supra,* 62 Cal.2d at p. 781, 44 Cal.Rptr. 442, 402 P.2d 130 [no felony
10       murder in provocative act murder case].)

11           FN14. This statute provided, in pertinent part, that the "penalty for a defendant
        who is found guilty of murder in the first degree is death or imprisonment in the
12       state prison for life without the possibility of parole if one or more of the
        following special circumstances has been found ... to be true: [¶] ... [¶] (17) The
13       murder was committed while the defendant was engaged in, or was an accomplice
        in, the commission of, attempted commission of, or the immediate flight after
14       committing, or attempting to commit ...:[¶] (A) Robbery in violation of Section
        211 or 212.5. [¶] ... [¶] (G) Burglary in the first or second degree in violation of
15       Section 460." (Former § 190.2, subd. (a)(17)(A), (G), as amended by Stats.1995,
        ch. 478, § 2.)
16
        FN15. At the time of the offenses committed in this matter, this provision stated
17       in part that "every person, not the actual killer, who, with reckless indifference to
        human life and as a major participant, aids, abets, counsels, commands, induces,
18       solicits, requests, or assists in the commission of a felony enumerated in
        paragraph (17) of subdivision (a) which results in the death of some person or
19       persons, and who is found guilty of murder in the first degree therefor, shall be
        punished by death or imprisonment in the state prison for life without the
20       possibility of parole if a special circumstance enumerated in paragraph (17) of
        subdivision (a) has been found to be true...." (See former § 190.2, subd. (d), as
21       amended by Stats.1995, ch. 478, § 2.)

22           We disagree with Briscoe's argument. Regardless of how subdivisions (a)(17) and
        (d) of former section 190.2 have been characterized in cases arising in
23       nonprovocative act murder cases, the purpose of these statutes is to impose
        criminal liability on a defendant who commits an enumerated felony that results in
24       the death of another. The California Supreme Court has held that limitations
        placed on the felony-murder doctrine do not shield a defendant from criminal
25       liability for murder when the elements of the crime-homicide and malicious
        conduct-can be established without resort to the felony-murder doctrine. When a
26       defendant, with a conscious disregard for life, intentionally commits an act that is

                                            25

likely to cause death, and a victim kills in response to such act, the defendant is guilty of murder. (*People v. Antick, supra,* 15 Cal.3d at pp. 87-88, 123 Cal.Rptr. 475, 539 P.2d 43.) The reasoning in Antick is similar to section 190.2, subdivisions (a)(17) and (d), in that they seek to impose liability on a defendant who provoked a lethal response.

The language of the challenged statutes do not support this claim of error, either. Subdivision (a)(17) of former section 190.2 did not limit the special circumstances it described to homicides found to have been committed based on the theory of felony murder. It required only that the murder be committed while the defendant was committing a specified felony.  (*People v. Kainzrants, supra*, 45 Cal.App.4th at p. 1081, 53 Cal.Rptr.2d 207; see fn. 14, ante.) The fact that the defendant is convicted of murder under the application of the provocative act murder doctrine rather than pursuant to the felony-murder doctrine is irrelevant to the question of whether the murder qualified as a special-circumstances murder under former section 190.2, subdivision (a)(17). ( *Id.* at p. 1081, 53 Cal.Rptr.2d 207 [death of accomplice].) The statute requires only that the murder be committed while the defendant was engaged in the commission of an enumerated felony. ( Ibid.) Similarly, the language of subdivision (d) of former section 190.2 was not limited to felony-murder cases. (See fn. 15, ante.) It required an act committed in reckless indifference to life during the commission of a felony. (See former § 190.2, subd. (d).)

2. Cooperative Relationship

Briscoe also asserts that former section 190.2, subdivision (d) does not apply because there was no cooperative relationship between the defendant and the actual killer. Former section 190.2, subdivision (d) punishes a major participant who acts with reckless disregard for life and who inter alia aids, abets, or assists in the commission of a statutorily enumerated felony when that felony results in death. (See fn. 15, ante.) A plain reading of the language of the statute shows that the cooperative relationship required by subdivision (d) must occur in the commission of the felony, not in the killing. As Briscoe assisted in the commission of the robbery and the burglary, former section 190.2, subdivision (d) applies to this case.

3. Causation

Briscoe also contends that subdivision (d) of former section 190.2 does not apply because that provision requires the killing to result from the felony and the provocative act murder doctrine requires the killing to result from an act beyond the underlying felony. This claim of error ignores the fact that there can be more than one proximate cause of a killing. (See *People v. Caldwell, supra*, 36 Cal.3d at pp. 219-220, 203 Cal.Rptr. 433, 681 P.2d 274; *Shamis, supra*, 58 Cal.App.4th at p. 846, 68 Cal.Rptr.2d 388.) The jury was instructed that there could be more than one cause of death and that it could not find the special circumstances allegation to be true unless it found that Briscoe's commission of a felony with reckless indifference to life resulted in Pina's death. (See CALJIC Nos. 3.41, 8.80.1 (1997 rev.).) On these facts, the jury could have concluded that Parovel shot Pina as a response to both the robbery and burglary and the provocative acts that Briscoe committed.

26

1          4. Taking of Innocent Life

2           Finally, Briscoe argues that subdivisions (a)(17) and (d) of former section 190.2
do not apply in his case because Pina's death did not result in the taking of an
3          innocent life. He reasons that because the United States Supreme Court referred to
innocent life twice in its Tison decision, that the murder victim's innocence is a
4          required element for the constitutional application of felony-murder statutes. (See
_Tison v. Arizona_ (1987) 481 U.S. 137, 152, 154, 107 S.Ct. 1676, 95 L.Ed.2d 127.)
5          We disagree with this reasoning. The high court did not use this term when it set
out the issue in Tison, nor in its holding. Answering the question whether the
6          Eighth Amendment prohibited the imposition of the death penalty on a major
participant in a crime whose mental state was one of reckless indifference to the
7          value of human life, the court held that these two elements established culpability
sufficient to constitute a capital crime. (See id. at pp. 152, 158, 107 S.Ct. 1676.)
8          We are satisfied that the United States Supreme Court's use of the term innocent
life elsewhere in its decision was incidental and does not limit its holding. Thus,
9          Briscoe's claim of error is meritless.

10   Respondent's Lodged Document 12, pp. 26-29.

11          Because the California Court of Appeal applied the relevant constitutional

12   standards, the undersigned must defer to this ruling unless it is objectively unreasonable.

13          Respondent argues, and the undersigned agrees, that petitioner's claim alleging

14   insufficient evidence of the special circumstance is really a claim arguing that the California

15   Court of Appeal misinterpreted state law.  Generally, issues of state law are not cognizable on

16   federal habeas.  Estelle v. McGuire, 502 U.S. 62, 67, (1991) ("We have stated many times that

17   'federal habeas corpus relief does not lie for errors of state law.' "), quoting Lewis v. Jeffers, 497

18   U.S. 764, 780 (1990).

19          Moreover, the California Court of Appeal ruled that the special circumstance

20   allegation used in this case was entirely correct under state law.  Federal courts are bound by state

21   court rulings on questions of state law.  Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir.

22   1989).  State courts are "the ultimate expositors of state law," and this court is "bound by the

23   state's construction except when it appears that its interpretation is an obvious subterfuge to

24   evade the consideration of a federal issue." Peltier v. Wright, 15 F.3d 860, 862 (1994), quoting

25   Mullaney v. Wilbur, 421 U.S. 684, 691, 95 S.Ct. 1881 (1975) (construing state court judgment).

26   There is no evidence of subterfuge here.

1        A "claim of error based upon a right not specifically guaranteed by the

2   Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so

3   infects the entire trial that the resulting conviction violates the defendant's right to due process."

4   Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir.1981), citing Quigg v. Crist, 616 F.2d 1107 (9th

5   Cir. 1980).  In order to raise such a claim in a federal habeas corpus petition, the "error alleged

6   must have resulted in a complete miscarriage of justice."  Hill v. United States, 368 U.S. 424,

7   428, 82 S.Ct. 468 (1962). The undesigned finds no such error here.

8        Petitioner also argues that pursuant to Tison v. Arizona, 481 U.S. 137, 107 S.Ct.

9   1676 (1987), interpreting Cal. Penal Code § 190.2(a)(17) to permit death eligibility for a felon

10  for the killing of his cofelon by a third party is unconstitutional.  On appeal, petitioner argued

11  that the death penalty may only be imposed where there is a loss of innocent life because the

12  Supreme Court used that term twice in Tison.  The undersigned finds that the denial of this claim

13  by the California Court of Appeal was not an unreasonable application of clearly established

14  Supreme Court authority.  In any event, as noted by respondent, Tison does not apply because the

15  district attorney did not seek the death penalty in petitioner's case.

16       The denial of these claims by the California Court of Appeal was not an

17  unreasonable application of clearly established Supreme Court authority.  Accordingly, these

18  claims should be denied.

19              B.  Claim 2: Jury Instruction Error

20              *Legal Standard*

21       A challenge to jury instructions does not generally state a federal constitutional

22  claim.  See Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983); see also Middleton v.

23  Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985).  Habeas corpus is unavailable for alleged error in the

24  interpretation or application of state law.  Estelle v. McGuire, 502 U.S. 62, 112 S. Ct. 475

25  (1981); see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786

26  F.2d 1378, 1381 (9th Cir. 1986).  The standard of review for a federal habeas court "is limited to

1  deciding whether a conviction violated the Constitution, laws, or treaties of the United States

2  (citations omitted)." Estelle v. McGuire, 502 U.S. at 68, 112 S. Ct. at 480.  In order for error in

3  the state trial proceedings to reach the level of a due process violation, the error had to be one

4  involving "fundamental fairness." Id. at 73, 112 S. Ct. at 482.  The Supreme Court has defined

5  the category of infractions that violate fundamental fairness very narrowly. Id. at 73, 112 S. Ct.

6  at 482.

7          Where the issue is the failure to give an instruction, petitioner's burden is

8  "especially heavy" because it has been held that "[a]n omission or an incomplete instruction is

9  less likely to be prejudicial than a misstatement of the law." Henderson v. Kibbe, 431 U.S. 145,

10  155, 97 S. Ct. 1730, 1737 (1977).  Moreover, a trial judge need not instruct on a defense which

11  would be inconsistent with petitioner's theory of the case.  Bashor v. Risley, 730 F.2d 1228, 1240

12  (9th Cir. 1984).  Failure to give a jury instruction under these circumstances will not amount to a

13  due process violation.  Id.

14          Furthermore, the Supreme Court has recently held that there is no unreasonable

15  application of federal law where a state appellate court decided that a jury instruction's single

16  incorrect statement of the "imperfect self-defense" standard did not render the instruction

17  reasonably likely to have misled the jury.  Middleton v. McNeil, 541 U.S. 433, 124 S. Ct. 1830

18  (2004).

19          *Supplemental Instruction*

20          Petitioner first argues that the trial court did not properly respond to the jury's

21  inquiry regarding whether robbery at gunpoint is a provocative act.  Amended Petition, p. 35.

22  The California Court of Appeal denied this claim for the following reasons:

23          C. Robbery at Gunpoint as Provocative Act

24          Next, Briscoe contends that the trial court erred by failing to properly respond to
          the jury's inquiry about whether robbery at gunpoint is-in and of itself-a

25          provocative act. He argues that the answer is clearly "no," but that the trial court
          failed to instruct the jury so. As such, Briscoe reasons that the trial court abdicated

26          its statutory duty to advise the deliberating jury on a point of law, violating his

state and federal constitutional rights to due process and a fair trial when it refused to instruct the jury that robbery at gunpoint in and of itself did not constitute a provocative act. (See § 1138; see also U.S. Const., 6th Amend.)

During deliberations, the jury sought clarification from the trial court about whether a robbery at gunpoint constituted a provocative act in and of itself. The prosecutor argued that the jury should be told that robbery at gunpoint did constitute a provocative act in and of itself. Defense counsel argued that the jury's question was one of law to be answered in the negative, because the provocative act must be an act beyond the robbery itself. The trial court viewed the jury's inquiry as a factual question turning on the circumstances of each case. It noted that the underlying offense was robbery, not robbery at gunpoint. The trial court reasoned that if robbery could be committed without a gun, then the use of a gun might constitute the provocative act beyond that required to commit the underlying robbery in an appropriate case. Ultimately, the trial court told the jury that this was a factual determination for it to make and suggested that it review CALJIC No. 8.12 defining a provocative act.FN8 In his motion for new trial, Briscoe argued that the trial court's response to this jury question was erroneous and that its reference to CALJIC No. 8.12 FN9 exacerbated the error. The motion for new trial was denied.

FN8. The jury was instructed that in order to prove the killing was the result of Briscoe's provocative act, "each of the following elements must be proved: [¶] One, the crime of robbery and/or burglary or attempted robbery and/or burglary was committed; [¶] Two, during the commission of the crime, the defendant also committed an intentional provocative act; [¶] Three, the victim of the robbery and/or burglary in response to the provocative act killed a perpetrator of such crime; [and][¶] Four, the defendant's commission of the intentional provocative act was a cause of the death of Shaun Pina." (See CALJIC No. 8.12.)

FN9. We note that Briscoe originally requested that this jury instruction be given.

 When the jury asks to be informed on any point of law arising out of the case, the trial court has a duty to help the jurors understand the legal principles that it is being asked to apply. (*People v. Beardslee* (1991) 53 Cal.3d 68, 97, 279 Cal.Rptr. 276, 806 P.2d 1311, cert. den. 502 U.S. 972, 112 S.Ct. 449, 116 L.Ed.2d 467; see § 1138.) The satisfaction of this obligation does not always require the trial court to elaborate on standard jury instructions already given. When the instructions were full and complete, the trial court has the discretion to determine what additional explanations are sufficient to satisfy the jury's request for information. Comments that diverge from the standard jury instruction are often risky to undertake. (*People v. Beardslee, supra*, 53 Cal.3d at p. 97, 279 Cal.Rptr. 276, 806 P.2d 1311.) In this case, we must determine whether the trial court abused its discretion by reiterating the standard jury instructions as it did. (See, e.g., *People v. Noguera* (1992) 4 Cal.4th 599, 643, 15 Cal.Rptr.2d 400, 842 P.2d 1160, cert. den. 512 U.S. 1253, 114 S.Ct. 2780, 129 L.Ed.2d 892.)

Briscoe argues that the trial court's response was inadequate because it did not treat the jury's inquiry as a simple question of law clearly warranting a negative response. We disagree first with his interpretation that the inquiry was a question of law. (See § 1138 [trial court must assist jury on point of law].) The crime of

1    robbery is a felonious taking of personal property accomplished by means of force
     or fear. (See § 211.) This offense can be committed without necessarily using a
2    gun. (See *People v. White, supra*, 35 Cal.App.4th at p. 766, 41 Cal.Rptr.2d 510
     [robbery may consist of only oral or visual demands accompanied by a threat of
3    force].) For example, a robber may use a different type of weapon or convey a
     sense of bodily intimidation in order to create a sense of fear or force. If anything,
4    this analysis suggests-contrary to Briscoe's position–that the trial court could have
     responded to the jury's inquiry by telling the jurors that robbery at gunpoint is in
5    and of itself a provocative act.

6    However, we think that the issue posed was properly characterized as a question
     of fact and that the trial court was prudent to respond to the jury's inquiry as it did.
7    In the real world, robbery at gunpoint may or may not be a provocative act,
     depending on the degree to which the perpetrator uses the gun. One who robs
8    another while doing no more than holding a weapon may not have committed a
     provocative act, while a perpetrator who brandishes a deadly weapon, puts it to
9    the head of a robbery victim, cocks the gun or pistol-whips the victim with it may
     have. Thus, the inquiry was one that turned, at least in part, on the particular facts
10   of the case. In this case, the trial court declined to decide the factual issue before
     the jury, advising it instead of its obligation to perform this task and reminding it
11   of the guidance already set forth in CALJIC No. 8.12 defining a provocative act as
     an act beyond that necessarily involved in a robbery. We are satisfied that the trial
12   court did not abuse its discretion in responding as it did. (See *People v. Noguera,
     supra*, 4 Cal.4th at p. 643, 15 Cal.Rptr.2d 400, 842 P.2d 1160.) Thus, the trial
13   court acted within the authority granted to it by section 1138.FN10

14   FN10. In light of this conclusion, we need not address Briscoe's additional claim
     that the trial court violated his rights to due process and a fair trial by violating
15   section 1138.

16   Respondent's Lodged Document 12, pp. 16-19.

17           While the California Court of Appeal did not recite the Supreme Court cases

18   pertinent to this claim, it applied the elements of the constitutional standard when it analyzed the

19   claim.  As in <u>Early v. Packer</u>, <u>supra</u>, the state court analyzed the claim using state-law principles

20   analogous to the constitutional standards.  Accordingly, the undersigned must defer to that ruling

21   unless it is objectively unreasonable.

22           Under federal law, supplemental jury instructions and responses to jury inquiries

23   do not rise to the level of a constitutional violation unless those erroneous instructions "so infect

24   [ ] the entire trial that the resulting conviction violates due process."  <u>Estelle v. McGuire</u>, 502

25   U.S. 62, 72, 112 S.Ct. 475 (1991);  <u>Beardslee v. Woodford</u>, 358 F.3d 560, 573-74 (9th Cir.2004).

26   Although a trial judge is obligated to clear up any confusion the jury may have, the judge has

1    broad discretion in determining how to do so.  Arizona v. Johnson, 351 F.3d 988, 994 (9th

2    Cir.2003). The judge must be cautious in balancing his interest in providing a clear response with

3    his responsibility to avoid influencing the jury.  Id.

4            The California Court of Appeal correctly found that the question posed by the jury

5    raised an issue of fact.  Whether robbery at gunpoint is a provocative act depends on the how the

6    perpetrator uses the gun, i.e., the circumstances of the gun wielding.  For that reason, the trial

7    court's response to the jury's inquiry that this was a factual determination for it to make and

8    suggested that it review CALJIC No. 8.12 defining a provocative act was appropriate.  This

9    response did not violate fundamental fairness.  The denial of this claim by the California Court of

10   Appeal was not an unreasonable application of clearly established Supreme Court authority.

11   Accordingly, this claim should be denied.

12                    *Failure to Instruct Re: Use of Lethal Force*

13            Petitioner argues that the trial court failed to properly instruct the jury concerning

14   the requirement that the use of lethal force must be a reasonable response to the provocative

15   conduct of the accused under the provocative act murder doctrine.  Amended Petition, p. 36.  The

16   California Court of Appeal denied this claim for the following reasons:

17              Next, Briscoe argues that CALJIC No. 8.12 FN13–given by the trial court–
                neglected to inform the jury that for the provocative act murder doctrine to apply,
18              Parovel's killing of Pina had to be a reasonable response to Briscoe's provocative
                act. He contends that in cases other than those involving hostages and human
19              shields, the provocative act murder doctrine requires that the responsive act
                resulting in death be a subjectively reasonable response to the provocative act. He
20              also urges us to conclude that the trial court had a sua sponte duty to so instruct
                the jury. At trial, Briscoe himself requested that this standard jury instruction be
21              given, arguing that this be read to the jury instead of CALJIC No. 8.21 on felony
                murder. The People sought both instructions. The trial court reviewed both
22              instructions and concluded that only CALJIC No. 8.12 on provocative act murder
                should be given. Briscoe did not seek to modify the standard jury instruction in
23              the trial court. The jury was instructed that the killing had to be in response to
                Briscoe's provocative act, but not that Parovel's response had to be reasonable.
24
                FN13. The jury was instructed that a "homicide committed during the commission
25              of a crime by a person who is not a perpetrator of such crime, in response to an
                intentional provocative act by a perpetrator of the crime other than the deceased
26              [perpetrator], is considered in law to be an unlawful killing by the surviving

1    perpetrator[s] of the crime." (CALJIC No. 8.12, italics added.)

2        In essence, Briscoe argues that the trial court had a sua sponte duty to modify the
3    standard jury instruction, which did not include the "reasonable response"
     language he now seeks. One of the seminal cases on the doctrine of provocative
4    act murder included language suggesting that the victim's response to the
     defendant's conduct must be reasonable. (See *People v. Gilbert, supra*, 63 Cal.2d
5    at p. 704, 47 Cal.Rptr. 909, 408 P.2d 365.) However, the California Supreme
     Court has since returned the focus to the objective facts surrounding the
6    defendant's provocative act rather than centering the doctrine's applicability on the
     question of whether the victim's response to that act was subjectively reasonable.
7    (See, e.g., *Pizano v. Superior Court, supra*, 21 Cal.3d at p. 136, 145 Cal.Rptr.
     524, 577 P.2d 659; *People v. Gardner, supra*, 37 Cal.App.4th at pp. 478-479, 43
8    Cal.Rptr.2d 603.) Now, courts use the term "reasonable response" as a shorthand
     expression of the principle that the killing must-on an objective view of the
9    facts-be proximately caused by the defendant's acts. (See *People v. Gardner,
     supra*, 37 Cal.App.4th at pp. 478-479, 43 Cal.Rptr.2d 603; see also *Pizano v.
10   Superior Court, supra*, 21 Cal.3d at pp. 137-139, 145 Cal.Rptr. 524, 577 P.2d
     659.) This objective approach allows the jury to find culpability-and to imply
11   malice-based on the defendant's conduct, not on the crime victim's state of mind.
     (See *Pizano v. Superior Court, supra*, 21 Cal.3d at p. 137, 145 Cal.Rptr. 524, 577
12   P.2d 659.)

13       CALJIC No. 8.12 is the standard jury instruction on vicarious liability for a killing
     resulting from the acts of another. (See *People v. Gardner, supra*, 37 Cal.App.4th
14   at pp. 480-481, 43 Cal.Rptr.2d 603.) At one time, this standard instruction
     included the "reasonable response" language that Briscoe contends that the trial
15   court should have added back in. (See *id.* at p. 480, 43 Cal.Rptr.2d 603.) Since
     that time, the word "reasonable" has been deleted from CALJIC No. 8.12. (See *id.*
16   at p. 481, 43 Cal.Rptr.2d 603 [urging this change].) The language of the standard
     jury instruction properly rejects the wording that Briscoe urges. Thus, we
17   conclude that the trial court had no sua sponte duty to add it.

18   Respondent's Lodged Document 12, pp. 21-23.

19       The court agrees with respondent that petitioner's claim is based on an

20   interpretation of state law only, specifically whether the doctrine of provocative act murder

21   requires that the victim's response to the defendant's conduct be reasonable.  Citing Pizano v.

22   Superior Court, 21 Cal.3d 128, 136, 145 Cal.Rptr.524 (1978), the California Court of Appeal

23   found that the California Supreme Court has returned the focus to the objective facts surrounding

24   the defendant's provocative act rather than centering the doctrine's applicability on the question

25   of whether the victim's response to that act was subjectively reasonable.  Thus, the challenged

26   instruction did not violate state law.

33

1    Petitioner's argument that the jury instruction should have included the language

2  regarding subjective reasonability is a dispute with the California Court of Appeal's

3  interpretation of state law.  The jury instruction did not violate fundamental fairness, see Estelle

4  v. McGuire, 502 U.S. at 72, and nor does the undersigned find the California Court of Appeal's

5  interpretation of state law do be a subterfuge to evade the consideration of the federal issue.

6    The denial of this claim by the California Court of Appeal was not an

7  unreasonable application of clearly established Supreme Court authority.  Accordingly, this claim

8  should be denied.

9    C.  Claim 3: Jury Instruction re: Unanimity

10    Petitioner argues that the trial court erroneously instructed the jury concerning the

11  need for unanimity.  Amended Petition, p. 38.  The California Court of Appeal denied this claim

12  for the following reasons:

13    First, he contends that the trial court erred by informing the jury that unanimity
      was not required about which intentional provocative act that he committed
14    triggered liability for murder. He argues that a unanimity instruction was
      compelled under both the state and federal Constitutions. (See U.S. Const., 14th
15    Amend.; Cal. Const., art. I, § 16.)

16    At trial, the People argued that two acts could constitute the required provocative
      act in this case-the handling of Rozadilla and the pistol-whipping of Parovel.
17    During deliberations, the jury asked the trial court if all the jurors had to agree
      about which act constituted the provocative act that caused Pina's death. The
18    People argued that unanimity was not required. Briscoe's attorney argued that the
      jury had to agree beyond a reasonable doubt on which act was the provocative act.
19    She also sought a reference to CALJIC No. 8.12. The trial court advised the jury
      that if the jurors each found beyond a reasonable doubt that the defendant
20    committed a provocative act, it was not required to unanimously agree on a
      particular provocative act. In his motion for new trial, Briscoe argued that unless
21    there was jury unanimity about a provocative act, the verdict was defective. He
      reasoned that the trial court was required to instruct on CALJIC No. 17.01 FN11
22    sua sponte. The trial court denied the motion for new trial.

23    FN11. CALJIC No. 17.01 reads: "The defendant is accused of having committed
      the crime of ----.... The prosecution has introduced evidence for the purpose of
24    showing that there is more than one [act] ... upon which a conviction ... may be
      based. Defendant may be found guilty if the proof shows beyond a reasonable
25    doubt that [he][she] committed any one or more of the [acts].... However, in order
      to return a verdict of guilty ..., all jurors must agree that [he][she] committed the
26    same [act].... It is not necessary that the particular [act] ... agreed upon be stated in

34

your verdict."

First, Briscoe argues that the California Constitution compels jury unanimity on which particular provocative act occurred in order to find him guilty of provocative act murder. (See Cal. Const., art. I, § 16.) Generally, California courts follow a version of the jury unanimity rule requiring the jury to agree about the ultimate issue of whether the defendant is guilty of the charged offense. Any jury disagreement on subordinate issues is considered irrelevant. Specifically, under this rule as it has been adopted in this state, it does not matter if the jury disagrees about any facts proving the defendant guilty, even if based on differing theories. (*People v. Davis* (1992) 8 Cal.App.4th 28, 40-41, 10 Cal.Rptr.2d 381.) "If each juror concludes, based on legally applicable theories supported by substantial evidence, that the defendant is guilty of the charged offense, the defendant is properly found guilty even if the jurors disagree about the particular theories or facts." ( Id. at p. 34, 10 Cal.Rptr.2d 381; see *People v. Santamaria* (1994) 8 Cal.4th 903, 918, 35 Cal.Rptr.2d 624, 884 P.2d 81 [if each juror is convinced beyond reasonable doubt that defendant is guilty of murder, jury need not agree unanimously on theory by which defendant is guilty]; *People v. Beardslee, supra*, 53 Cal.3d at p. 92, 279 Cal.Rptr. 276, 806 P.2d 1311 [same rule].) Briscoe's claim of error is, in essence, that the jury could have relied on different facts when unanimously concluding that he committed a provocative act, which in turn allowed the jury to find him guilty of murder under the provocative act murder doctrine. As the jury need not agree on the underlying facts in order for us to uphold a murder conviction, we find that the unanimity requirement did not apply.

Briscoe also contends that a unanimity instruction was compelled as a matter of federal due process. (See U.S. Const., 14th Amend.) He cites United States Supreme Court decisions in support of this argument. (See *Schad v. Arizona* (1991) 501 U.S. 624, 630-633, 111 S.Ct. 2491, 115 L.Ed.2d 555 (plur.opn.); see also *Richardson v. United States* (1999) 526 U.S. 813, 817-818, 119 S.Ct. 1707, 143 L.Ed.2d 985.) In *Schad*, the high court concluded that there was no general requirement that the jury agree on preliminary facts underlying a verdict.FN12 (*Schad v. Arizona, supra*, 501 U.S. at pp. 631-632, 111 S.Ct. 2491; see *People v. Jenkins* (2000) 22 Cal.4th 900, 1025, 95 Cal.Rptr.2d 377, 997 P.2d 1044, cert. den. 531 U.S. 1155, 121 S.Ct. 1104, 148 L.Ed.2d 975.) However, the high court held that due process precludes a state from punishing a criminal defendant under a statute so broadly defined that it is fundamentally unfair. (*Schad v. Arizona, supra*, 501 U.S. at pp. 632-633, 111 S.Ct. 2491; *Richardson v. United States, supra*, 526 U.S. at pp. 819-820, 119 S.Ct. 1707.)

FN12. Briscoe concedes as much in his brief.

Briscoe urges that if we apply this fundamental fairness test, we will conclude that the trial court's failure to instruct on jury unanimity violates due process. The California Supreme Court has concluded otherwise. It specifically upheld our state's version of the jury unanimity rule-requiring jury unanimity only on the issue of whether the defendant is guilty of the charged crime, irrespective of whether the jurors agree on which of several theories of guilt provide the means to that ultimate conclusion-concluding that the rule "passes federal constitutional muster." (*People v. Santamaria*, supra, 8 Cal.4th at pp. 918-919, 35 Cal.Rptr.2d 624, 884 P.2d 81; see *People v. Jenkins, supra*, 22 Cal.4th at pp. 1024-1025, 95

1    Cal.Rptr.2d 377, 997 P.2d 1044.)  Thus, we find no federal constitutional error.

2   Respondent's Lodged Document 12, pp. 19-21.

3    Because the California Court of Appeal applied the appropriate constitutional

4   standards, the undersigned must defer to that ruling unless it is objectively unreasonable.

5    Petitioner was not entitled to a unanimity instruction regarding which intentional

6   provocative act triggered liability for murder as a matter of federal due process.  There is no

7   constitutional requirement that "the jury reach agreement on the preliminary factual issues which

8   underlie the verdict." McKoy v. North Carolina, 494 U.S. 433, 449, 110 S.Ct. 1227 (1990)

9   (Blackman, J., concurring).  Distinguishing between the facts necessary to satisfy the required

10   elements of the charged offense from those facts that show the means by which the elements are

11   established, the United States Supreme Court has held that juror unanimity is not required with

12   respect to the theory underlying the criminal charge.  Schad v. Arizona, 501 U.S. 624, 631-32,

13   649, 111 S.Ct. 2491 (1991) ("[I]t has long been the general rule that when a single crime can be

14   committed in various ways, jurors need not agree upon the mode of commission.") (Scalia, J.

15   concurring in part); Jeffries v. Blodgett, 5 F.3d 1180, 1195 (9th Cir.1993) (holding that it is

16   "irrelevant" whether the jurors unanimously agree on which of the alternative means was

17   employed to commit the crime). [5]

18    The denial of this claim by the California Court of Appeal was not an

19   unreasonable application of clearly established Supreme Court authority.  Accordingly, this claim

20   should be denied.

21    D.  Claim 4: Jury Instruction re: Lesser Included Offense

22    Petitioner argues that the trial court refused his request to instruct the jury on the

23   lesser included offense of involuntary manslaughter.  Amended Petition, p. 39.

24

25    [5]  Petitioner cites Richardson v. United States, 526 U.S. 813, 119 S.Ct. 1707 (1999).
     However, this case involved a "unanimity" interpretation of a specific federal statute, and does
26   not provide a rule for state statutes.

36

To the extent that petitioner rests his claim on a duty to give an instruction <u>sua</u> <u>sponte</u> under rules

of state law, petitioner has stated no federal claim.  Indeed, in the failure to give a lesser included

offense instruction context, the Ninth Circuit has flatly held in non-capital cases that the failure

to give the instruction states no federal claim whatsoever.  <u>James v. Reece</u>, 546 F.2d 325, 327

(9th Cir. 1976).  However, that direct ruling has been modified over the years.

> In *Bashor v. Risley*, 730 F.2d 1228 (9th Cir.1984), the Ninth Circuit,
> without reference to Beck, held that "the failure of a state court to instruct
> on a lesser offense [in a non-capital case] fails to present a federal
> constitutional question and will not be considered in a federal habeas
> corpus proceeding." 730 F.2d at 1240 (quoting *James v. Reese*, 546 F.2d
> 325, 327 (9th Cir.1976)). The *Bashor* court noted, however, that the
> defendant's right to adequate jury instructions on his or her theory of the
> case might, in some cases, constitute an exception to the general rule. 730
> F.2d at 1240; cf. *Windham v. Merkle*, 163 F.3d 1092, 1106 (9th
> Cir.1998)(mentioning no exception to the general rule).
> ***
> We subsequently held that *Teague* barred this Court from changing
> the law regarding failure to instruct errors in the context of a
> habeas petition. *Turner v. Marshall*, 63 F.3d 807, 819 (9th
> Cir.1995), overruled on other grounds by *Tolbert v. Page,* 182 F.3d
> 677 (9th Cir.1999). Consequently, we adhere to the law as stated in
> Bashor and its predecessors. [FN7]
> [FN7. Our statement, in *Windham v. Merkle*, 163 F.3d 1092, 1106,
> that "Under the law of this circuit, the failure of a state court to
> instruct on lesser included offenses in a non-capital case does not
> present a federal constitutional question," was a restatement of the
> general rule of *Bashor*, 730 F.2d at 1240, and did not announce a
> new rule of law.]

<u>Solis v. Garcia</u>, 219 F.3d 922, 929 (9th Cir. 2000).

The California Court of Appeal found that there was no reasonable probability of

a different outcome had the jury received the involuntary manslaughter instruction:

> In his third claim of instructional error, Briscoe contends that his murder
> conviction must be reversed because the trial court failed to instruct the jury on
> the lesser included offense of involuntary manslaughter as he had requested. He
> contends that involuntary manslaughter is a lesser included offense of murder with
> implied malice and that the trial court committed prejudicial error when it refused
> to give this instruction. (See U.S. Const., 5th, 6th, 8th & 14th Amends.) In the
> trial court Briscoe sought lesser included offense instructions on involuntary
> manslaughter. (See CALJIC No. 17.10.) The trial court refused to give this
> instruction, concluding that Briscoe could only be guilty of first degree murder
> under the provocative act murder doctrine-that he could not be guilty of any of the
> more typical lesser included offenses of murder.

Briscoe argues that if the jury believed that his organic brain damage rendered him incapable of forming the required mental state of implied malice for provocative act murder, it would have found him guilty of no more than involuntary manslaughter if it had been given that option. We need not address this issue because-assuming arguendo that the trial court erred by failing to give the requested jury instruction-any error was necessarily harmless. An error arising from the failure to instruct the jury on a lesser included offense is not subject to reversal unless the record establishes a reasonable probability that the error affected the outcome of the trial. (See *People v. Breverman* (1998) 19 Cal.4th 142, 165, 77 Cal.Rptr.2d 870, 960 P.2d 1094 [sua sponte instruction should have been given in noncapital case]; *People v. Watson* (1956) 46 Cal.2d 818, 836, 299 P.2d 243, cert. den. 355 U.S. 846, 78 S.Ct. 70, 2 L.Ed.2d 55; see also Cal. Const., art. VI, § 13.)

We conclude that there was no reasonable probability of a different outcome if the jury had been instructed as Briscoe urges it should have. The jury rejected the mental defense that is the underpinning of this claim on appeal. It had little difficulty in concluding that Briscoe was guilty of burglary and robbery during its first day of deliberations. The jury had been instructed that these were both specific intent crimes. It took two more days of deliberation before the jury was able to render a verdict on the murder charge. This offense also required the jury to find that Briscoe committed an intentional act.

At trial, Briscoe argued that he lacked the mental capacity to commit any of the three crimes because he had suffered organic brain damage. The timing of the robbery and burglary verdicts suggests that the jury rejected this defense almost immediately. The jury pondered the murder charge for a longer period of time, but given the close similarity of the mental defense offered to challenge the murder charge and that offered to challenge the allegations of other crimes, it is not reasonably probable that the jury was concerned about Briscoe's mental state during this time. As it is not reasonably probable that there would have been a different outcome if the jury had been given lesser included offense instructions, any error in failing to so instruct the jury was necessarily harmless under California law. (See *People v. Breverman, supra*, 19 Cal.4th at p. 165, 77 Cal.Rptr.2d 870, 960 P.2d 1094.)

Briscoe also argues that the trial court's failure to give this jury instruction violated his federal constitutional rights. (See U.S. Const., 5th, 6th, 8th & 14th Amends.) He admits that the California Supreme Court rejected this claim in 1998, but argues that since that time the United States Supreme Court has rendered a decision that places that California ruling in doubt. (*See People v. Breverman, supra*, 19 Cal.4th at pp. 165-169, 77 Cal.Rptr.2d 870, 960 P.2d 1094; see also *Neder v. United States* (1999) 527 U.S. 1, 11-12, 119 S.Ct. 1827, 144 L.Ed.2d 35 [structural errors in jury instructions].) The California Supreme Court has reiterated Breverman since Neder was decided. (See *People v. Sakarias* (2000) 22 Cal.4th 596, 621, 94 Cal.Rptr.2d 17, 995 P.2d 152, cert. den. 531 U.S. 947, 121 S.Ct. 347, 148 L.Ed.2d 279.) Even if-as in Sakarias-we assume arguendo that federal constitutional error occurred when the trial court failed to instruct**423 on a lesser included offense, we are satisfied that any error was harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705; *People v. Sakarias, supra*, 22 Cal.4th at p.

1       621, 94 Cal.Rptr.2d 17, 995 P.2d 152.) The jury's rejection of Briscoe's mental

2       defense as to the robbery and burglary charges means that it necessarily rejected

    that defense as to the murder charge as well. Beyond any reasonable doubt, any

3       error in failing to instruct on involuntary manslaughter could not have affected the

    outcome of the trial.

4   Respondent's Lodged Document 12, pp. 23-25.

5           Assuming the manslaughter instruction should have been read because it was

6   consistent with petitioner's mental defense, the failure to give the instruction was harmless for

7   the reasons stated by the California Court of Appeal.  In this habeas action, whether an error was

8   harmful is reviewed under the standard set forth in <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 113

9   S.S.Ct. 1710 (1993), i.e., whether the error had a substantial and injurious effect on the verdict.

10  No analysis is performed as to whether the Court of Appeal's harmless error review was correct

11  under a more rigorous standard. <u>See</u> <u>Fry v. Pliler</u>, 551 U.S. 112, 120-22, 127 S.Ct. 2321 (2007)

12  (recognizing that a habeas court must apply the <u>Brecht</u> standard, which subsumes the AEDPA/

13  <u>Chapman</u> standard).

14          Like the Court of Appeal, the undersigned need not make a determination whether

15  the evidence submitted by petitioner at his trial would suffice for the giving of an involuntary

16  manslaughter instruction.[6]  Because the jury rejected the same mental "defense" as to the robbery

17  and burglary charges, they would not have adopted this defense for the provocative act murder

18  charge and found petitioner guilty only of involuntary manslaughter.

19          The denial of this claim by the California Court of Appeal was not an

20

21        [6]  The undersigned does, however, have doubts on that matter.  The mental aspect of a

defendant which would give rise to an involuntary manslaughter instruction is not, in truth, an

22  affirmative defense, but is part of the mental state which the state must ultimately negate (if the

issue is raised by the defendant).  However, in order to obtain an instruction on involuntary

23  manslaughter, the defendant must present evidence demonstrating, not that his capacity to form

intent was diminished, but that he actually did not possess the required intent because of mental

24  disease, voluntary intoxication and the like.  This is very difficult argument for a defendant.  <u>See</u>

<u>People v. Babbit</u>, 45 Cal. 3d 660, 693 (1988).  Thus, not just any evidence of a mental disease is

25  sufficient to warrant an involuntary manslaughter instruction, but rather evidence that the

defendant was acting unconsciously when committing the act.  <u>See</u> <u>People v Ochoa</u>, 19 Cal. 4th

26  353, 423-424 (1998) (voluntary intoxication case).  The evidence discussed in the next section

does not appear to rise to the level of "unconscious" as defined in California law.

1  unreasonable application of clearly established Supreme Court authority.  Accordingly, this claim

2  should be denied.

3          E.  Claim 5: Violation of Right to Present a Defense

4          Petitioner alleges that he was denied his right to present a defense when the trial

5  court precluded him from presenting the testimony of several witnesses.  Amended Petition, p.

6  40.  While the California Court of Appeal did not recite the Supreme Court cases pertinent to this

7  claim, it applied the elements of the constitutional standard when it analyzed this claim.  As in

8  Early v. Packer, supra, the state court analyzed the claim using state-law principles analogous to

9  the constitutional standards.  Accordingly, the undersigned must defer to that ruling unless it is

10  objectively unreasonable.

11          Petitioner argues that the trial court improperly precluded him from presenting the

12  testimony of Detective Hamers to impeach Parovel.  Petitioner also alleges that the trial court

13  denied him his right to present a defense when it prevented his expert, Dr. Kowell, from

14  testifying that as a result of his mental defect, petitioner could not appreciate the consequences of

15  his actions.  Petitioner also argues that the trial court erred in preventing Dr. Kowell from

16  explaining how his brain dysfunction affected his conduct on the day of the charged crimes.

17  Petitioner also argues that the trial court erred when it ruled that Dr. Kowell could only testify

18  generally regarding his mental disorder, and not specifically as to how it affected him.  Finally,

19  petitioner argues that the trial court improperly limited the testimony of his "drug culture expert,"

20  William Zerby, regarding the drug subculture, etc.

21          Criminal defendants have a constitutional right to present relevant evidence in

22  their own defense.  See Crane v. Kentucky, 476 U.S. 683, 690, 106 S.Ct. 2142 (1986) ("[T]he

23  Constitution guarantees criminal defendants a meaningful opportunity to present a complete

24  defense.") (internal quotation marks omitted). The Supreme Court has indicated that a

25  defendant's right to present a defense stems both from the right to due process provided by the

26  Fourteenth Amendment, see Chambers v. Mississippi, 410 U.S. 284, 294, 93 S.Ct. 1038 (1973),

1   and from the right "to have compulsory process for obtaining witnesses in his favor" provided by

2   the Sixth Amendment, see Washington v. Texas, 388 U.S. 14, 23, 87 S.Ct. 1920 (1967)

3   (explaining that the right to compulsory process would be meaningless if the defendant lacked

4   the right to use the witnesses whose presence he compelled).

5          However, "[a] defendant's right to present relevant evidence is not unlimited, but

6   rather is subject to reasonable restrictions," such as evidentiary and procedural rules.  United

7   States v. Scheffer, 523 U.S. 303, 308, 118 S.Ct. 1261 (1998).  In fact, "state and federal

8   rulemakers have broad latitude under the Constitution to establish rules excluding evidence from

9   criminal trials," id., and the Supreme Court has indicated its approval of "well-established rules

10  of evidence [that] permit trial judges to exclude evidence if its probative value is outweighed by

11  certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the

12  jury," Holmes v. South Carolina, 547 U.S. 319, 326, 126 S.Ct. 1727 (2006).  Evidentiary rules

13  do not violate a defendant's constitutional rights unless they "infring[e] upon a weighty interest

14  of the accused and are arbitrary or disproportionate to the purposes they are designed to serve."

15  Id. at 324, 126 S.Ct. 1727 (alteration in original) (internal quotation marks omitted); see also

16  Scheffer, 523 U.S. at 315, 118 S.Ct. 1261 (explaining that the exclusion of evidence pursuant to

17  a state evidentiary rule is unconstitutional only where it "significantly undermined fundamental

18  elements of the accused's defense").  In general, it has taken "unusually compelling

19  circumstances ... to outweigh the strong state interest in administration of its trials."  Perry v.

20  Rushen, 713 F.2d 1447, 1452 (9th Cir.1983).

21         The undersigned first considers the claims challenging the testimony of Detective

22  Hamers.  The California Court of Appeal denied this claim as follows:

23         A.  *Parovel's Credibility*

24         Next, Briscoe argues that on three occasions the trial court deprived him of a
           meaningful opportunity to present a complete defense in violation of his
25         constitutional rights (See U.S. Const., 6th & 14th Amends.)  On cross-
           examination, Parovel denied that he sold drugs and denied telling Detective
26         Michael Hamers–the investigating officer of the shooting case–that he did.

Almost immediately afterward, Parovel admitted that he had sold some marijuana.

Later, defense counsel asked outside the presence of the jury to call Detective Hamers to impeach Parovel's testimony that he did not sell drugs. Detective Hamers told the court that Parovel had admitted to him that he sold marijuana and that Nate Newman was one of his suppliers. Briscoe argued that this was proper impeachment of Parovel, who denied selling drugs. The trial court, prosecutor and defense counsel tried to reconstruct exactly what Parovel testified to about sales of marijuana, prompting the trial court to obtain a transcript of Parovel's cross-examination. The trial court concluded that Parovel's testimony was that he occasionally sold marijuana, because he first denied and then admitted selling marijuana. Thus, the trial court suggested that Detective Hamer's testimony might not be strictly inconsistent with Parovel's testimony. The prosecutor argued that whether Parovel purchased marijuana from Newman was a collateral matter and that the jury already knew that Parovel was not a law-abiding citizen.

Ultimately, the trial court concluded that the testimony Briscoe's attorney had elicited from Parovel was not specific enough to be inconsistent with the testimony Detective Hamers could offer. The proffered evidence was not proper impeachment, the trial court ruled, and even if it was, these were collateral matters. Applying section 352 of the Evidence Code, the trial court ruled that the evidence would be more prejudicial and time consuming than probative. It also saw no prejudice to Briscoe from its ruling because the jury already knew that Parovel was not living an upstanding life–he had sold drugs and destroyed evidence. It indicated that defense counsel could recall Parovel on this issue, but would not permit the impeachment that Briscoe proposed based on the testimony that Parovel had given until that time. [Footnote 17]

> [Footnote 17: It appears that Parovel was then preparing to leave the jurisdiction, having completed his testimony. Briscoe had not asked that he remain available for additional questions when he had completed his questioning of Parovel.]

On appeal, Briscoe contends that the trial court improperly precluded him from presenting evidence of Parovel's prior inconsistent statement to Detective Michael Hamers about whether Parovel had admitted to the detective that he was a drug dealer. A witness's inconsistent statement is admissible in evidence to assist the jury in determining his or her credibility. (Evid. Code, § 780, subd. (h).) The trial court concluded that the proffered statement was *not* inconsistent with Parovel's earlier testimony. Whether or not the statement *was* inconsistent, the court found that the evidence was more prejudicial than probative. A trial court may exclude otherwise admissible evidence if its probative value is substantially outweighed by its prejudicial effect–undue consumption of time, danger of undue prejudice, confusion of issues or misleading the jury. (Evid. Code, § 352.) Its exercise of its discretion pursuant to Evidence Code § 352 will not be reversed on appeal, absent a clear showing of an abuse of that discretion. (*People v. O'Brien* (1976) 61 Cal.App.3d 766, 781.) Such an abuse of discretion occurs if the trial court's ruling falls outside the bounds of reason. (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1226, cert. den. 508 U.S. 917.) Here, the trial court found that the proffered evidence would be more prejudicial and time-consuming than probative. The evidence might have misled the jurors to believe that the fact that Parovel was a

1    drug dealer would constitute a defense to the charged crimes.  It was also of slight
2    probative value, as it was cumulative of evidence that the jury already had heard
     that Parovel had sold drugs on several occasions.  For these reasons, we are
3    satisfied that the trial court's decision did not fall outside the bounds of reason
     and that, thus, the trial court did not abuse its discretion in excluding this
4    evidence.

5    Respondent's Exhibit 12, pp. 38-40.

6            For the reasons stated by the California Court of Appeal, the undersigned finds

7    that the trial court's denial of his request to call Detective Hamers as a witness did not violate his

8    right to present a defense.  The California Court of Appeal correctly found that the proposed

9    testimony was potentially misleading and of slight probative value.   Because Parovel admitted to

10   buying the marijuana, occasionally selling it, using it and to throwing the scale out the window,

11   the proposed testimony would have added little to undermining his credibility.  See also Zerby's

12   testimony, below, regarding his opinion that Parovel had an amount of marijuana consistent with

13   selling.  In addition, as pointed out by respondent, Parovel's testimony was corroborated by

14   Rozadilla's testimony and the excited utterances they made to the Tate's after the shooting, the

15   physical evidence as well as the confession petitioner made two days after the crime.

16           The California Court of Appeal denied petitioner's claim challenging the

17   restrictions on William Zerby's testimony as follows:

18       *B.  Drug Culture*

19       Briscoe also argues that the trial court erred when it restricted the testimony of
         defense investigator William Zerby.  At trial, Briscoe stated his intention to ask
20       Zerby to offer an opinion that the April 2 incident was a "drug rip off."  He
         explained this evidence would allow the jury to better understand the "culture of
21       drug dealers" and the circumstances under which the crime occurred.  The trial
         court did not believe that if Briscoe and Pina stole from a drug dealer, this would
22       constitute a defense to the charged crimes.  Whether Parovel was a good citizen or
         not was irrelevant to the legal issues that the jury had to determine, it concluded.
23       It also challenged defense counsel's intention to have Zerby offer an expert
         opinion about whether Parovel was involved in illegal activities based on
24       evidence–which it regarded as speculative–of a disagreement with Newman.
         Parovel had earlier testified that he bought marijuana from Newman.  The trial
25       court allowed Zerby to offer his personal opinion of whether a quarter pound
         purchase of marijuana was for personal use or for sale, but refused to allow the
26       defense to elicit testimony from him about whether drug dealers and other

                                                43

members of the drug subculture frequently rob one another of drugs.  Ultimately, Zerby testified as a defense expert witness.  He told the jury that he was an investigator who had once worked in narcotics enforcement.  Briscoe asked Zerby about robberies or "drug rip[-]offs" between members of the drug subculture.  The prosecution's objection to this line of inquiry was sustained.  When asked about the purchase of a quarter pound of marijuana for $1,300, Zerby opined that the purchaser would likely keep part for personal use, but sell the remainder in order to pay for the purchaser's part.

On appeal, Briscoe complains that the trial court unduly restricted Zerby's testimony.  He argues that he was precluded from presenting evidence at trial that Pina's death was not the result of the robbery of a law abiding merchant but the culmination of a drug rip-off in which he and Pina were the pawns of drug dealers Parovel and Nate Newman.  He asserts that the rejection of this evidence violated his federal constitutional rights.  (See U.S. Const., 5th, 6th & 14th Amends.)

In his brief, Briscoe argues that by the proffered evidence, he sought to create a reasonable doubt by undermining the prosecution's case in three ways.  First, if he could challenge Parovel's credibility, the jury was less likely to believe his testimony about all the events of April 2.  Second, he could contradict the provocative act murder theory by suggesting that Parovel shot–not because Briscoe provoked him–but because he was intent on maintaining his illegal drug operation.  Third, Briscoe contends that the evidence would support an inference that Newman had taken advantage of his mental impairment by recruiting him to rob Parovel, thus creating a reasonable doubt that he aided and abetted Pina's robbery.

However, we need not consider whether the proffered evidence was relevant to prove *these* theories because at trial, Briscoe argued none of them.  He argued only that if the jury understood that Parovel was involved in an illegal drug culture, it would have a clearer picture of what happened.  Implicit in this argument was the hope that the jury would somehow be less likely to hold Briscoe culpable for the charged crimes if the jurors knew more about Parovel's illegal activities.  The trial court concluded that the purpose of this evidence was to "trash" Parovel by offering evidence that was not relevant to any defense to the charged crimes.  Stealing from a drug dealer is a crime, the trial court reasoned.  It also noted that the jury already knew from other evidence that Parovel was a drug dealer.

The trial court must limit the introduction of evidence to relevant and material matters.  (§ 1044.)  Relevant evidence is that evidence tending to prove any disputed fact that is of consequence to the determination of the action.  This includes evidence relevant to the credibility of a witness.  (Evid. Code § 351.)  Whether particular evidence constitutes relevant evidence within this standard is a matter to be determined by the trial court, in its discretion.  (*People v. Kelly* (1992) 1 Cal.4th 495, 523, cert. den. 506 U.S. 881; *People v. Green* (1980) 27 Cal.3d 1, 19.)  On appeal, we review whether the trial court abused that discretion.  (See, e.g., *People v. Kelly, supra*, 1 Cal.4th at p. 523.)

The admissibility of expert testimony on a certain subject turns on both the nature of the evidence and its relation to a question that is at issue in the trial.  (*People v. Bledsoe* (1984) 36 Cal.3d 236, 246).  In this matter, the reasons argued in the trial

1  court for admission of the evidence are little more than to paint Parovel as a drug
2  dealer in order to make Briscoe seem less culpable. This is not a defense to the
   charges against Briscoe.  In the words of the California Supreme Court, it is not
3  evidence relevant to "a question actually at issue in the case."  (*People v. Bledsoe,*
   *supra,* 36 Cal.3d at p. 246.)  In any event, the jury already knew that Parovel was
4  involved in illegal activities, so that the evidence, even if it were marginally
   relevant on some asserted theory of benefit to the defense–would have been
5  cumulative.  (See Evid. Code, § 352 [trial court has discretion to exclude relevant
   evidence that is more prejudicial than probative].)  For these reasons, we are
6  satisfied that the trial court did not abuse its discretion in this matter. [Footnote
   18.]

7                [Footnote 18: Defense counsel at trial also suggested that Zerby could
                 offer his opinion that Parovel and Newman had a dispute because of an
8                underweight sale of drugs from Newman to Parovel.  However, Parovel
                 testified that he had no dispute with Newman and he did not tell police
9                anything contradicting this testimony.  He told Detective Hamers that the
                 marijuana he purchased from Newman weighed less than the quarter
10               pound he paid for, but there was no evidence of any dispute between
                 Parovel and Newman over this.  Thus, there was no evidence to support
11               the defense theory that Parovel was angry with Newman about this and the
                 trial court properly rejected this proffered evidence as speculative.  (See
12               Evid. Code, § 352.)  Even if there had been, the evidence would not have
                 been relevant, because it would not constitute a defense to any of the
13               charges.  (See People v. Bledsoe, supra, 36 Cal.3d at p. 246.)]

14  Respondent's Exhibit 12, pp. 40-43.

15           Applying Cal. Evid. Code § 352, the trial court found that Zerby's testimony was

16  more prejudicial than probative.  RT at 287.  Zerby was offered as an expert witness on the drug

17  subculture.

18           The United States Supreme Court has not squarely addressed the issue of whether

19  an evidentiary rule "requiring a trial court to balance factors and exercise its discretion" may

20  violate a defendant's due process right to present a defense.  Moses v. Payne, 555 F.3d 742, 758

21  (9th Cir.2009).  In the absence of clearly-established federal law holding that a state trial court's

22  "exercise of discretion to exclude expert testimony violates a criminal defendant's constitutional

23  right to present relevant evidence[,]" Moses, 555 F.3d at 758-59, the trial court's application of

24  California Evidence Code § 352 in this case could not have been contrary to or an unreasonable

25  application of clearly established Supreme Court precedent.  Accordingly, this claim should be

26  denied.

1    The California Court of Appeal denied petitioner's claim challenging the limits

2  imposed on the testimony of Dr. Kowell for the following reasons:

3    *C.  Organic Brain Dysfunction Testimony*

4    Finally, Briscoe contends that the trial court erred when it impermissibly
     precluded expert witness Dr. Arthur Kowell from testifying about whether his
5    organic brain dysfunction reduced the likelihood that he acted with the requisite
     mens rea because he could not appreciate the consequences of his actions.  (See
6    §§ 28, 29.)  He contends that the restrictions of this mental defense evidence
     violated his constitutional rights.  (See U.S. Const., 5th, 6th & 14th Amends.)
7    Before trial, Briscoe was tested for possible organic brain irregularity.  At the
     beginning of trial, defense counsel indicated that she intended to offer evidence of
8    Briscoe's organic brain damage to demonstrate, inter alia, that he did not fully
     understand the extent of his acts or their consequences.  Defense counsel opined
9    that this evidence would be relevant to the issue of whether or not Briscoe could
     form a specific intent to commit burglary or robbery or the implied malice
10   required to commit provocative act murder.

11   Psychologist Daniel Amen testified as a defense expert in brain imaging.
     Briscoe's August brain imaging scan revealed, in Dr. Amen's opinion, significant
12   decreased activity in the frontal lobes of his brain.  This part of the brain instructs
     a person on judgments of what is good and bad, he explained to the jury.  Briscoe
13   had significant problems with his brain functions, the doctor told the jury.  These
     problems could affect his memory, mood stability, temper control, and ability to
14   learn, impacting his judgment, impulse control, organization ability and planning
     capabilities.  They could have been the result of head trauma, severe attention
15   disorder or schizophrenia.  He opined that a person like Briscoe was much more
     likely to commit a violent crime than someone with a normal brain.  On a scale of
16   one to 10, with one being the best brain, Dr. Amen rated Briscoe's brain as an
     eight and a half to a nine.  Briscoe would have a lot of trouble planning something
17   out.  Dr. Amen offered his expert opinion that Briscoe's brain functioned poorly.

18   Briscoe sought to offer the opinion testimony of a second expert
     witness–neurologist Arthur Kowell–who had reviewed Dr. Amen's report and
19   interviewed the defendant.  At a foundational hearing conducted outside the
     presence of the jury, Dr. Kowell opined that Briscoe suffered organic brain
20   dysfunction as the result of chronic marijuana usage.  (See Evid. Code, § 402.)
     He also opined that Briscoe was under the influence of marijuana at the time he
21   committed the April 2, offense.  Dr. Kowell believed that Briscoe suffered from a
     mental defect that may have precluded him from appreciating the consequences of
22   his actions.  The trial court ruled that the neurologist could testify that Briscoe had
     an organic brain dysfunction and could explain how that manifested in a person in
23   that condition.  However, it held that Dr. Kowell could not testify that Briscoe
     himself was unable to form a specific intent, regardless of how that question was
24   formed.  A more specific inquiry was precluded by statute, the trial court ruled.
     (See § 28.)

25
     Dr. Kowell testified before the jury as an expert neurologist.  He told the jury that
26   he met with Briscoe and reviewed reports prepared by other doctors about him.

46

His examination of Briscoe revealed a number of neurological abnormalities.  Dr. Kowell opined that Briscoe suffered from a form of chronic, organic brain dysfunction resulting from chronic marijuana usage.  That dysfunction constituted a mental defect, he told the jury.  He testified that this type of brain dysfunction was consistent with that of a person who had abnormal memory, impulse control, judgment and abstract reasoning capabilities.  Such a person would have difficulty concentrating and carrying out complex actions, and that he or she would have a short attention span, he concluded.  Dr. Kowell also told the jury that a person suffering from this type of organic brain dysfunction would have an impaired ability to appreciate the consequences of his or her actions.  The trial court did not permit Kowell to offer an opinion about Briscoe's psychological condition on the date of the crime.

By law, a defendant may offer evidence of a mental defect solely to establish whether or not he or she actually formed the requisite intent or malice required to prove a charged crime.  (§ 28, subd. (a).)  However, an expert testifying in a criminal case about a defendant's mental defect may not testify on the ultimate issue of whether the defendant possessed that mental state required for the charged crimes.  Those issues are to be left to the jury to determine.  (See § 29.)  Briscoe complains that the trial court unduly restricted Dr. Kowell's testimony based on its misreading of section 29.  We disagree, finding the trial court's rulings to be consistent with these two statutes.  As the California Supreme Court has held, "section 29 prohibits an expert witness from giving an opinion about the ultimate fact whether a defendant had the required mental state for conviction of a crime."  (*People v. Ochoa* (1998) 19 Cal.4th 353, 431, cert. den. 528 U.S .862.)  Briscoe argues that while Dr. Kowell was not permitted to state that the defendant did not possess the required mental states, he was entitled to testify as to the "functional equivalent" of this opinion.  Courts have rejected the argument that "as long as a defense expert avoids the use of the legal name of the mental state in question, the testimony is admissible."  (See *People v. Nunn* (1996) 50 Cal.App.4th 1357, 1364.)  Section 29 not only precludes a defense expert from using certain terms of art such as "premeditate" and "deliberate."  It precludes an expert witness from offering any opinion on the ultimate issue of whether the defendant possessed the required mental state, regardless of the wording of that opinion.  (Ibid.)  The trial court properly limited Dr. Kowell's testimony in a manner that was consistent with sections 28 and 29.

Respondent's Exhibit 12, pp. 43-36.

Petitioner challenges the following specific restrictions on Dr. Kowell's testimony.  First, citing RT at 401-402, he argues that the trial court erred when it prevented Dr. Kowell from testifying that petitioner *might not appreciate the consequences of his actions.*  Petitioner argued that this ruling violated Cal. Penal Code § 29.

The undersigned pauses a moment to reflect and emphasize California law which is completely at odds with petitioner's assertions here.  Petitioner must understand that the

1  previous law regarding a diminished capacity, i.e., that for whatever reason, from high on sugar

2  Twinkies, or personality disorders, a person with such an affliction might lack the capacity to

3  form intent, was abolished in 1982.

4       "The essence of a showing of diminished capacity is a 'showing
         that the defendant's mental capacity was reduced by *mental illness,*

5       *mental defect or intoxication*.' " (*People v. Berry*, *supra*, 18 Cal.3d
         at p. 517, 134 Cal.Rptr. 415, 556 P.2d 777.)  However, the

6       Legislature abolished the defense of diminished capacity before
         defendant committed this crime. (*People v. Castillo* (1997) 16

7       Cal.4th 1009, 1013-1014, 68 Cal.Rptr.2d 648, 945 P.2d 1197;
         *People v. Saille* (1991) 54 Cal.3d 1103, 1114, 2 Cal.Rptr.2d 364,

8       820 P.2d 588.)  Only diminished actuality survives, i.e., the jury
         may generally consider evidence of voluntary intoxication or

9       mental condition in deciding whether defendant actually had the
         required mental states for the crime.

10

11  People v. Steele, 27 Cal. 4th 1230, 1253, 120 Cal. Rptr. 2d 432, 450 (2002) (emphasis in

12  original).

13       Nevertheless petitioner essentially argues a diminished capacity scenario here

14  essentially because the medical evidence demonstrates nothing more.  Throughout his trial and in

15  these collateral proceedings, petitioner relies on experts who simply opined to one degree or

16  another that petitioner *may not have* appreciated the consequences of his action.  This is a far cry

17  from the showing required for diminished actuality – that petitioner *had not* actually formed the

18  intent required for the crime. Thus, evidence that "he might not understand the consequences of

19  his action," was not testimony which mattered under California law, regardless of whether an

20  expert witness should be allowed to testify directly to a defendant's state of mind.[7]  The

21  undersigned now turns to the precise issue raised by petitioner.

22       Petitioner challenges the following specific ruling which occurred outside the

23

24       [7]If an expert testified that a person with such and such a medical condition "*could not*
    appreciate the consequences of his action," i.e, that if this person brandished a gun at a victim,
25  the person would not understand that the victim would be in fear of his life, such testimony could
    be viewed in other words as a showing of an actual lack of intent which the jury might relate to
26  the defendant.  That type of firm testimony did not appear in this case.

1   presence of the jury:

2       Petitioner's counsel: And doctor, does Mr. Khyle Briscoe have a condition that
        would affect and impair his ability to appreciate the consequences of his action?
3

4       Dr. Kowell: Yes.

5       Petitioner's Counsel: And would you define organic brain damage that Mr.
        Briscoe suffers from as a mental disorder or mental defect?

6       Dr. Kowell: Yeah.  It results, in colloquialism, in a mental defect, that's correct.

7       Petitioner's Counsel: So that if Mr. Briscoe is suffering from this condition, then
        he couldn't understand or appreciate the consequences of his actions?
8

9       Dr. Kowell: Let's put it this way.  He is–his condition is such that *he may not
        appreciate the consequences of his actions.* (Emphasis added)

10      Court: Now, you realize you are not going to be able to ask that question in front
        of the jury.  That goes–that's pursuant to Penal Code Section 28.  That's just a
11      different way of asking the same question.  You cannot ask the doctor did he form
        specific intent, and you can't ask him that question because that asks the same
12      thing, just without the use of the legal word "specific intent."  The law is clear, 28.
        He can testify, from what I've heard so far, that he has organic brain dysfunction.
13      He can explain how this manifests itself in a person with that condition.  But he
        can't tell us that this defendant was unable to form specific intent or however you
14      phrased that last question.  That's inadmissible pursuant to 28 of the Penal Code.

15  RT at 401-402.

16          Citing RT at 417-418, petitioner next argues that the trial court prevented Dr.

17  Kowell from explaining how petitioner's brain dysfunction affected his conduct on the day of the

18  charged crimes.  Citing RT at 419-421, petitioner argues that the court went on to rule that Dr.

19  Kowell could only testify generally concerning the mental disorder from which petitioner

20  suffered and not specifically as to how the disorder affected petitioner.  In order to put these

21  rulings in context, the undersigned will summarize Dr. Kowell's testimony in front of the jury.

22          Dr. Kowell testified that he met with petitioner, reviewed the police reports, his

23  medical records and a report and brain scan by Dr. Amen.  RT at 412.  He testified that

24  petitioner's brain scan showed abnormalities in the prefrontal or cortex.  RT at 417.  These are

25  areas of the brain involved with memory functioning, judgment, impulse control, personality or

26  being motivated or not motivated.  RT at 417.  Based on his review of the brain scan as well as

1   knowledge of petitioner's marijuana use, he determined that plaintiff had "at least a chronic brain

2   dysfunction involving his frontal and temporal lobes related to chronic usage of marijuana."  RT

3   at 417.  Dr. Kowell then testified,

4       Dr: With respect to the reason we are in court today, the events of April of 1998–
        Petitioner's Counsel: If I may interrupt–
5
6       Dr:  Well, you asked me regarding his brain condition.

7       Court: We are going not going to hear about that.  You are going to answer her
        next question.

8       Dr:  Okay.

9       Petitioner's Counsel: Doctor–actually, what I wanted to do is to offer the doctor as
        an expert, and I know I asked the question but–
10
11      Court: Well, Ms. McGuire [deputy prosecutor], did you want to hold off on your
        voir dire since at this point we are getting into his opinion.

12      Ms. McGuire: Yes.

13      Court: Go ahead, Ms. Galeano.

14      Petitioner's Counsel: Could you explain to the jury what mental impairment
        would be consistent with someone possessing that particular brain dysfunction
15      that you described?

16      Dr.: Well, I think I've already answered.  But the areas of the brain in which
        there's evidence of abnormality, those areas of the brain serve functions such as
17      memory, impulse control, judgment, abstract reasoning, ability to carry out
        complex actions, and it also includes attention span and ability to concentrate.
18
        Petitioner's Counsel: Now would you describe this chronic brain dysfunction as a
19      mental defect?

20      Dr.: Yes.

21      Petitioner's Counsel: And apart from what you have described, his memory
        impairment, control, lack of judgment and whatever, could you tell–could you tell
22      the jury how someone with organic brain dysfunction, how this would manifest
        itself in a person suffering from this condition?
23
        Dr.: I think I already mentioned it.
24
        Petitioner's Counsel: Oh, and that would be the memory impairment?
25
26      Dr.: Right.  They can have–they don't necessarily have to have all the facets of it,
        but they–of the things they can have, they can have memory impairment, they can

50

have impulse control problems, impaired attention span, impaired judgment, flat affect, or abnormal facial animation.

Petitioner's Counsel: Would a person that's been diagnosed with this organic brain dysfunction, would have–how would that affect the ability to appreciate and understand the consequences?

Deputy District Attorney: Objection, you Honor, and may be approach please?

***

Court: Okay.  The jurors have left the courtroom. There's been an objection to this line of questioning at this point, and I just wanted to be sure it's on the record, so everybody knows what you can and can't ask the doctor.  But if you take a look at Penal Code Section 28 and 29, I think the objection might have been slightly premature, but obviously once the doctor testifies, it's a little hard to unring that bell.

But he can testify, it seems to me, that in general, people who have organic–I think he's referred to it as organic brain dysfunction from chronic marijuana usage, I think he can opine, it says under 28, "Evidence of mental disease," and I think he's characterized this as a mental defect, "mental defect or mental disorder shall not be admitted to show or negate the capacity to form any mental state, including but not limited to purpose, intent, knowledge, premeditation, deliberation or malice aforethought, with which the accused committed the act. Evidence of mental defect is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated or harbored malice aforethought, when specific intent crime is charged."

And it says under 29, "shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to purpose, intent, knowledge or malice aforethought."

So long as the testimony is general and not specific to the defendant, it seems to me he can testify in this vein.  Ms. McGuire [deputy prosecutor]?

Deputy Prosecutor: I don't have any problem with that, your Honor, as long as the next question is not going to be slipped in. That's gone on all morning.

Court: Okay.  Ms. Galeano, any problem with where we are?

Petitioner's Counsel: No, your Honor.

Court: Okay.  We are not going to have any violations of my orders.  Let's bring the jurors in.

*****

Petitioner's Counsel: Doctor, in general, could you tell the jury how this type of defect manifests itself?

Dr.: Well, again, patients who have frontal lob temporal dysfunction in the brain can have problems with judgment, impulse control, memory, responding appropriately in a given social situation, in other words, they could have a lack of understanding of a particular social situation.  They may have problems in understanding complex processes.  They may have decreased attention span and decreased ability to mentally concentrate on whatever they are doing.

Petitioner's Counsel: In general, could you tell the jury for people who have this type of defect, how it affects their ability to understand and appreciate consequences?

Dr.: People that have abnormalities or dysfunction–brain dysfunction in these areas could have impairment of their ability to appreciate the consequences of Their actions.

Petitioner's Counsel: That's all the questions I have.

RT at 417-422.

        "By its terms, [Cal. Penal Code] section 29 prohibits an expert witness from giving an opinion about the ultimate fact whether a defendant had the required mental state for conviction of a crime. It prohibits no more than that."  People v. Ochoa, 19 Cal.4th 353, 431 (1998).  In other words, the expert cannot say "'[k]nowing [defendant's] situation and the drugs that he used ... my opinion is that the drugs in this situation caused a chemical imbalance and caused him to go out and do something and he could not keep from doing it.'"  Id. at 430-431.  Nor can he say " '[defendant's] tendency to overreact, coupled with his level of inebriation, resulted in his impulsive firing of the weapon.'"  People v. Nunn, 50 Cal.App.4th 1357, 1362 (1996).  The court in Nunn explained that "section 29 does not simply forbid the use of certain words, it prohibits an expert from offering an opinion on the ultimate question of whether the defendant had or did not have a particular mental state at the time he acted."  Id. at p. 1364.

        A psychiatric expert witness may testify regarding the types of behavior or mental processes that can be expected from people who suffer from particular mental defects or diseases.  The court in People v. Nunn, supra, gave the following examples of appropriate opinion testimony: "[Defendant] experienced several traumatic incidents related to his service with the Navy during the Vietnam War.... [S]uch experiences can result in a person overreacting to

1    subsequent stressful events." 50 Cal.App.4th at p. 1362.  It is further permissible to opine that

2    "[defendant], because of his history of psychological trauma, tended to overreact to stress and

3    apprehension"; that "such condition could result in [defendant] acting impulsively under certain

4    particular circumstances"; or to "evaluate[ ] the psychological setting of [defendant's] claimed

5    encounter with the [victims]" and to "offer[ ] an opinion concerning whether that encounter was

6    the type that could result in an impulsive reaction from one with [defendant's] mental condition."

7    Id. at p. 1365.

8            The restriction imposed by state law is no different than the restriction imposed by

9    federal law.  Fed. R. Ev. 704(b) precludes an expert from "stat[ing] an opinion or inference to

10   whether the defendant did or did not have the mental state or condition constituting the element

11   of the crime charged or a defense thereto."  Yet the Supreme Court has not struck down this rule

12   because it prevents a defendant from presenting a defense.  This is what petitioner must show,

13   and he cannot.   Indeed, the federal case law indicates that the federal rule, substantively identical

14   to the state rule, is routinely upheld.  See  United States v. Hofus, __F.3d__, 2010 WL 986799 *8

15   (9th Cir. 2010).

16           The trial court did not improperly limit Dr. Kowell's testimony.  Dr. Kowell's

17   opinion fit well within the parameters of Cal. Penal Code sections 28 and 29 as well as the case

18   law cited above.  Petitioner's argument that the trial court improperly limited the scope of Dr.

19   Kowell's testimony is without merit.[8]

20           The denial of these claims by the California Court of Appeal was not an

21   unreasonable application of clearly established Supreme Court authority.  Accordingly, these

22   claims should be denied.

23   \\\\\

24   _____

25   [8] The reasoning of the Ninth Circuit in Moses v. Payne, supra, is inapplicable to this
     claim because Moses considered an evidentiary rule regarding expert testimony requiring a trial
     court to balance factors exercising its discretion.  Cal. Evid. Code §§ 28, 29 do not require trial

26   courts to balance factors and exercise discretion.

1         F.  <u>Claim 6</u>

2         In claim 6, petitioner alleges that he was denied his right to the effective

3 assistance of counsel.  Amended Petition, p. 45.

4          *Legal Standard for Ineffective Assistance of Counsel*

5         A claim of ineffective assistance of counsel is cognizable as a claim of denial of

6 the Sixth Amendment right to counsel, which guarantees not only assistance, but effective

7 assistance of counsel.  <u>Strickland v. Washington</u>, 466 U.S. 668, 686, 104 S. Ct. 2052, 2063

8 (1984).  The benchmark for judging any claim of ineffectiveness must be whether counsel's

9 conduct so undermined the proper functioning of the adversarial process that the trial cannot be

10 relied upon as having produced a just result.  <u>Id</u>., 104 S. Ct. at 2064.

11         First, the defendant must show that counsel's performance was deficient.  This

12 requires showing that counsel made errors so serious that counsel was not functioning as the

13 "counsel" guaranteed by the Sixth Amendment.  <u>Id</u>. at 687, 104 S. Ct. at 2064.  The defendant

14 must show that counsel's representation fell below an objective standard of reasonableness.  <u>Id</u>.

15 at 688, 104 S. Ct. at 2064.  The relevant inquiry is not what defense counsel could have done, but

16 rather whether the choices made by defense counsel were reasonable.  <u>Babbitt v. Calderon</u>, 151

17 F.3d 1170, 1173 (9th Cir. 1998).  Judicial scrutiny of counsel's performance must be highly

18 deferential, and a court must indulge a strong presumption that counsel's conduct falls within the

19 wide range of reasonable professional assistance.  <u>Strickland</u>, 466 U.S. at 689, 104 S. Ct. at 2065.

20 The reasonableness of counsel's decisions may be assessed according to professional norms

21 prevailing at the time of trial.  <u>Silva v. Woodford</u>, 279 F.3d 825, 846 (9th Cir. 2002).

22         Second, the defendant must show that counsel's errors were so serious as to

23 deprive the defendant of a fair trial, a trial whose result is reliable.  <u>Strickland</u>, 466 U.S. at 687

24 104 S. Ct. at 2064.  The test for prejudice is not outcome-determinative, i.e., defendant need not

25 show that the deficient conduct more likely than not altered the outcome of the case; however, a

26 simple showing that the defense was impaired is also not sufficient.  <u>Id</u>. at 693, 104 S. Ct. at

1  2067-68.  The defendant must show that there is a reasonable probability that, but for counsel's

2  unprofessional errors, the result of the proceeding would have been different; a reasonable

3  probability is a probability sufficient to undermine confidence in the outcome.  Id., 466 U.S. at

4  694, 104 S. Ct. at 2068.

5            *Impeachment of Parovel and Rozadilla*

6          Petitioner contends that trial counsel failed to impeach Parovel and Rozadilla with

7  several prior inconsistent statements that they made to police following the shooting.  Amended

8  Petition, pp. 46-63.  On July 28, 2009, the undersigned denied petitioner's motion for an

9  evidentiary hearing as to this claim.  For the reasons stated in that order, which will be set forth

10  below, this claim should be denied.

11          Petitioner describes four[9] different inconsistencies that counsel failed to utilize
during trial.

12

13              A.  Counsel failed to impeach Parovel and Rozadilla about the changing
and inconsistent stories they provided to different police officers.

14              B.  Counsel failed to impeach Parovel with statements he made to the
police that Pina was unarmed when Parovel shot him.

15

16              C.  Counsel failed to impeach Rozadilla with prior statements that the
lighting was bad and she could not identify the robbers.

17              D.  Counsel failed to competently cross examine and re-call Parovel to
question him regarding his drug dealing.

18

19  However, It is important to note, that in direct and cross examination, Parovel
admitted to lying to the police to cover up his marijuana selling and attempting to
conceal evidence.  Reporter's Transcript (RT) at 118-19, 132, 143.  In addition,

20  petitioner provided a recorded statement to police that was played before the jury.
Petitioner's admission corroborates much of Parovel and Rozadilla's testimony.

21  Petitioner admits to taking part in the robbery, holding the .38 to Rozadilla's head,
pistol whipping Parovel and tackling Parovel to prevent him from obtaining one

22  of the guns.  Clerk's Transcript (CT) at  86-117.  It seems that trial counsel made a
tactical decision not to spend a great deal of time impeaching the witnesses

23  on prior inconsistent statements after the witnesses admitted to lying and petitioner
confessed in detail to his involvement.  Trial counsel's strategy focused on

24  demonstrating that petitioner's treatment of Rozadilla and the pistol whipping of

25

26      [9] Petitioner describes five claims but one claim will be discussed later as it is essentially
the same as claim 13.

Parovel were not provocative acts to support a murder charge and that petitioner has a brain dysfunction that prevented him from forming the requisite mental states for murder, robbery and burglary.  RT at 489-504.

A.  Impeachment Re Inconsistent Stories

Petitioner first argues that trial counsel erred by not presenting evidence and witnesses to impeach Parovel and Rozadilla regarding inconsistent and changing stories they initially provided to the police.  As the jury was aware of the lies from the direct and cross examination, it is unclear what trial counsel could have accomplished by presenting extrinsic evidence to show the deceit.  Petitioner does not describe how impeaching Parovel's testimony with more specific details of his lies would have more likely than not, altered the outcome of the trial.

The jury heard testimony that Parovel initially lied to police.  Trial counsel addressed Parovel's lies in closing.  RT at 496.   Even the prosecution referred to Parovel as a drug dealer in closing argument.  RT at 459, 464.  In addition, the jury heard petitioner's recorded statement that corroborated the victims' testimony.  Trial counsel's decision appears reasonable under the circumstances.  Pursuant to Strickland, petitioner must show that trial counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Strickland, 466 U.S. at 687 104 S. Ct. at 2064.  Petitioner has not set forth a sufficient argument to show that trial counsel's failure to impeach the witnesses resulted in an unfair trial.  Petitioner is not entitled to an evidentiary hearing.

B.  Impeachment Re Unarmed Pina

Petitioner next argues that Parovel provided conflicting accounts regarding if Pina was armed when Parovel shot him and trial counsel was ineffective for failing to impeach Parovel.  The essential issue of this claim is testimony concerning Parovel's Beretta firearm and its whereabouts during the robbery.  Petitioner seems to argue that the whereabouts of the Beretta are vital to determine if Parovel was justified in shooting Pina and Petitioner.

At trial, Parovel testified that he handed the Beretta to Pina, who put it in his pocket.  RT at 102-103.  When Parovel shot Pina, Parovel believed that Pina still had the Beretta on his person.  RT at 139.  It is important to note that Parovel also testified at trial that he did not see Pina holding the Beretta when he shot him.  RT at 139.  Petitioner argues that trial counsel was ineffective for failing to impeach Parovel regarding his belief that Pina was armed.

Petitioner contends that counsel should have impeached Parovel's testimony with the admitted fake statement he provided to police immediately after the shooting.  Parovel falsely stated that when he entered the house with petitioner and Pina, he saw the Beretta lying in plain view.  AP, Exh. H.  Parovel said that during the struggle inside the house he observed that the Beretta was no longer on the bed and petitioner appeared to be holding two guns.  Id.  Petitioner believes that according to these statements, Parovel could not have had a good faith belief that Pina was armed with the Beretta, when Parovel shot him.

As stated above, Parovel testified at trial that he initially lied to police.  RT at 118-

19. The statement to the police occurred just after the incident. Had counsel impeached Parovel with this statement, it is more than likely that he would have replied that he was lying to the police, which would have been consistent with his other testimony. In addition, trial counsel addressed Parovel's lies surrounding the incident in closing arguments. RT at 496. Most importantly, petitioner admitted in his statement that was played to the jury that Parovel had the Beretta on him and then relinquished the Beretta to them during the robbery.[10] Petitioner has not stated what would have been gained by impeaching Parovel.

While Parovel gave differing accounts of how he lost control of the Beretta, it remains clear that petitioner and Pina each had a firearm and one of them had the Beretta, when the three men were struggling for control of Pina's Glock. By the time Parovel ran outside and obtained control over the .38, he did not know the exact locations of the other guns or who was holding them. Parovel testified that he did not see Pina holding a firearm, but he believed Pina had the Beretta.

Petitioner has failed to demonstrate the trial counsel was ineffective for failing to attempt to impeach Parovel's belief that Pina was armed. Petitioner's argument is far too convoluted for trial counsel to be found ineffective, let alone for a finding that petitioner was deprived of a fair trial as a result. Petitioner is not entitled to an evidentiary hearing on this claim.

C. Impeachment Re Bad Lighting

Petitioner next argues that counsel failed to impeach Rozadilla based on her failure to identify petitioner in a photographic lineup and her statement that the house was dark during the incident. Petitioner suggests that impeaching Rozadilla with these facts would have cast doubt upon her testimony. However, petitioner's admission to the police corroborates Rozadilla's testimony and places petitioner at the scene of the crime, lessening the importance of Rozadilla's failed identification. It appears that trial counsel made a tactical decision not to press Rozadilla regarding her initial lies to the police. A tactical decision by counsel with which the defendant later disagrees is not a basis for a claim of ineffective assistance of counsel. Guam v. Santos, 741 F.2d 1167, 1169 (9th Cir.1984). Trial counsel may have considered it imprudent to impeach Rozadilla who petitioner admitted to putting in a headlock and then putting a gun to her head. It would be likely that the jury would have sympathy for this victim and would not appreciate trial counsel going to great lengths to impeach her testimony. This decision is reasonable based upon a review of the record. Petitioner has not set forth facts that if proven would entitle him to relief.

D. Cross-Examination

Finally, petitioner alleges that trial counsel was ineffective for failing to lay a proper foundation while cross examining Parovel and for neglecting to request that Parovel be available for re-call. Trial counsel intended to call a defense investigator to describe Parovel's drug selling and how the incident was a "drug

---

[10] In his admission to the police, petitioner stated that Parovel gave the gun to him. This contradicts Parovel's testimony that he gave the gun to Pina.

rip off." RT at 259.  The trial court did not allow the defense investigator to testify due to the lack of an adequate foundation.  RT at 260-262.  Trial counsel then attempted to call Detective Hamers to impeach Parovel's testimony concerning the extent of his drug dealing.[11]  RT at 261-262.  The trial court denied this request as well, but suggested that counsel re-call Parovel and impeach him to lay the proper foundation.  RT at 277.  Trial counsel attempted to re-call Parovel, but he was unavailable as trial counsel had failed to request that the prosecutor make Parovel available for further testimony.  Petitioner now argues that trial counsel was ineffective for failing to properly impeach Parovel and for failing to request that Parovel be subject to recall.  The California Court of Appeal addressed part of petitioner's instant argument.

Next, [petitioner] argues that on three occasions the trial court deprived him of a meaningful opportunity to present a complete defense in violation of his constitutional rights.  (See U.S. Const., 6th & 14th Amends.)  On cross-examination, Parovel denied that he sold drugs and denied telling Detective Michael Hammers-the investigating officer of the shooting case-that he did.  Almost immediately afterwards, Parovel admitted that he had sold some marijuana.

Later, defense counsel asked outside the presence of the jury to call Detective Hamers to impeach Parovel's testimony that he did not sell drugs.  Detective Hamers told the trial court that Parovel had admitted to him that he sold marijuana and that Nate Newman was one of his suppliers.  [Petitioner] argued that this was proper impeachment of Parovel, who denied selling drugs.  The trial court, the prosecutor and defense counsel tried to reconstruct exactly what Parovel testified to about sales of marijuana, prompting the trial court to obtain a transcript of Parovel's cross examination.  The trial court concluded that Parovel's testimony was that he occasionally sold marijuana, because he first denied and then admitted selling marijuana.  Thus, the trial court suggested that Detective Hamers's testimony might not be strictly inconsistent with Parovel's testimony.  The prosecutor argued that whether Parovel purchased marijuana from Newman was a collateral matter and that the jury already knew that Parovel was not a law-abiding citizen.

Ultimately, the trial court concluded that the testimony [petitioner's] attorney had elicited from Parovel was not specific enough to be inconsistent with the testimony Detective Hamers could offer.  The proffered evidence was not proper impeachment, the trial court ruled, and even if it was, these were collateral matters.  Applying section 352 of the Evidence Code, the trial court ruled that the evidence would be more prejudicial and time-consuming than probative.  It also saw no prejudice to [petitioner] from its ruling because the jury already knew that Parovel was not living an upstanding life-he had sold drugs and destroyed evidence.  It indicated that defense counsel could recall Parovel on this issue, but would not permit the impeachment that [petitioner] proposed based on the

---

[11] Parovel admitted to Detective Hamers that he sold drugs.

testimony that Parovel had given until that time.[12]

On appeal, [petitioner] contends that the trial court improperly precluded him from presenting evidence of Parovel's prior inconsistent statement to Detective Michael Hamers about whether Parovel had admitted to the detective that he was a drug dealer. A witness's inconsistent statement is admissible in evidence to assist the jury in determining his or her credibility. (Evid. Code § 780, subd. (H).) The trial court concluded that the proffered statement was not inconsistent with Parovel's earlier testimony. Whether or not the statement *was* inconsistent, the court found that the evidence was more prejudicial than probative. A trial court may exclude otherwise admissible evidence if its probative value is substantially outweighed by its prejudicial effect-undue consumption of time, danger of undue prejudice, confusion of issues or misleading the jury. (Evid. Code § 352.) Its exercise of its discretion pursuant to Evidence Code section 352 will not be reversed on appeal, absent a showing of an abuse of that discretion. (*People v. O'Brien* (1976) 61 Cal.App.3d 766, 781.) Such as abuse of discretion occurs if the trial court's ruling falls outside the bounds of reason. (*People v. DeSantis* (1992) 2 Cal.4 th 1198, 1226, cert. Den. 508 U.S. 917.) Here, the trial court found that the proffered evidence would be more prejudicial and time-consuming than probative. The evidence might have misled the jurors to believe that the fact that Parovel was a drug dealer would constitute a defense to the charged crimes. It was also of slight probative value, as it was cumulative of evidence that the jury already had heard that Parovel had sold drugs on several occasions. For these reasons, we are satisfied that the trial court's decision did not fall outside the bounds of reason and that, thus, the trial court did not abuse its discretion in excluding this evidence.

Respondent's Reply, Exh. 12 at 38-40.

Even if a proper foundation had been laid and even if Parovel had been subject to recall, the trial court held that petitioner's proffered testimony could not be entered into evidence as it was more prejudicial than probative. The court of appeal upheld the trial court's ruling and noted the slight probative value based on the testimony already in evidence that Parovel sold drugs.

Pursuant to Schriro v. Landrigan, 550 U.S. 465, 127 S.Ct. 1933, 1940, 167 L.Ed.2d 836 (2007), the federal court must apply the AEDPA deferential standards to legal and factual questions necessarily reached by the state courts in determining whether to grant an evidentiary hearing. Id. Petitioner has failed to demonstrate that the state court decision is contrary to federal law. While trial counsel may have been deficient, the conduct did not affect the outcome of the trial. Had trial counsel properly attempted to admit the evidence, the court would not have allowed it. Petitioner has failed to show any prejudice, i.e. any drug

---

[12] It appears that Parovel was then preparing to leave the jurisdiction, having completed his testimony. [Petitioner] had not asked that he remain available for additional questions when he had completed his questioning of Parovel.

1  selling evidence that trial counsel should have presented was already known to the
2  jury.  Furthermore, the integrity of Parovel as a witness was not the crux of trial
   counsel's defense as petitioner's own admission corroborated the majority of
3  Parovel's testimony.  An evidentiary hearing need not be held when the record
   clearly refutes the collateral factual allegations raised by petitioner.  Schriro, 550
4  U.S. 465, 127 S.Ct. 1933, 1940.

5  July 28, 2009, order, pp.  13-19.

6          Because the undersigned found that petitioner was not entitled to an evidentiary

7  hearing as to these claims, they should be denied.  After conducting an independent review of the

8  record, the undersigned finds that the denial of these claims by the California Supreme Court was

9  not an unreasonable application of clearly established Supreme Court authority.

10          *Mental State Evidence*

11          Petitioner makes several arguments in support of his claim that trial counsel

12  inadequately presented his defense that he lacked the requisite mental states for the charged

13  crimes due to organic brain disorders and multiple cognitive and adaptive impairments.

14  Amended Petition, pp. 63-80.  The undersigned notes that petitioner did not seek an evidentiary

15  hearing regarding mental state evidence.  See petitioner's motion for evidentiary hearing, court

16  file Docket no. 72.  Not asking for an evidentiary hearing for an ineffective assistance claim is

17  tantamount to abandoning the claim in most instances.  It is not the court's function to *sua sponte*

18  correct an omission from petitioner's evidentiary hearing motion.  But even taking the allegations

19  of the petition as true, such allegations would not make out a case of Strickland prejudice.

20          In order to put these arguments in context, the following factual background is

21  necessary.

22          As discussed in the opinion of the California Court of Appeal, to find petitioner

23  guilty of provocative act murder, the jury had to find that petitioner knew that his provocative act

24  had a high probability of eliciting a life-threatening response from Parovel.  See In re Aurelio R.,

25  supra, 167 Cal.App.3d at p. 57, 212 Cal.Rptr. 868; see People v. Gallegos, supra, 54 Cal.App.4th

26  at p. 460, 63 Cal.Rptr.2d 382.  To find petitioner guilty of the special circumstances that led to

60

1    his lengthy sentence, the jury had to find that the Pina's killing was committed while petitioner

2    acted with reckless indifference to human life and as a major participant aiding and abetting the

3    burglary/robbery.  CT at 268.  To find reckless indifference to human life, the jury had to find

4    that petitioner knew or was aware that his acts involved a grave risk to the death of an innocent

5    human being.  CT at 268.  To find petitioner guilty of robbery/burglary, the jury had to find that

6    petitioner had the specific intent to deprive the victim of his property.  CT at 273, 276.

7         Petitioner's trial counsel argued that because petitioner's organic brain disorders

8    prevented him from understanding the consequences of his actions, he did not know that his

9    provocative acts were a danger to or involved a grave risk to human life.  Counsel also argued,

10   although less forcefully, that petitioner's organic brain disorder prevented him from forming the

11   specific intent to commit robbery or burglary.  Petitioner now argues that trial counsel failed to

12   adequately present his defense that he lacked the requisite mental states for the charged crimes

13   due to organic brain disorders and multiple cognitive and adaptive impairments.

14        Having clarified the claim, the undersigned will next summarize the testimony of

15   the mental health experts who testified on petitioner's behalf.  Dr. Daniel Amen, a psychiatrist,

16   testified that he performed a SPECT scan on petitioner's brain.  RT at 361.  At rest, petitioner's

17   brain showed significantly decreased activity in the front part of his brain and terrible activity in

18   his temporal lobes.  RT at 365.  When he tried to concentrate, petitioner's brain significantly

19   suppressed an activity, i.e. got significantly worse in activity.  RT at 366.  At rest, petitioner's

20   brain had significant over activity in his limbic system which is the part of the brain that controls

21   mood.  RT at 367.  People with this type of brain tend to pick out the negative idea in a situation.

22   RT at 367.

23        Dr. Amen testified that petitioner's cingulate gyrus, the area of the brain that helps

24   people go from thought to thought or idea to idea, was working very hard.  RT at 368.  When it

25   works too hard, people often get stuck on repetitive thoughts or repetitive behaviors. RT at 368.

26   Dr. Amen also saw a problem on the left side of petitioner's brain that led him to believe that

1   petitioner probably had a head injury that damaged the executive decision making part of his

2   brain.  RT at 368.

3          Dr. Amen testified that overall, petitioner's brain problems affected his memory,

4   mood stability, temper control and ability to learn.  RT at 369.  He also thought that petitioner

5   probably had severe attention deficit disorder.  RT at 370.  He also testified, "We also see this

6   overall suppression in people that have schizophrenia."  RT at 370.  He testified that petitioner's

7   poor functioning brain would impact his judgment, impulse control, organization and planning.

8   RT at 374.  Petitioner would have trouble following through with things.  RT at 375.

9          Dr. Kowell, a neurologist, testified that he reviewed the police reports, medical

10  records, blood tests done by Valley Toxicology, a report by Dr. Datta, a report by Dr. Amen of

11  his SPECT report of petitioner.  RT at 412-413.  In addition, Dr. Kowell examined petitioner. RT

12  at 412.  He testified that he did a mini-mental state exam on petitioner which showed some

13  abnormalities.  RT at 416.  In particular, Dr. Kowell asked petitioner to perform serial 7

14  subtractions, which means you start at a hundred, and up in your mind, subtract 7 over and over.

15  RT at 416.  Petitioner made one mistake in doing that at the end.  RT at 416.

16         When Dr. Kowell asked petitioner to spell the word "world" backwards, he was

17  not able to correctly do that.  RT at 416.  Petitioner had some difficulty copying figures. RT At

18  416.  Dr. Kowell also testified that petitioner's affect was flat meaning he did not have a lot of

19  emotion.  RT at 416.

20         Dr. Kowell testified that based on the information he reviewed, it was his

21  impression that petitioner had at least a chronic brain dysfunction involving his frontal and

22  temporal lobes related to chronic usage of marijuana. RT at 417.  Dr. Kowell testified that these

23  areas of the brain serve functions such as memory, impulse control, judgment, abstract reasoning,

24  ability to carry out complex actions and attention span and ability to concentrate.  RT at 418.

25  People with this type of brain dysfunction could have a lack of understanding of a particular

26  social situation and problems understanding complex processes.  RT at 421.  They could also

1    have an impairment of an ability to appreciate the consequences of their actions.  RT at 421.

2              *Dr. Datta*

3              Petitioner first argues that counsel was ineffective for not calling Dr. Datta as a

4    witness.  Amended Petition, pp. 64-66.  At trial counsel's request, the court appointed Dr. Datta

5    to perform a psychological/psychological evaluation of petitioner.  Amended Petition, p. 64, ¶ a.

6    Dr. Datta diagnosed that petitioner had possible organic brain damage due to or associated with

7    severe drug abuse or his chronic psychiatric illness, i.e., schizophrenia.  Amended Petition, p. 65,

8    ¶ b.  After receiving Dr. Datta's finding, defense counsel sought funding to have brain scans

9    performed on petitioner by Dr. Amen to show frontal lobe organic brain damage.  Amended

10   Petition, p. 65, ¶ a.  Defense counsel subpoenaed Dr. Datta to appear at trial and identified him as

11   a witness during her opening statement.  Amended Petition, p. 65, §§ c, d.  On January 10, 1999,

12   defense counsel canceled Dr. Datta's subpeona.  Amended Petition, p. 65, ¶ e.

13             On January 11, 1999, the trial court ruled that defense counsel's expert, Dr.

14   Kowell, a neurologist, could not testify to a psychiatric diagnosis supporting CALJIC 3.32, which

15   the jury ultimately read.  Amended Petition, p. 66, ¶ f.  CALJIC 3.32, as read to the jury,

16   provides,

17             You have received evidence regarding a mental defect of the defendant at the time
              of the commission of the crimes charged or lesser crimes thereto.  You should
18            consider this evidence solely for the purpose of determining whether the
              defendant formed the specific–the requisite intent and/or mental state as set forth
19            elsewhere in these instructions.

20   RT at 531.

21             On January 11, 1999, the court heard an offer of proof from defense counsel as to

22   the proposed testimony of Dr. Kowell.  Amended Petition, p. 66, ¶ g.  Defense counsel stated that

23   Dr. Kowell would give an opinion that petitioner had a mental defect and lacked the mental state

24   underlying at least two of the charges.  Id.  Defense counsel stated that Dr. Kowell had relied on

25   Dr. Amen's brain scans, Dr. Datta's neuropsychological report and various documents.  Id.  The

26   court then conducted a hearing pursuant to Cal. Evid. Code § 402 on the admissibility of Dr.

1    Kowell's testimony.  Id.

2           At the 402 hearing, Dr. Kowell testified that petitioner suffered from organic brain

3    dysfunction as a result of chronic marijuana usage which affected his frontal and temporal lobes.

4    Amended Petition, p. 66, ¶ h; RT at 400.  At the time of the offense, petitioner was under the

5    influence of marijuana.  Amended Petition, p. 66, ¶ h; RT at 401.  At the conclusion of the

6    hearing, the court told defense counsel that she could not ask Dr. Kowell about Dr. Datta's report

7    unless it was elicited on cross-examination because of its hearsay nature.  Amended Petition, p.

8    66, ¶ j; RT at 4-6-407.

9           Dr. Datta's report of his evaluation of petitioner is contained in respondent's

10   Exhibit 17, volumes 2-5, pp. 199-201.  In this report, Dr. Datta found that petitioner suffered

11   from some form of organic brain damage "which could be associated with his excessive drug

12   abuse or his mental illness (possible schizophrenia)."  Respondent's Exhibit 17, volumes 2-5, p.

13   200.  He wrote that petitioner had been hearing voices sporadically since his adolescence but did

14   not want to talk about it.  Id.  Dr. Datta wrote that petitioner demonstrated "some typical

15   behavior mannerism normally demonstrated by patients suffering from schizophrenia,

16   disorganized type" including ritualistic touching objects, sniffing or kissing them.  Id.

17          Dr. Datta made reference to a report by a Dr. Caldwell suggesting that petitioner

18   showed symptoms of thought disorder and a current disorganization of intellectual functioning.

19   Id. at 200.  Dr. Datta found that his MMPI-2 generated a 6-8/8-6 codetype.  Id.  Persons with this

20   codetype are likely to exhibit thought disorder and paranoid features; their affect is blunted and

21   their behavior is unpredictable.  Id

22          Dr. Datta wrote that petitioner was dependent on Pina to take care of him.  Id. at

23   200.  It was quite possible that petitioner went along with Pina and fantasized about becoming

24   rich with the victim's money.  Id. at 201.  Dr. Datta wrote that when he saw the fight between

25   Pina and Parovel, petitioner panicked and frantically hit Pina with the gun.  Id. at 201.  He also

26   wrote that it was likely that petitioner complied with Pina's instructions and did not intend to

1  shoot anyone.  Id. at 201.

2           Turning to the merits of the instant ineffective assistance of counsel claim, Dr.

3  Datta's report does not at all state that someone with petitioner's brain dysfunction was incapable

4  of forming specific intent.  While Dr. Datta found that petitioner might have schizophrenia, he

5  did not state that this would cause petitioner to be unable to form specific intent.

6           The testimony of Dr. Amen and Dr. Kowell regarding petitioner's mental abilities

7  was, in certain respects, stronger for petitioner than Dr. Datta's report because these doctors

8  made more clear statements regarding petitioner's ability to make plans and understand

9  consequences.  Dr. Amen testified that petitioner's brain did not function well when he was

10  concentrating and that the brain dysfunction would impact his impulse control, organization and

11  planning as well as the ability to follow through with things.  Petitioner also mostly likely had

12  severe attention deficit disorder.  Even if relevant, and the undersigned does not believe so, Dr.

13  Kowell also testified that people with petitioner's brain dysfunction could have an impaired

14  ability to appreciate the consequences of their actions.  Dr. Datta made no specific findings

15  regarding petitioner's ability to plan, organize or ability to appreciate consequences.

16           For the reasons discussed above, the undersigned finds that his confidence in the

17  outcome of the trial was not undermined because petitioner's counsel did not call Dr. Datta to

18  testify.  For that reason, petitioner has failed to establish prejudice.

19           For the reasons discussed above, petitioner is not entitled to relief as to this claim.

20           *Trial Counsel's Failure to Elicit Findings from Amen Report*

21           Petitioner argues that counsel failed to elicit several findings in Dr. Amen's report

22  during his testimony.  Amended Petition, p. 66.  In particular, petitioner argues that in his report,

23  Dr. Amen noted that the study of petitioner's prefrontal cortex and temporal lobe brain

24  functioning was consistent with learning disabilities and poor executive function, and that the

25  increased cingulate gyrus and limbic activity were consistent with overfocus and depressive

26  issues.  Petitioner argues that counsel was ineffective for not eliciting these findings during Dr.

1   Amen's testimony.

2          Dr. Amen testified that petitioner's frontal lobe had a decrease in activity when he

3   tried to concentrate.  RT at 366.  He went on to explain that the frontal lob is the part of the brain

4   that helps with "executive functions."  RT at 367.  Therefore, petitioner's claim that counsel did

5   not elicit the portion of his report stating that petitioner had poor executive functioning is

6   inaccurate.  Petitioner's claim that counsel failed to elicit the portion of his report stating that

7   petitioner's cingulate gyrus and limbic systems were consistent with overfocus and depressive

8   issues is also inaccurate.  See RT at 367-369.  While Dr. Amen did not use the words "learning

9   disability," he testified that someone with petitioner's brain dysfunction would have learning

10  problems.  See RT at 369.  Petitioner's claim that trial counsel failed to elicit these findings from

11  Dr. Amen's report is without merit.

12         Petitioner next argues that Dr. Goldman of the Amen Clinic for Behavior

13  Medicine prepared a report including his diagnosis of petitioner.  Amended Petition, p. 67, ¶ d.

14  Petitioner argues that the results of Dr. Goldman's report were not conveyed to Dr. Kowell by

15  defense counsel or Dr. Amen.  Amended Petition, p. 68, ¶ f.  Petitioner suggests that counsel was

16  ineffective for failing to call Dr. Goldman as a witness.  Amended Petition, p. 68, ¶ g.

17         A copy of Dr. Goldman's report is attached to respondent's 17, 3 of 5, pp. 375-

18  381.  Dr. Goldman apparently prepared this report following the SPECT scan performed by Dr.

19  Amen.  In the petition, petitioner highlights the following portions of the report which he claims

20  counsel was ineffective for conveying to Dr. Kowell or presenting to the jury by way of Dr.

21  Goldman's testimony.  Dr. Goldman found that petitioner had mood disorder due to a few

22  episodes of head trauma.  Respondent's Exhibit 17, 3 of 5, p. 380.  Dr. Goldman also clinically

23  diagnosed, which was confirmed by the SPECT scan, features of attention deficit disorder,

24  temporal lobe subtype with likely simple partial seizures.  Id.  He also found that petitioner had

25  problems with depression and other emotional difficulties.  Id.  He also found that there was

26  concern that petitioner could have other chronic medical problems affecting his brain in addition

66

1  to attention deficit disorder, "so the diagnostic study of the brain, the SPECT brain imaging was

2  very helpful, since it did reveal medical problems in some other brain areas." Id.

3          Petitioner suggests that had the findings described above been relayed to Dr.

4  Kowell, then his opinion of petitioner's brain dysfunction would have been different.  However,

5  petitioner offers no evidence in support of this claim such as a declaration by Dr. Kowell to that

6  effect.  Moreover, Dr. Kowell testified that he reviewed Dr. Amen's report.  RT at 412.  In his

7  report, Dr. Amen found that the SPECT scan of petitioner's brain was consistent with depressive

8  issues and severe attention deficit disorder.  Respondent's Exhibit 17, 3 of 5, p. 458.  Therefore,

9  Dr. Kowell was aware of these diagnosis, although made by Dr. Amen rather than Dr. Goldman.

10  While petitioner faults trial counsel for not informing Dr. Kowell that Dr. Goldman found that

11  petitioner suffered a mood disorder caused by head traumas, in his next claim for relief

12  petitioner admits that Dr. Kowell's notes reflect an awareness that petitioner suffered a head

13  injury at the age of seven or eight in which there was a loss of consciousness.  Amended Petition,

14  p. 69, ¶ b.  It is unclear what additional information petitioner believes Dr. Kowell would have

15  gleaned from knowing that Dr. Goldman also found that petitioner suffered from a head trauma.

16          The only information in Dr. Goldman's report that was not specifically stated in

17  Dr. Amen's report or by Dr. Kowell is that petitioner had likely partial seizures as a result of the

18  temporal lobe subtype.  However, petitioner offers no evidence that Dr. Kowell's opinion

19  regarding petitioner's brain capabilities would have changed had he been aware that he might

20  suffer from partial seizures.  Accordingly, for the reasons discussed above, the undersigned finds

21  that petitioner has failed to demonstrate that the outcome of his trial would have been different

22  had Dr. Kowell been given the information in Dr. Goldman's report discussed above or had Dr.

23  Goldman testified to these matters.

24          *Dr. Kowell's Diagnosis of Organic Brain Disorder and its Causes*

25          Regarding Dr. Kowell, petitioner suggests that counsel was ineffective in his

26  examination of him.  Petitioner argues that while Dr. Kowell's notes reflected that petitioner

67

1   suffered a head injury at the age of seven or eight in which he lost consciousness, this factor was

2   not mentioned during his testimony as a cause of petitioner's organic brain dysfunction.

3   Amended Petition, p. 69, ¶ b.  It is unclear how petitioner is arguing counsel was ineffective in

4   connection with this claim.  Dr. Kowell testified that petitioner had chronic brain dysfunction

5   related to chronic marijuana usage.  RT at 417.  Petitioner cannot base this claim of ineffective

6   assistance of counsel simply on his own disagreement with Dr. Kowell's opinion regarding what

7   caused his brain dysfunction.  This claim should be denied.

8           Petitioner argues that counsel was ineffective for failing to propound hypothetical

9   questions to Dr. Kowell asking him to suppose that a person with the organic brain dysfunctions

10  of petitioner was confronted by the specific scenarios established by the testimony describing the

11  charged crimes, and how those scenarios might be understood and acted upon by that person.

12  Amended Petition, p. 69, ¶ d.  Petitioner appears to repeat this argument later in this section of

13  the petition.  See Amended Petition, p. 71, ¶ j.

14          Without even asking for an evidentiary hearing, petitioner heaps speculation upon

15  speculation in claiming that if trial counsel had asked more hypothetical questions, these

16  questions would have turned the case around for petitioner.  However, the fact is, the best the

17  expert could actually muster was that such a person with petitioner's problems "might not" have

18  appreciated the consequences of his actions.  This testimony was immaterial.

19          Moreover, the case specific hypothetical questions petitioner argues counsel

20  should have asked Dr. Kowell would not have been permitted based on the court's ruling that Dr.

21  Kowell could not testify regarding the ultimate fact, i.e. how petitioner's brain dysfunction

22  affected his conduct on the day of the charged crimes.  Clearly, such hypothetical questions

23  would have been a transparent, and unsuccessful, attempt to circumvent the court's ruling.

24  Counsel was not ineffective for failing to ask hypothetical questions petitioner now proposes.

25          Petitioner argues that defense counsel was ineffective for failing to object to the

26  prosecution's questions to Dr. Kowell regarding the events of the crime and its aftermath, in an

attempt to demonstrate that notwithstanding petitioner's organic brain dysfunction, petitioner had

an awareness of the consequences of his conduct to himself and others.  Petitioner argues that

this cross-examination violated the restrictions imposed by the court on Dr. Kowell's testimony.

Amended Petition, p. 69, ¶ e.  Petitioner appears to repeat this argument later in the petition.

Amended Petition, p. 71, ¶ k.

The undersigned will quote some of this cross-examination:

> Q: Are you aware of any evidence in this case from your review of the file that shows an awareness on the defendant's part, an awareness, conduct by the defendant that manifests an awareness of consequences to himself and to others?
>
> A: That's a broad–that's a broad question.  I mean, it's clear that obviously when he was shot, he ran to the car to apparently get help.  But that's just–that's one specific instance.  I mean, your question is broad.  How would it affect his ability to sit down and do a crossword puzzle?  I can't tell you that.
>
> Q: Well, for example, Mr. Briscoe had a gun with him, and Mr. Briscoe went to commit a robbery.  Can you imagine, Doctor, that Mr. Briscoe imagined that if he used a gun, he might be able to take property by force?
>
> A: That's certainly a possibility.
>
> Q: Well, certainly that is.  And can you imagine, Doctor, that Mr. Briscoe–or do you know that Mr. Briscoe was friends, knew the person from prior marijuana dealings that he was going to steal from?
>
> A: yeah.
>
> Q: And when he saw this person, he encountered him on the street, not in the house, and that he did not pull a gun on him and cause a commotion on the street, but concealed his intent, went in the house with the victim under the pretense of friendship and wanting to purchase marijuana, and then did the robbery inside the home, can you conceive that the defendant could commit that, could do those things?
>
> A: Yes.
>
> *****
>
> Q: And that once in that room, Mr. Briscoe kept the gun to that woman's head while she was in a headlock until her boyfriend left that room?  And while in that room, he heard a struggle and instead of staying with the female victim, he presumably went to the person who posed the larger threat, went to help his crime partner, who was struggling with the male victim, who was six foot five, because in his words, he didn't want him to get the gun.  I mean, there's nothing about the condition that you have said he has that keeps that from happening, right?

69

1    A: No.

2    Q: And that shows a manifestation of his understanding consequences to himself
     and to others, does it not?

3
     A: Well, it depends on what you might visualize the consequences are at that
4    point in time.

5    Q: But you know that's why we are in business.  So once you get past that initial
     bad decision, because all criminals are making decisions just the fact that they are
6    involved in these types of crimes, Doctor, so let's just get past that.  Once you get
     past the initial decision to be involved in felony conduct, that conduct manifests
7    an awareness of consequences to himself and others, does it not?

8    A: It may not.  It may not.

9    RT at 437-440.

10          Petitioner's point is unclear to the undersigned.  Even if the prosecutor was

11   permitted to direct improper questions to *petitioner's* expert, the same type of question that

12   petitioner desired to ask, but was refused, see supra, how was petitioner harmed by the "failure to

13   object?"  At best, the expert would be able to answer the improper question.  Defense counsel

14   would have acted unreasonably if an objection *had* been made.  The fact that the testimony was

15   not very probative is simply an argument that the expert did not have much to sway the jury.

16          Petitioner argues that defense counsel was ineffective for failing to question Dr.

17   Kowell during redirect examination on the subject matter opened up by the prosecution's cross-

18   examination, including whether and how petitioner's organic brain dysfunction impacted his

19   awareness of the consequences of his behavior before, during and after the incident.  Amended

20   Petition, p. 69, ¶ f.  Petitioner appears to repeat this argument later in the petition.  Amended

21   Petition, p. 71, ¶ l.

22          Even assuming that the prosecutor asked improper questions that "opened up" the

23   issue, the fact of the matter is that *petitioner's* expert was able tot answer the questions which

24   trial counsel would have then posed – again.  The fact that this relatively non-probative testimony

25   was not repeated is of little consequence.

26          Petitioner argues that during closing argument, the prosecutor committed

                                                    70

1    misconduct by exploiting the restrictions placed on Dr. Kowell's testimony.  Amended Petition,

2    p. 70, ¶ g, h.  Petitioner cites the following argument as improper:

3              See, Dr. Kowell either didn't want to bother to know or knew and didn't want to
               be forthcoming with you, but we know what this man's intent was when he went
4              there.  He went there to rob a man.

5    RT at 481.

6              Petitioner argues that counsel should have objected to this improper argument.

7              The argument cited above suggests that Dr. Kowell either knew or chose not to

8    know whether petitioner was capable of forming the intent to rob on the day in question.  As

9    discussed above, the trial court prohibited Dr. Kowell from testifying to this ultimate fact.

10   Therefore, this argument was improper.  Counsel should have objected to this argument.

11   However, it is not likely that a failure to object to this improper argument would have changed

12   the outcome of the trial.  This fleeting assertion in a lengthy argument simply was too brief to

13   make much difference.  The remainder of the argument made by the prosecutor focused on the

14   facts of the case which made it unlikely that petitioner had not actually formed the requisite

15   intent,  RT 481-484, something the jury was entitled to hear.  For these reasons, the undersigned

16   does not find that petitioner suffered prejudice as a result of counsel's failure to object.

17                         *Failure to Competently Consult with and Prepare Experts*

18             Petitioner argues that defense counsel did not adequately prepare and consult with

19   her mental health experts.   Amended Petition, p. 71, ¶ a.  In particular, petitioner argues that

20   defense counsel did not provide Dr. Datta with a copy of either Dr. Amen's or Dr. Goldman's

21   reports or information concerning Dr. Kowell's evaluations.  Amended Petition, p. 72, ¶ a.

22   Petitioner argues that prior to cancelling Dr. Datta's subpoena, defense counsel failed to consult

23   with Dr. Datta regarding those reports.  Amended Petition, p. 72, ¶ a.  For these reasons,

24   petitioner contends that defense counsel was ineffective for failing to present the testimony of Dr.

25   Datta.  Amended Petition, p. 72, ¶ a.

26             Petitioner offers no evidence that Dr. Datta's opinion regarding petitioner's

                                                   71

1  condition would have been different had he reviewed those reports.  The court has reviewed Dr.

2  Datta's report, Dr. Goldman's report and Dr. Amen's report as well as Dr. Kowell's testimony

3  regarding petitioner's condition.  The reports and testimony of all four doctors were not

4  inconsistent.  Petitioner's conclusory assertion that Dr. Datta would have had a different opinion

5  after reviewing the reports of the other doctors is sheer speculation and not supported with

6  anything but a bald conclusion.  Accordingly, petitioner's claim that counsel was ineffective for

7  failing to provide Dr. Datta with the reports of the other doctors and for failing to call him as a

8  witness is denied.

9       Petitioner argues that defense counsel was ineffective for failing to provide Dr.

10  Kowell with Dr. Goldman's report.  Amended Petition, p. 72, ¶ c.  As a result of counsel's failure

11  to consult with Dr. Kowell regarding Dr. Goldman's report, counsel's decisions regarding what

12  questions to ask Dr. Kowell were inadequate.  Petitioner argues that Dr. Kowell's testimony was

13  incomplete and misleading.  Amended Petition, p. 73, ¶ e.

14       In the section above titled "Trial Counsel's Failure to Elicit Findings from Amen

15  Report," the undersigned addressed petitioner's claim that trial counsel was ineffective for failing

16  to convey to Dr. Kowell certain aspects of Dr. Goldman's report.  It is unclear whether the instant

17  claim is a restatement of the earlier claim or whether petitioner is now arguing that Dr.

18  Goldman's entire report should have been given to Dr. Kowell.  Assuming petitioner is now

19  claiming that Dr. Kowell's opinion would have changed had he reviewed the entire Goldman

20  report, he offers no evidence to support such a claim.  In any event, the opinions of Dr. Kowell

21  and Dr. Goldman were not inconsistent.  Because this claim is speculative and unsupported, it

22  should be denied.

23       Petitioner argues that counsel was ineffective for failing to consult with Dr. Amen

24  regarding Dr. Goldman's report prior to his testimony.  Amended Petition, p. 73, ¶ f.  As a result

25  of counsel's failure to consult with Dr. Amen regarding Dr. Goldman's report, counsel's decision

26  regarding what questions to ask Dr. Amen was inadequate.  Id.  Petitioner argues that Dr. Amen's

1   testimony was incomplete and misleading as a result of his failure to review Dr. Goldman's

2   report.  Amended Petition, p. 73, ¶ h.

3            As discussed above, Dr. Goldman works at the Amen Clinic.  In relevant part, Dr.

4   Goldman's report basically summarizes the results of Dr. Amen's SPECT scan.  Respondent's

5   Exhibit 17, 3 of 5, pp. 380-381. Petitioner offers no evidence that Dr. Amen's opinion regarding

6   petitioner's condition would have been different had he reviewed Dr. Goldman's report.  Because

7   this claim is speculative and unsupported, it should be denied.

8            Petitioner argues that counsel was ineffective for failing to consult with Dr.

9   Goldman regarding his report or consider whether Dr. Goldman should be called as a witness.

10  Amended Petition, p. 74, ¶ I. .  In the instant claim, petitioner does not identify which portion of

11  Dr. Goldman's report, had it been presented to the jury, would have changed the outcome of his

12  case.  The undersigned will not speculate regarding this matter on petitioner's behalf.  In any

13  event, the undersigned above rejected petitioner's claim that counsel was ineffective for failing to

14  call Dr. Goldman as a witness.  For the reasons discussed above, this claim should be denied.

15           Finally, petitioner argues that the depth of his cognitive deficits and the

16  implications of his impairments upon his behavior and actions were not properly appreciated by

17  trial counsel.  Petitioner argues that had counsel fully and effectively investigated and researched

18  his mental, cognitive and adaptive deficits, provided all relevant information to experts, she

19  would have presented evidence that

20           1) he suffers from long standing organic brain damage acquired early in life or
             perinatally, possibly compounded by head trauma, attention deficit disorder and
21           adaptive deficits.  Amended Petition, p. 75, ¶ m(I);

22            2) neuropsychiatric testing of petitioner demonstrates that he has a damaged and
             impaired brain, with neuropsychological dysfunction localized in the left and
23           frontal temporal lobes as well as learning disabilities.  These conditions impair
             petitioner's ability to inhibit unwanted responses, cause him difficulty in shifting
24           his thinking and behavior in response to environmental and verbal cues, or
             changed circumstances, cause him to suffer impairments in sequencing, mental
25           flexibility and adaptive functioning, an impaired ability to anticipate and
             understand consequences and conceptualize alternatives, an impaired ability to
26           sequence actions in a meaningful way when confronted with rapidly changing

                                              73

1    situations, and adapt his behavior accordingly.  Amended Petition, p. 75, ¶ m(ii);

2    3) the brain damage can cause deficits in auditory processing, verbal memory and
     emotional regulation; can impair a person's ability to carry out all but the simplest
3    plans; can impair a person's ability to maintain and shift attention, results in a lack
     of insight, an inability to adapt to new situations, difficulties making mental or
4    behavior shifts, impulsivity and impulse and control problems.  Amended
     Petition, p. 76, ¶ m (iii);

5
     4) petitioner's disorders significantly impaired his judgment; he suffers from
6    profound deficits in attention and concentration, memory, problem solving
     abilities, coping strategies, perception of self and others and impulse control.
7    Amended Petition, p. 76, ¶ m (iv); 5) his drug and alcohol use at an early age
     occurred when his frontal lobes were in their most crucial development stages.
8    Amended Petition, p. 76, ¶ m(v).

9           The undersigned above rejected petitioner's claims that counsel was ineffective in

10   failing to prepare the experts called as witnesses, i.e. Dr. Amen and Dr. Kowell, as well as

11   ineffective for failing to call Dr. Goldman and Dr. Datta as witnesses.  Accordingly, to the extent

12   the present claim is a restatement of these earlier claims, it should be denied for the reasons

13   discussed above.

14          In support of the instant claim, petitioner also cites the declaration of Dr. Woods,

15   see Respondent's 17, 5 of 5, pp. 1024-1031, and the declaration of Natasha Khazanov. Ph.D., Id.,

16   at pp. 1005-1014.  Dr. Woods and Dr. Khazanov were retained by petitioner's state appellate

17   counsel.

18          Dr. Woods interviewed petitioner as well as reviewed the reports of Dr. Datta, Dr.

19   Amen, Dr. Goldman, Dr. Khazanov and the trial transcripts of the testimony of Dr. Amen and

20   Dr. Kowell.  Id. at 1025.  Dr. Woods concluded that petitioner suffered from impairments of

21   executive functioning as identified during the neuropsychological testing of Dr. Khazanov.  Id. at

22   1025.  These defects include specific impairments in sequencing, mental flexibility and adaptive

23   functioning.  Id.

24          Dr. Woods states that the depth and breadth of plaintiff's cognitive deficits were

25   not recognized by plaintiff's attorney "in spite of some evidence."  Id. at 1027.  "Therefore, the

26   implications of his organic impairment in the offense were not properly taken into

                                                    74

1   consideration." Id.  In making this finding, Dr. Woods stated that although plaintiff's

2   neurological deficits were determined during his pretrial evaluation by Dr. Goldman, no

3   neuropsychological battery was administered by either Dr. Kowell or Dr. Datta.  Id.  Dr.

4   Khazanov performed neuropsychological testing on plaintiff that demonstrated the degree of his

5   cognitive deficits.  Id at 1026.

6          Dr. Woods also states that Dr. Kowell's opinion that petitioner's impairments

7   were caused by chronic marijuana use was not well informed, since a thorough social history and

8   careful anatomic localization of his cognitive deficits would have shown a neuropsychological

9   pattern of brain problems most likely starting perinatally and certainly earlier than the onset of

10  his consistent marijuana use.  Id. at 1027.  Dr. Khazanov stated that although there was no

11  documentation of any specific etiologic cause for petitioner's brain damage, in her opinion it was

12  the result of the following factors: 1) some kind of perinatal trauma; 2) several closed head

13  injures; and 3) history of chronic substance abuse.  Id. at 1017.

14         Dr. Woods went on to summarize Dr. Khazanov's report which discussed

15  plaintiff's executive function limitations.  Dr. Khazanov noted that perseveration, the tendency to

16  get stuck, to not be able to adapt one's behavior successfully, was one of plaintiff's most

17  prominent neurological deficits.  Id. at 1029.  Plaintiff's responses to various tests also

18  demonstrated that he suffered from brain damage.  Id. at 1030.

19         In his declaration, Dr. Woods stated that in his opinion, due to his impaired

20  cognitive ability to conceptualize alternative behavior, to sequence his actions in a meaningful

21  way when confronted with rapidly changing situations and to adapt his behavior accordingly,

22  particularly under significant stress, petitioner did not appreciate the potential consequences of

23  his actions at the time of the incident.  Id. at 1031.  Dr. Woods goes on to state,

24         The police interrogation documents that the goal was to rob Parovel.  The police
           interrogation also documents that Mr. Briscoe held a gun to Alisha Rozadilla.
25         However, the police interrogation reflects that Mr. Briscoe did not realize that she
           no longer had a gun, in spite of having been in the same room when Ms. Rozadilla
26         gave the gun to Parovel.  She had to tell him he could search her, which he did, in

1   order for him to realize she no longer had the weapon she was earlier sitting next to.

2

3   When Mr. Briscoe became aware of the altercation between Mr. Pina and Mr. Parovel, he left Ms. Rozadilla completely alone and ran into the next room.  She was then able to crawl to safety out of a window.

4

5   Mr. Briscoe was faced with a rapidly deteriorating situation.  He did not shoot the intended victim, although Mr. Briscoe had a gun in his hand.  Rather, he hit the intended victim several times.  Mr. Parovel gained the upper hand, mortally wounding Shaun Pina and critically wounding Mr. Briscoe.

6

7   This series of events, and Mr. Briscoe's response to them, is consistent with the behavior of someone without the neurologically intact reliability to rapidly weigh circumstances and understand the potential of an explosive situation.

8

9   Id at 1031.

10      Turning to the merits of the instant claim, Dr. Woods suggests that it should have

11  been clear to petitioner's trial counsel, apparently from Dr. Goldman's report, that petitioner's

12  cognitive deficits were more serious than she believed.  After again reviewing Goldman's report,

13  respondent's exhibit 17, 3 0f 5, pp. 375-381, it is unclear to the undersigned what portion of the

14  report should have made counsel aware that petitioner's cognitive impairments were more

15  serious than she believed.  In the "Discussion" section of the report, Dr. Goldman summarized

16  the results of the SPECT test performed by Dr. Amen, discussed the symptoms of Attention

17  Deficit Disorder and recommended treatment.  Id at 380.  Interestingly, Dr. Goldman did not

18  recommend further neurological testing.  Because it is not clear what in Dr. Goldman's report

19  should have tipped counsel off that petitioner's cognitive deficits were far more serious than she

20  knew, the undersigned cannot find that counsel was ineffective for failing to seek further

21  neurological testing of petitioner.  See also Harris v. Vasquez, 949 F.2d 1497, 1525 (9th

22  Cir.1990) ("It is certainly within the 'wide range of professionally competent assistance' for an

23  attorney to rely on properly selected experts."); see also Williams v. Woodford, 384 F.3d 567,

24  611 (9th Cir.2004) (holding counsel's decision not to investigate mental defense further was

25  reasonable in light of conclusions of mental health experts).

26      Moreover, Dr. Woods' main disagreement with the descriptions of petitioner's

76

1  cognitive deficits testified to by Dr. Kowell and Dr. Amen is with degree of symptoms of the

2  cognitive deficits.  These doctors do not disagree on the actual symptoms, although Dr. Woods

3  disagrees with Dr. Kowell's opinion regarding the cause.  Dr. Kowell testified that people with

4  the type of brain dysfunction petitioner suffered from had difficulty in appreciating the

5  consequences of their actions.  RT at 421.  Dr. Amen testified that petitioner's poor brain

6  functioning would impact his judgment, impulse control, organization and planning.  RT at 374.

7  Petitioner would have trouble following through with things.  RT at 375.  Dr. Woods apparently

8  would have been able to testify more definitely that a person with petitioner's type of brain

9  dysfunction, put into a rapidly changing situation, would be unable to appreciate the

10  consequences of their actions.

11          In essence, petitioner is arguing that had the jury known of the more severe degree

12  of his cognitive deficits, which Dr. Woods found made him incapable of appreciating the

13  consequences of his actions, he would have been found not guilty.  After a review of the

14  evidence, summarized above, the undersigned finds it highly unlikely that the jury would have

15  found petitioner not guilty of any of the offenses had Dr. Woods testified.  For the same reason

16  the jury apparently rejected the testimony of Dr. Kowell and Dr. Amen, it would have rejected

17  the testimony of Dr. Woods.  The evidence was very clear that petitioner intended to rob and

18  burglarize Parovel.  Petitioner admitted to this in his confession.  It would have been a stretch for

19  the jury to then go find that he did not appreciate the consequences of his actions.  Petitioner's

20  confession as well as the description of the events by Pina and Rozadilla, demonstrated that

21  petitioner was not incapable of understanding the consequences of his actions.

22          The undersigned has also considered Dr. Woods' statement that the facts of the

23  case demonstrate that petitioner did not have the cognitive ability to understand the

24  consequences.  In particular, Dr. Woods points to the fact that petitioner tried to take the gun

25  from Rozadilla even though he was in the room with her when she gave the gun to Parovel.

26  While one explanation of this fact could be that petitioner's mental deficits combined with the

1   chaos of the situation prevented him from processing the fact that Rozadilla had given the gun

2   away, another explanation could be that he did not see her do it.

3          Dr. Woods also points to the fact that Briscoe left Rozadilla alone, during which

4   time she escaped, to come to the aid of Pina when he and Parovel began fighting as evidence of

5   his cognitive deficits.  Another reasonable explanation of this fact could be that petitioner went to

6   the aid of Pina because he was concerned about getting the money, or that if Parovel gained the

7   upper hand, the situation might become very dangerous for him.  Indeed, simply guarding

8   Rozadilla in light of the fracas in the other room would have shown petitioner's inability to

9   appreciate consequences.  Petitioner also reasonably may not have appreciated that Rozadilla

10  could and would climb out a window.  Petitioner also knew that Rozadilla did not have a gun and

11  may have appreciated that the fight between Parovel and Pina was more dangerous.

12         Finally, Dr. Woods finds petitioner's pistol-whipping of Parovel to be evidence of

13  his severe mental deficits.  Dr. Woods suggests that a person not suffering petitioner's cognitive

14  deficits would have shot Parovel.  Another reasonable explanation of this could be that petitioner

15  decided it would be better not to kill Parovel if he did not have to, i.e., that petitioner was aware

16  of the consequences of firing the gun.

17         For the reasons discussed above, petitioner's claim of ineffective assistance of

18  counsel for failing to competently consult with and prepare experts is without merit.

19         After independently reviewing the record, the undersigned finds that the denial of

20  petitioner's claim 6 regarding the mental health evidence by the California Supreme Court was

21  not an unreasonable application of clearly established Supreme Court authority.

22         G.  Claim 8

23         Petitioner alleges ineffective assistance of counsel regarding the admission of two

24  statements he made to the police on April 2,1998, and April 4, 1998.  Petitioner arrived at the

25  hospital on the evening of April 2, 1998, with gunshot wounds.  At that time, police officers

26  questioned petitioner about the events that led to his gunshot wounds, prior to him being

78

1    admitted for surgery.  Petitioner was not given Miranda warnings at that time.  On April 4, 1998,

2    after being Mirandized, petitioner provided a detailed statement to police that was recorded.

3                                *Failure to Investigate, Prepare and Present Evidence*

4                  Petitioner alleges that counsel was ineffective in challenging the admissibility of

5    his April 2, 1998, statement to the police.  Amended Petition, p. 87.  The factual background to

6    this claim is summarized in the statement of facts contained in the opinion of the California

7    Court of Appeal:

8                  On the night of April 2, [petitioner]–with multiple gunshot wounds–was taken to
              a hospital.  While lying on a gurney, he told police that he stood on a Vacaville
9              street when an unknown man pulled a gun on him.  [Petitioner] said that he
              wrestled with the man until he broke away and ran from him.  The man shot at
10             [petitioner] while he was lying on the ground.  [Petitioner] told police that he
              flagged down a passing vehicle and got a ride to the hospital.  A police officer
11             administered a gunshot residue test.  After a five- to 10-minute interview,
              [petitioner] was taken into surgery.  The police took his clothing as evidence.
12             They found no weapons or marijuana on his person.

13                 On the afternoon of April 4, [petitioner] gave a second statement to police while
              in the hospital.  A nurse advised a police officer that [petitioner] was not under the
14             influence of any medication that would cause him to be unable to answer
              questions.  [Petitioner] seemed alert.  They spoke for 20 to 25 minutes and the
15             statement was tape-recorded.

16                 In this statement, [petitioner] admitted that he and Pina went to the Vacaville
              house of a man named [Parovel] to purchase marijuana.  He told police that
17             [Parovel] tried to rob them and that he shot at them.  He learned from police that
              Pina was dead.  [Petitioner] admitted that he had been carrying a .38-caliber
18             revolver and that Pina was also armed...

19   Respondent's Lodged Document 12, pp. 4-5.

20                 Petitioner argues that had counsel successfully challenged the admissibility of the

21   April 2, 1998, statement, then the prosecutor would not have been able to later argue that it

22   showed a consciousness of guilt because it was inconsistent with the April 4, 1998, statement.

23   Petitioner also argues that had counsel successfully shown that petitioner invoked his right to

24   silence on April 2, 1998, then the April 4, 1998, statement would have been suppressed.

25                 In considering petitioner's claim that the trial court failed to conduct a

26   foundational hearing regarding the April 2, 1998, statement, the California Court of Appeal

                                                    79

1  found that he had no Miranda rights on April 2, 1998, because he was only a suspect and not in

2  custody.  Respondent's Lodged Document 12, p. 32.  The California Court of Appeal also found

3  that "[i]n like manner, Briscoe's statement was clearly voluntary.  He was conscious and able to

4  speak with the officer.  He had not been treated at the time that Officer Williams questioned him,

5  so there was not risk that he was under the influence of medication.  He gave a coherent

6  explanation of how he came to be shot."  Id.

7        Petitioner appears to argue that had counsel presented Officer Mayoral's report to

8  the trial court, it would have found that he was in custody on April 2, 1998.  Officer Mayoral's

9  report stated that on April 2, 1999, he spoke with Officer Williams at the emergency room.

10  Petitioner's Exhibit S.  Officer Williams told him that petitioner told him that he had been shot in

11  Vacaville by an unknown subject.  Id.  Officer Williams then said petitioner could not provide a

12  description of the subject who shot him or where the incident had occurred.  Id.  Officer Mayoral

13  then contacted petitioner lying on a bed in the hospital emergency room and he appeared to be in

14  and out of consciousness.  Petitioner's Exhibit S.  Officer Mayoral asked petitioner what

15  happened.  Id.  Petitioner said he could not talk.  Id.  Officer Mayoral attempted to interview

16  petitioner with negative results.  Id.  Officer Mayoral's report states that he remained at the

17  hospital while petitioner went through surgery.  Id.

18        Petitioner also argues that Officer Mayoral's report indicated that petitioner was in

19  custody at the time of the April 2, 1998, interrogation because he was a subject in the Pina

20  shooting because it showed that police questioned petitioner upon his entry into the emergency

21  room and performed a search and seizure of evidence including his clothing, gun shot residue test

22  and blood sample, and that petitioner had invoked his right to remain silent.

23        A defendant is in custody when "a reasonable person in such circumstances would

24  conclude after brief questioning [that] he or she would not be free to leave."  United States v.

25  Hayden, 260 F.3d 1062, 1066 (9th Cir.2001), cert. denied, 122 S.Ct. 1117 (2002).  The

26  determination is based on the totality of the circumstances.  Factors to be considered in the

analysis include "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." Id. Interrogation is "either express questioning or its functional equivalent' " and includes statements or actions "that the police should know are reasonably likely to elicit an incriminating response from the suspect." United States v. Wauneka, 770 F.2d 1434, 1438 (9th Cir.1985) (quotations omitted).

In similar cases where an individual is being questioned while receiving medical care, the Ninth Circuit suggested the following factors might turn medical treatment in a hospital into a custodial situation: the police transported the suspect to the hospital, monitored the suspect at the hospital, stayed outside the door, arranged an extended treatment schedule with the doctors, or otherwise intentionally delayed an arrest to avoid the need to give Miranda warnings. United States v. Martin, 781 F.2d 671, 673 (9th Cir.1985).

It is not likely that had the trial court been made aware of Officer Mayoral's report that it would have found petitioner in custody at the time he or Officer Williams questioned him. Applying the Wauneka factors, the questions to petitioner by both Officer Williams and Officer Mayoral regarding how he obtained his injuries did not confront petitioner with his guilt.  The length of the questioning by both Officer Williams and Officer Mayoral was brief and very little if no degree of pressure was applied to petitioner to answer questions.  Taking into consideration the factors set forth in United States v. Martin, supra, the police did not transport petitioner to the hospital and nor did they arrange for an extended treatment schedule with the doctors or otherwise intentionally delay an arrest in order to avoid giving a Miranda warning.  It is true that Officer Mayoral's report indicates that he stayed at the hospital during petitioner's surgery, however there is no evidence that he stayed outside petitioner's door.  While Officer Mayoral spoke with the surgeon after surgery, he did not truly "monitor" petitioner at the hospital. Because Officer Mayoral's report does not demonstrate that petitioner was in custody at the time

1  of the April 2, 1998, questioning, it is not likely that counsel could have successfully challenged

2  the admission of petitioner's April 2, 1998, statement on this ground.

3          Petitioner also argues that his April 2, 1998, statement violated <u>Miranda</u> because

4  it was involuntary based on the statement in Officer Mayoral's report that petitioner was in and

5  out of consciousness.  Because petitioner was not in custody, his claim that the admission of his

6  statement violated <u>Miranda</u> on this ground is without merit.  In any event, Officer Williams

7  testified that when he interviewed petitioner, before Officer Mayoral, that petitioner was

8  conscious and clear.

9          Petitioner next argues that counsel was ineffective in not offering into evidence

10 any of his medical records from the North Bay Medical Center to challenge the admissibility of

11 his April 4, 1998, statement.  Petitioner argues that these records demonstrated that he was

12 sedated at the time of the interrogation which rendered it involuntary.  Petitioner also argues that

13 counsel should have called Dr. Datta, Dr. Amen, Dr. Goldman and Dr. Kowell to testify

14 regarding the effects of petitioner's brain dysfunction on his ability to understand and appreciate

15 his right to remain silent.  Petitioner also argues that counsel should have offered evidence of his

16 lack of a criminal record to assess his knowledge, familiarity and understanding of his right to

17 remain silent.  Finally, petitioner argues that counsel should have offered his school records,

18 which demonstrated his longstanding cognitive and learning disabilities, which also bore on his

19 understanding of his right to remain silent.

20         The opinion of the California Court of Appeal describes the attempts made by

21 petitioner's counsel to challenge the admission of petitioner's April 4, 1998, statement:

22      [Petitioner] also challenges the admission of his April 4 postoperative statement to police
        on various grounds.  First, he argues that the trial court erred by determining the
23      admissibility of this statement under the procedure set out in section 1538.5.  (See §
        1538.5.)  He contends that this procedure allowed the trial court to improperly consider
24      irrelevant and hearsay evidence in violation of his constitutional rights by impermissibly
        shifting the burden of production evidence and burden of persuasion.
25
        At the preliminary hearing, [petitioner] objected to the admission of the April 4
26      postoperative statement on *Miranda* and involuntariness grounds.  (See U.S. Consti., 5th

82

& 14th Amends.)  The magistrate deemed the objection to be a motion to suppress and conducted a hearing on the admissibility of the statement. [Petitioner] was permitted to inquire about [petitioner's] level of awareness at the time that the statement was given.  A police officer testified that [petitioner] seemed alert and calm.  A nurse said that [petitioner] was not taking any medications that would cause him to have difficulty answering questions intelligently.  The officer testified that he read [petitioner] his *Miranda* rights from a printed card.  When the questioning was complete, the magistrate heard the tape recording of the statement.  After the hearing, the magistrate denied the motion finding that [petitioner] was advised of and waived his rights and that this statement was voluntary.  (See § 1538.5.)

[Petitioner] renewed his motion to suppress this statement on the same grounds before trial.  The same judge who sat as magistrate at the preliminary hearing heard the renewed motion.  Defense counsel agree that the proper procedure as outlined in subdivision (I) of section 1538.5 was to limit the evidence that was considered on the renewed motion to that offered at the preliminary hearing, but the trial court ultimately allowed the defense to offer further testimony in support of the motion.  The defense asserted that [petitioner] was under the influence of self-medicated pain medication-morphine, which can make a person sleepy-at the time he made his statement.  The trial court denied this motion finding no reason to change its earlier ruling, which it adopted in its entirety.

Respondent's Exhibit 12, pp. 32-33.

As noted by the California Court of Appeal, at the preliminary hearing Officer Donaldson testified that when he interrogated petitioner on April 4, 1998, he seemed alert and coherent and responded to what he saying intelligently.  Respondent's Lodged Document 2, p. 108.  Officer Donaldson testified that he asked petitioner's nurse if petitioner was taking any medication that would cause him to be unable to answer questions intelligently.  Id., p. 111.  The nurse responded that there were no medications that would cause that.  Id.  Petitioner did not appear sleepy.  Id., p. 113.

After hearing Officer Donaldson's testimony and the tape of his interrogation, the trial court found that petitioner's statement was voluntary:

And based upon the totality of the evidence, the court makes the finding, number one, the defendant was very coherent.  His responses were clear and responsive to the question asked, other than initially when he tried to lie to the detective a little bit about what actually happened, the detective asked him some further questions and the defendant then told more of the truth.

***

And my listening to the tape, it's clear to me that he knew exactly what the officer

83

1     was asking. He knew his rights.  Throughout the entire interview, he was very
      cooperative with the police.  As I say, other than when he initially tried to tell him
2     that the other guy tried to rob them, everything else is totally consistent with the
      testimony so far and seems to follow logically to the questions and there's nothing
3     at all to indicate there is anything but a valid Miranda waiver and a voluntary
      statement.  Nothing at all to show that the defendant was coerced into making this
4     statement.  So the motion to suppress is denied.

5     Id., p. 121.

6            Before trial, petitioner's counsel renewed her challenge to admission of

7     petitioner's April 4, 1998, statement.  At this hearing, petitioner's counsel called petitioner's

8     nurse, Coral Scholl, as a witness.  Nurse Scholl testified that after his surgery, petitioner was

9     taking patient controlled morphine.  Respondent's Exhibit 5, RT at 15.  After considering Nurse

10    Scholl's testimony, the court denied the motion to suppress.  Id., RT at 17.

11           While the voluntariness of a confession must be judged from the "totality of all

12    the surrounding circumstances," including consideration of "the characteristics of the accused

13    and the details of the interrogation," Schneckloth v. Bustamonte, 412 U.S. 218, 226, 93 S.Ct.

14    2041 (1973), the Supreme Court has made clear that "coercive police activity is a necessary

15    predicate to the finding that a confession is not 'voluntary' within the meaning of the Due

16    Process Clause of the Fourteenth Amendment."  Colorado v. Connelly, 479 U.S. 157, 167, 107

17    S.Ct. 515 (1986).

18           Petitioner now argues that had trial counsel presented additional evidence, the trial

19    court would have found petitioner's April 4, 1998, statement to be involuntary.  Petitioner

20    contends that the hospital records, see respondent's exhibit 17, 2 of 5, pp. 5-159, showed that

21    following his surgery, at 3:00 a.m. on April 3, 1998, he was given morphine and 5 mg of Versed,

22    a sedative/hypnotic drug with an amnesiac affect.  From 3:35 a.m. to 11:00 a.m. on April 3,

23    1998, he was given 2 mg of Versed every hour.  According to petitioner, the medical records

24    reflect that at 9:00 p.m. on April 3, 1998, petitioner began asking questions about the shooting.

25    The total morphine administered between 3:00 a.m. on April 3, 1998, and 3:45 a.m. on April 4,

26    1998, was 100 mg.  At 2:30 p.m. on April 4, 1998, petitioner complained of pain and was given

                                              84

morphine as needed.  The total morphine administered between 3:45 a.m. on April 4, 1998, and

12:30 a.m. on April 5, 1998, was 100 mg.

In <u>Mincey v. Arizona</u>, 437 U.S. 385, 98 S.Ct. 2408 (1978), the Supreme Court

found that the defendant's statements were involuntary because he was heavily sedated:

> It is hard to imagine a situation less conducive to the exercise of "a rational intellect and a free will" than Mincey's. He had been seriously wounded just a few hours earlier, and had arrived at the hospital "depressed almost to the point of coma," according to his attending physician. Although he had received some treatment, his condition at the time of Hust's interrogation was still sufficiently serious that he was in the intensive care unit.FN14 He complained to Hust that the pain in his leg was "unbearable." He was evidently confused and unable to think clearly about either the events of that afternoon or the circumstances of his interrogation, since some of his written answers were on their face not entirely coherent.FN15 Finally, while Mincey was being questioned he was lying on his back on a hospital bed, encumbered by tubes, needles, and breathing apparatus. He was, in short, "at the complete mercy" of Detective Hust, unable to escape or resist the thrust of Hust's interrogation. Cf. Beecher v. Alabama, 389 U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed.2d 35.

>> FN14. A nurse testified at the suppression hearing that the device used to aid Mincey's respiration was reserved for "more critical" patients. Moreover, Mincey apparently remained hospitalized for almost a month after the shooting. According to docket entries in the trial court his arraignment was postponed several times because he was still in the hospital; he was not arraigned until November 26, 1974.

>> FN15. For example, two of the answers written by Mincey were: "Do you me Did he give me some money (no)" and "Every body know Every body." And Mincey apparently believed he was being questioned by several different policemen, not Hust alone; although it was Hust who told Mincey he had killed a policeman, later in the interrogation Mincey indicated he thought it was someone else.

> In this debilitated and helpless condition, Mincey clearly expressed his wish not to be interrogated. As soon as Hust's questions turned to the details of the afternoon's events, Mincey wrote: "This is all I can say without a lawyer." Hust nonetheless continued to question him, and a nurse who was present suggested it would be best if Mincey answered. Mincey gave unresponsive or uninformative answers to several more questions, and then said again that he did not want to talk without a lawyer. Hust ignored that request and another made immediately thereafter.FN16 Indeed, throughout the interrogation Mincey vainly asked Hust to desist. Moreover, he complained several times that he was confused or unable to think clearly, or that he could answer more accurately the next day. FN17 But despite Mincey's entreaties to be let alone, Hust ceased the interrogation only during intervals when Mincey lost consciousness or received medical treatment, and after each such interruption returned relentlessly to his task. The statements at issue were thus the result of virtually continuous questioning of a seriously and

painfully wounded man on the edge of consciousness.

FN16. In his reconstruction of the interrogation, see n. 11, supra, Hust stated that, after he asked Mincey some questions to try to identify one of the other victims, the following ensued: "HUST: . . . What do you remember that happened? "MINCEY: I remember somebody standing over me saying 'move nigger, move.' I was on the floor beside the bed. "HUST: Do you remember shooting anyone or firing a gun? "MINCEY: This is all I can say without a lawyer. "HUST: If you want a lawyer now, I cannot talk to you any longer, however, you don't have to answer any questions if you don't want to. Do you still want to talk to me? "MINCEY: (Shook his head in an affirmative manner.) "HUST: What else can you remember? "MINCEY: I'm going to have to put my head together. There are so many things that I don't remember I. Like how did they get into the apartment? "HUST: How did who get into the apartment? "MINCEY: Police. "HUST: Did you sell some narcotics to the guy that was shot? "MINCEY: Do you mean, did he give me some money? "HUST: Yes. "MINCEY: No. "HUST: Did you give him a sample? "MINCEY: What do you call a sample? "HUST: A small amount of drug or narcotic to test? "MINCEY: I can't say without a lawyer. "HUST: Did anyone say police or narcs when they came into apartment? "MINCEY: Let me get myself together first. You see, I'm not for sure everything happened so fast. I can't answer at this time because I don't think so, but I can't say for sure. Some questions aren't clear to me at the present time. "HUST: Did you shoot anyone? "MINCEY: I can't say, I have to see a lawyer." (Emphasis supplied.)While some of Mincey's answers seem relatively responsive to the questions, it must be remembered that Hust added the questions at a later date, with the answers in front of him. See n. 11, supra. The reliability of Hust's report is uncertain. For example, Hust claimed that immediately after Mincey first expressed a desire to remain silent, Hust said Mincey need not answer any questions but Mincey responded by indicating that he wanted to continue. There is no contemporaneous record supporting Hust's statement that Mincey acted so inconsistently immediately after asserting his wish not to respond further, nor did the nurse who was present during the interrogation corroborate Hust. The Arizona Supreme Court apparently disbelieved Hust in this respect, since it stated that "after each indication from [Mincey] that he wanted to consult an attorney or that he wanted to stop answering questions, the police officer continued to question [him]." 115 Ariz., at 479, 566 P.2d, at 280 (emphasis supplied).

FN17. In addition to the statements quoted in n. 16, supra, Mincey wrote at various times during the interrogation: "There are a lot of things that aren't clear," "Thats why I have to have time to redo everything that happened in my mind," and "I'm not sure as of now." He also wrote: "If its possible to get a lawyer now. We can finish the talk. He could direct me in the right direction where as without a lawyer I might saw something thinking that it means something else." And at another point he wrote "Lets rap tomarrow. face to face. I can't give facts. If something happins that I don't know about." Before the interrogation ended, Mincey made two further requests for a lawyer.

1

2    There were not present in this case some of the gross abuses that have led the
     Court in other cases to find confessions involuntary, such as beatings, see Brown
     v. Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682, or "truth serums," see

3    Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770. But "the blood of
     the accused is not the only hallmark of an unconstitutional inquisition." Blackburn

4    v. Alabama, 361 U.S., at 206, 80 S.Ct., at 279. Determination of whether a
     statement is involuntary "requires more than a mere color-matching of cases."
     Reck v. Pate, 367 U.S. 433, 442, 81 S.Ct. 1541, 1547, 6 L.Ed.2d 948. It requires

5    careful evaluation of all the circumstances of the interrogation.FN18

6                FN18. E. g., Boulden v. Holman, 394 U.S. 478, 480, 89 S.Ct. 1138,
                1139, 22 L.Ed.2d 433; Clewis v. Texas, 386 U.S. 707, 708, 87

7               S.Ct. 1338, 1339, 18 L.Ed.2d 423; Haynes v. Washington, 373 U.S.
                503, 513-514, 83 S.Ct. 1336, 1842-1843, 10 L.Ed.2d 513.

8

9    It is apparent from the record in this case that Mincey's statements were not "the
     product of his free and rational choice." Greenwald v. Wisconsin, 390 U.S. 519,

10   521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77. To the contrary, the undisputed evidence
     makes clear that Mincey wanted not to answer Detective Hust. But Mincey was

11   weakened by pain and shock, isolated from family, friends, and legal counsel, and
     barely conscious, and his will was simply overborne. Due process of law requires

12   that statements obtained as these were cannot be used in any way against a
     defendant at his trial.

13   437 U.S. at 399-402, 98 S.Ct. at 2417-2418.

14          In the instant case, had the trial court been made aware of the drugs petitioner was

15   taking in the hospital, it is not likely that it would have changed it's ruling that petitioner's

16   statement was voluntary.  While the trial court did not know the exact amount of morphine

17   petitioner had taken, it knew that it was self administered when it denied petitioner's second

18   motion to suppress.  In addition, the trial court listened to the tape of the interrogation and found

19   that petitioner understood what was being asked, he was coherent and his responses were clear

20   and responsive.  Petitioner's situation was very much unlike that of the defendant's in Mincey

21   described above.  Petitioner was not "weakened by pain and shock, isolated from family, friends,

22   and legal counsel, and barely conscious." Id.  Accordingly, counsel's failure to admit petitioner's

23   medical records was not ineffective.

24          Petitioner also argues that counsel was ineffective for not challenging the

25   voluntariness of petitioner's statements based on his brain dysfunction, which prevented him

26   from appreciating his rights.  In support of this argument, petitioner refers to the evidence

87

1  discussed above regarding the reports and testimony by Dr. Datta, Dr. Amen, Dr. Goldman and

2  Dr. Kowell.  However, petitioner offers no declarations from these doctors stating that petitioner

3  was actually unable to make a voluntary statement based on his brain dysfunction.  The trial

4  judge, after listening to the tape of the interrogation, found that petitioner appeared to understand

5  what was going on.  Petitioner's conclusory and unsupported claim that counsel should have

6  challenged the admissibility of his statement on these grounds, which appears contrary to the tape

7  of the interrogation, is without merit.

8          Petitioner argues that counsel also should have presented evidence of his lack of a

9  criminal record as evidence of the involuntariness of his statement.  Petitioner argues that his sole

10  contact with the criminal justice system was his arrest for vandalism when he was 17 and no

11  charges were filed.  Petitioner argues that his lack of familiarity with criminal procedures made

12  him able to understand his rights.  In support of this claim, petitioner cites Alvarado v. Hickman,

13  316 F.3d 841 (9th Cir. 2002).  In Alvarado, 17 year old Alvarado confessed to a crime during a

14  two hour interview with police.  The Ninth Circuit found that the state court erred in not

15  considering his youth and inexperience in evaluating whether a reasonable person would believe

16  they could leave.  Id.  In Yarborough v. Alvarado, 541 U.S. 652, 124 S.Ct. 2140 (2004), the

17  Supreme Court reversed Alvarado, finding that the state court did not unreasonably apply federal

18  law by failing to consider suspect's youth when determining custodial status and that the

19  suspect's history with law enforcement was not a factor in the objective determination of whether

20  a suspect was in custody for Miranda purposes.  In any event, petitioner was 21 years old at the

21  time of the interrogation.  He was not a juvenile.

22          Petitioner also cites Fare v. Michael C., 442 U.S. 707, 99 S.Ct. 2560 (1979) in

23  support of this claim.  In Fare, the Supreme Court held that the totality of the circumstances

24  approach is adequate to determine whether there has been a valid waiver of Miranda rights when

25  a juvenile is involved.  442 U.S. at 725, 99 S.Ct. at 2572.  This approach mandates an inquiry

26  into all the circumstances surrounding the interrogation including the juvenile's age, experience,

1   background and intelligence.  Id.

2          Fare is not particularly applicable as it involved a juvenile.  Nevertheless, the

3   undersigned finds it very unlikely that the trial court would have found petitioner's statement to

4   be involuntary based on  petitioner's lack of experience with the criminal justice system.  Under

5   petitioner's reasoning, then any statement given by any adult who had never been arrested and

6   charged with an offense would be rendered involuntary.

7          Finally, petitioner argues that counsel should have presented his school records

8   which demonstrated a history of chronic absences as early as second grade and that he suffered

9   from learning disabilities.  Again, the undersigned finds it very unlikely that the trial court would

10  have found petitioner's statement involuntary had it considered petitioner's school records.  One

11  does not have to be a good student or high school graduate to understand a question whether one

12  desires to talk to the police or that one can have a lawyer present before further questioning.

13  Moreover, petitioner appeared to understand what was going on during the interrogation and

14  responded appropriately; evidence of his poor school attendance and learning disabilities would

15  not likely have changed the outcome of the hearings challenging the voluntariness of his April 4,

16  1998, statement.

17         Accordingly, for the reasons discussed above, petitioner's claims that counsel was

18  ineffective in her challenge to his April 4, 1998, statement is without merit.

19         After an independent review of the record, the undersigned finds that the denial of

20  these claims by the California Supreme Court was not an unreasonable application of clearly

21  established Supreme Court authority.

22              *Failure to Competently Litigate*

23         Petitioner alleges that counsel was ineffective for failing to use the correct

24  statutory procedure to litigate the admissibility of his statements to the police.  Amended

25  Petition, p. 99.  On July 28, 2009, the undersigned denied petitioner's request for an evidentiary

26  hearing as to this claim.  Because petitioner is not entitled to an evidentiary hearing as to this

1   claim, for the reasons stated in the July 28, 2009, order which are set forth below, this claim

2   should be denied:

3        April 2nd Statement

4        Petitioner seeks an evidentiary hearing due to trial counsel using the incorrect
     statutory procedure for litigating the admissibility of the April 2 statement.
5        Petitioner argues that he was in custody when he spoke to police on April 2, and
     counsel was ineffective for failing to request a proper suppression hearing outside
6        the presence of the jury.  The court of appeal held that the trial court properly
     allowed the April 2 statement into evidence.

7

8            [Petitioner] also asserts that the trial court erred by admitting two
         statements he made to police officers and by instructing the jury about the
         admissions contained in those statements.  First, he argues that the trial
9            court failed to conduct a foundational hearing to adjudicate preliminary
         facts implicated by his objection to the admission of his preoperative
10           statement given to police on April 2.  (See Evid. Code §§402, 405.)
         Before going into surgery for his gunshot wounds, [petitioner] told
11           Fairfield Police Officer Richard Williams that an unknown gunman drew a
         weapon on him, wrestled with him for that gun and ran away.  He said that
12           the stranger shot at him while he lay on the ground.  Two days later, he
         gave police a different statement about what happened that night.
13           [Petitioner] twice challenged the April 4 statement to police before trial,
         but did not move to suppress the April 2 statement.

14

15           At trial, Office Williams was questioned about [petitioner's] April 2
         statement.  When the prosecutor asked if [petitioner] told him how he
         came to be injured, defense counsel objected that the question called for a
16           hearsay response and that the statement was both taken in violation of
         *Miranda* and was involuntary.  The trial court overruled the objection.
17           The prosecution then brought before the jury evidence of the substance of
         [petitioner's] April 2 statement.  On cross-examination, defense counsel
18           brought out evidence pertaining to [petitioner's] competence to speak to
         police before surgery.  She also asked Officer Williams whether
19           [petitioner] was advised of his *Miranda* rights before the statement was
         taken.  He admitted that [petitioner] was not so advised before the
20           prosecutor had an opportunity to object that [petitioner] was not in custody
         at the time of the statement.  The trial court agreed, concluded that the
21           question was irrelevant, and instructed the jurors to disregard both the
         question and the reply.  Finally, Officer Williams testified that the April 2
22           statement was not tape-recorded.

23           During argument, the prosecution urged the jury to conclude that this
         statement-which was inconsistent with his April 4 statement-evidenced a
24           consciousness of guilt on [petitioner's] part.  The jury was instructed that
         if it concluded that [petitioner] made a willfully false statement, it could
25           use that fact to raise an inference of a consciousness of guilt.  (CALJIC
         No. 2.03.)

26

On appeal, [petitioner] argues that once defense counsel objected to the prosecution's questioning of Officer Williams about his April 2 statement, the trial court had a procedural duty to conduct a foundational hearing to determine the preliminary facts about voluntariness and any violation of *Miranda*. (See Evid. Code §§402, 405.)  Its failure to conduct this hearing outside the presence of the jury was prejudicial federal constitutional error, he reasons, and implicated his due process rights to a fair trial.  By statute, a criminal defendant may have issues of preliminary fact bearing on the admissibility of evidence determined outside the presence of the jury, on request. (Evid. Code, §402, subd. (B); see Evid. Code, § 400.) [Petitioner] did not seek such a hearing.  Thus he did not trigger the application of the procedure set forth in section 402 of the Evidence Code.

When the existence of a preliminary fact is disputed and that preliminary fact is also a fact in issue in the trial, the jury must not be informed of the court's determination about the existence or nonexistence of the preliminary fact.  (Evid. Code, §405, subd. (a), (b)(1).)  Some cases have held that even if no request for a hearing is made, this statute mandates that the trial court conduct an in camera hearing when a criminal defendant challenges the voluntariness of a confession or challenges a statement as taken in violation of *Miranda*.  (See, e.g., *People v. Torrez* 1987) 188 Cal.App.3d 723, 730-731 [voluntariness, *Miranda* issues to be determined pursuant to Evid. Code, § 405].)  If the trial court fails to hold a hearing outside the presence of the jury, we must determine whether the trial court abused its discretion in holding its hearing in the presence of the jury.  (*People v. Torrez*, supra, 188 Cal.App.3d at p. 733.)

In our case, unlike *Torrez*, no extended discussion of the legal issues occurred in the jury's presence.  The objections were clearly meritless and the trial court disposed of them without undue emphasis.  He had no *Miranda* rights at this stage of the case, because he was only a suspect and was not then in custody.  (*See Miranda v. Arizona, supra*, 384 U.S. at p. 444; *People v. Mickey* (1991) 54 Cal.3d 612, 648 cert. den. 506 U.S. 819.)  In like manner, [petitioner's] statement was clearly voluntary.  He was conscious and able to speak with the officer.  He had not been treated at the time that Officer Williams questioned him, so there was no risk that he was under the influence of medication.  He gave a coherent explanation of how he came to be shot.  All of these factors suggest that [petitioner] gave a voluntary statement to police on April 2; there was no evidence to the contrary.  The statement was clearly unobjectionable on the ground asserted.  If a hearing had been conducted outside the presence of the jury, the same evidence would have been given to the jury at its conclusion.  Thus, we conclude that the trial court did not abuse its discretion in failing to conduct a hearing on the admissibility of this statement outside the presence of the jury.

Respondent's Reply, Exh. 12 at 30-32.

Petitioner argues that trial counsel should have requested a hearing outside the presence of the jury to present evidence that petitioner was in custody at the time he spoke to police.  Petitioner alleges that he was not free to leave at the time the

police were questioning him, thus it was a custodial interrogation.  Petitioner may not have been free to go, but such "custody" was a result of an impending, life saving surgery.  Petitioner presents <u>no</u> facts suggesting that police had imposed any restraint on him.  Petitioner also contends that trial counsel was ineffective by objecting in front of the jury and having the objection overruled and characterized as irrelevant by the trial court.

However, petitioner has failed to demonstrate that trial counsel's conduct was ineffective under <u>Strickland</u>.  Even if trial counsel was deficient, petitioner was not prejudiced by the conduct.  The court of appeal held that the statement was properly admitted into evidence.  Had there been a hearing without the jury, the trial court would still have admitted the statement into evidence and would have been correct in its ruling.  Nor has petitioner demonstrated any prejudice from the jury hearing the objection and trial court's ruling.  In determining whether to grant an evidentiary hearing the federal court must apply the AEDPA deferential standards to legal and factual questions necessarily reached by the state courts. <u>Schriro v. Landrigan</u>, 550 U.S. 465, 127 S.Ct. 1933, 1940, 167 L.Ed.2d 836 (2007).  The court of appeal's holding is not contrary to established federal law.

April 4th Statement

Petitioner alleges that trial counsel was ineffective for failing to present evidence of medication that petitioner was taking and for using the incorrect statutory procedure to challenge the admissibility of the April 4 statement.  The court of appeal held the trial court did not err in admitting the April 4 statement into evidence.

> [Petitioner] also challenges the admission of his April 4 postoperative statement to police on various grounds.  First, he argues that the trial court erred by determining the admissibility of this statement under the procedure set out in section 1538.5.  (See § 1538.5.)  He contends that this procedure allowed the trial court to improperly consider irrelevant and hearsay evidence in violation of his constitutional rights by impressibly shifting the burden of production evidence and burden of persuasion.

> At the preliminary hearing, [petitioner] objected to the admission of the April 4 postoperative statement on *Miranda* and involuntariness grounds.  (See U.S. Consti., 5th & 14th Amends.)  The magistrate deemed the objection to be a motion to suppress and conducted a hearing on the admissibility of the statement.  [Petitioner] was permitted to inquire about [petitioner's] level of awareness at the time that the statement was given.  A police officer testified that [petitioner] seemed alert and calm.  A nurse said that [petitioner] was not taking any medications that would cause him to have difficulty answering questions intelligently.  The officer testified that he read [petitioner] his *Miranda* rights from a printed card.  When the questioning was complete, the magistrate heard the tape recording of the statement.  After the hearing, the magistrate denied the motion finding that [petitioner] was advised of and waived his rights and that this statement was voluntary.  (See § 1538.5.)

92

> [Petitioner] renewed his motion to suppress this statement on the same grounds before trial.  The same judge who sat as magistrate at the preliminary hearing heard the renewed motion.  Defense counsel agree that the proper procedure as outlined in subdivision (I) of section 1538.5 was to limit the evidence that was considered on the renewed motion to that offered at the preliminary hearing, but the trial court ultimately allowed the defense to offer further testimony in support of the motion.  The defense asserted that [petitioner] was under the influence of self-medicated pain medication-morphine, which can make a person sleepy-at the time he made his statement.  The trial court denied this motion finding no reason to change its earlier ruling, which it adopted in its entirety.

Respondent's Reply, Exh. 12 at 32-33.

> Petitioner's argument lacks merit.  There were two separate hearings regarding admission of the statement and trial counsel presented additional evidence at the later hearing regarding the morphine.  Despite the morphine evidence, the trial court still allowed the statement into evidence.   Petitioner has failed to describe how trial counsel was deficient in presenting the morphine evidence.

> Petitioner also faults trial counsel for not presenting evidence regarding the side effects of the drug, Versed, that petitioner was administered.  Petitioner describes Versed as a sedative/hypnotic drug with an amnesiac effect.  Other than this brief description, petitioner has not presented sufficient evidence that the effects of the drug should lead to suppression of the statement or even that trial counsel was ineffective for failing to raise the issue.  Petitioner has not provided a declaration with any information or any evidence from an expert.[13]  The court of appeal noted that a nurse stated that petitioner was not given any medication that would cause him difficulty in answering questions.  Petitioner has not demonstrated that trial counsel was ineffective in her attempts to suppress the statement.

> With respect to the statutory procedures used to adjudicate the motion, the court of appeal stated:

>> On appeal, [petitioner] contends that the trial court erred by using the procedures set out in 1538.5 on the renewal of his motion.  He accurately asserts that section 1538.5 sets forth the proper procedure to be applied in cases challenging the seizure of evidence, but that this statutory procedure does not have specific application when the defendant challenges the admissibility of his or her statement on Fifth Amendment grounds.  (*People v. Superior Court (Zolnay)* (1975) 15 Cal.3d 729, 733-734, cert. den. 429 U.S. 816.)  However, we find no error on the trial court's part in using a similar procedure to review the motion before it.

>> In order to comply with due process, a criminal defendant has a right at some stage in the proceedings to have a hearing on and a determination of

---

[13]  Petitioner is clearly flailing at this point.  Petitioner appeared to have a clear memory at the time of his statement.  He did not complain about forgetfulness.

common law issues pertaining to whether a statement may properly be admitted into evidence at trial. (*Jackson v. Denno* (1964) 378 U.S. 368, 376-377 [voluntariness].) Although a pretrial ruling is not always binding on the trial court, a defendant is not entitled to two evidentiary hearings on *Miranda* and voluntariness issues. The trial court would be within its authority to refuse to hear a renewed motion challenging the admissibility of a defendant's statement on these grounds after a full pretrial hearing on these issues. (*People v. Clark* (1992) 3 Cal.4th 41, 199, cert. den. 507 U.S. 993 [Miranda]; (*People v. Superior Court (Zolnay)*, *supra*, (1975) 15 Cal.3d at p. 735 [Miranda]; *Saidi-tabatabai v. Superior Court* (1967) 253 Cal.App.2d 257, 266 [voluntariness].) Once a defendant has had a suppression motion hearing before a magistrate and renews that motion in the trial court, a trial court procedure mirroring that set forth in section 1538.5 affords the defendant a fair opportunity to litigate a *Miranda* objection. (*People v. Smithson* (2000) 79 Cal.App.4 th 480, 497.)

This procedure was used in this case. The trial court considered the evidence adduced at the pretrial hearing and new evidence that [petitioner] found since the time of that hearing. The use of this procedure on a renewed statutory motion to suppress has been found to consistent with due process rights. (*People v. Hansel* (1992) 1 Cal 4 th 1211, 1218-1222.) In like manner, the use of a similar procedure in these issues would not implicate [petitioner's] federal due process rights. Thus, we find no procedural impropriety at the trial court's hearing on the renewed motion to suppress [petitioner's] April 4 statement.[14]

Exh. 12 AG's reply at 33-34.

Petitioner has not shown that the statutory procedure used or the court of appeal ruling were contrary to federal law. While trial counsel may have erred in the type of hearing requested, the court of appeal was clear that the hearing did not violate petitioner's due process rights. In both hearings the trial court ruled that the admission was voluntary and complied with <u>Miranda</u>. The court of appeal upheld the trial court's ruling and found the admission to be knowingly, intelligent and voluntary. Respondent's Reply, Exh. 12 at 35-37. If counsel did err by choosing the incorrect type of hearing, it was harmless error. Petitioner has not shown he suffered prejudice as the suppression hearing used by the court did not violate the federal constitution.

Petitioner has not shown that he received ineffective assistance of trial counsel with respect to the admission of the April 2 and April 4 statements. The court of appeal held that the statements were properly admitted into evidence. Thus, any errors that trial counsel made were harmless. No evidentiary hearing is required for either statement.

Order filed July 28, 2009, pp. 22-27.

[14] In light of this conclusion we need no address [petitioner's] additional contention that the trial court's failure to conduct a second full hearing on this issue fatally infected its ruling.

1        Because petitioner is not entitled to an evidentiary hearing as to this claim, it

2   should be denied.  After an independent review of the record, the undersigned finds that the

3   denial of this claim by the California Supreme Court was not an unreasonable application of

4   clearly established Supreme Court authority.

5        H.  Claim 9

6        Petitioner argues that defense counsel was ineffective for failing to investigate,

7   prepare and present evidence relevant to his sentence and to object to his sentence for special

8   circumstances murder and robbery.  Amended Petition, p. 103.  In particular, petitioner argues

9   that counsel was ineffective for failing to object that Cal. Penal Code § 190.2(a)(17) special

10  circumstances allegations were constitutionally impermissible under Tison v. Arizona, supra, and

11  People v. Estrada, 11 Cal.4th 568 (1995) and that his sentence was cruel and unusual under the

12  state and federal constitution.  Petitioner also argues that counsel failed to present substantial

13  available evidence which mitigated petitioner's culpability.

14       As noted by respondent in the answer, the Supreme Court "has not delineated a

15  standard which should apply to ineffective assistance of counsel claims in noncapital sentencing

16  cases, therefore there is no clearly established federal law as determined by the Supreme Court in

17  this context.  Davis v. Grigas, 443 F.3d 1155, 1158 (9th Cir. 2006); Cooper-Smith v. Palmateer,

18  397 F.3d 1236, 1244 (9th Cir. 2005).  Accordingly, this claim is without merit.  No further

19  discussion of this claim is warranted.

20       I.  Claim 11[15]

21       In claim 11 of the amended petition, petitioner alleges that Parovel suffered from

22  an undisclosed memory impairment during the trial that violated petitioner's right to confront and

23  cross examine him.  Amended Petition, p. 107.  On July 28, 2009, the undersigned denied

24  petitioner's request for discovery as to this claim.  For the reasons stated in that order, as set forth

25  

26       [15]  Claim 10, cumulative error, is reserved for discussion at the end of all claims.

1   below, this claim should be denied:

2         Petitioner relies on Parovel's trial testimony at a 2002 Texas murder trial where
      he testified, "I have a memory problem due to an accident I suffered in '94.", in
3     response to some questions. Amended Petition, Exh. D at 40. Parovel made only
      one more vague reference to the memory problem during his Texas trial
4     testimony.

5         Petitioner contends that this memory impairment exists and would explain many
      of Parovel's inconsistent statements in the instant case. Petitioner requests that
6     the court issue a deposition subpoena, have the United States Marshal for the
      Western District of Texas serve the subpoena and have the United States Marshal
7     for the Eastern District of California pay any fees in connection with the
      deposition. Parovel's current whereabouts are unknown but a Texas investigator
8     retained by petitioner has located an address where Parovel's wife lives.[16]
      Rule 6 of the Rules Governing § 2254 cases deal with discovery in habeas cases.

9
      Rule 6(a) provides that the court may, for good cause, allow discovery and may
10    limit the extent of discovery. Rule 6(b) requires a party requesting discovery to
      provide reasons for the request, and to specify any requested documents. Unlike
11    civil litigants, a habeas petitioner is not presumptively entitled to discovery. See
      Rich v. Calderon, 187 F.3d 1064, 1068 (9th Cir.1999). "Habeas is an important
12    safeguard whose goal is to correct real and obvious wrongs. It was never meant to
      be a fishing expedition for habeas petitioners to 'explore their case in search of its
13    existence.' " Id. at 1067. "A habeas petitioner does not enjoy the presumptive
      entitlement to discovery of a traditional civil litigant." Id. at 1068. "The
14    availability of any discovery during a habeas proceeding is committed to the
      sound discretion of the district court." Campbell v. Blodgett, 982 F.2d 1356,
15    1358 (9th Cir.1993)." Good cause may be shown " 'where specific allegations
      before the court show reason to believe that the petitioner may, if the facts are
16    fully developed, but able to demonstrate that he is ... entitled to relief.' " Bracy v.
      Gramley, 520 U.S. 899, 908-09, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997).
17    Most importantly, Parovel already testified that his inconsistent statements were a
      result of his lying to the police, and petitioner provides no reason to doubt that
18    explanation. Furthermore, Parovel's testimony of the incident was corroborated
      by Rozadilla and more importantly, by petitioner's own statements regarding the
19    incident. If Parovel had a memory impairment, it does not seem to have affected
      his testimony at petitioner's trial. Ultimately, petitioner has not demonstrated
20    how any memory impairment, if proven, would benefit petitioner. Petitioner's
      request seems nothing more than a fishing expedition, which is denied.

21

22   July 28, 2009, order, pp. 27-29.

23         For the reasons stated above, this claim should be denied. After an independent

24   review of the record, the undersigned finds that the denial of this claim by the California

25   _____

26        [16] The defendant in the Texas case was Parovel's brother in law.

                                    96

1   Supreme Court was not an unreasonable application of clearly established Supreme Court

2   authority.

3           J.   Claim 13

4           In claim 13, petitioner argues that he was denied effective assistance of counsel

5   based on counsel's failure to investigate, prepare and present evidence impeaching Parovel's

6   statement that petitioner pistol-whipped him.  Amended Petition, p. 122.  On July 28, 2009, the

7   undersigned denied petitioner's request for an evidentiary hearing as to this claim.  For the

8   reasons stated in that order, as will be set forth below, the instant claim should be denied:

9           Immediately following the incident, Parovel told police that Pina had pistol
       whipped him.  Amended Petition, P, Exh. Q at 965.  However, at trial Parovel
10          testified that petitioner pistol whipped him.  RT at 106.  In his admission to the
       police, petitioner also admitted to hitting Parovel in the head with the gun.  CT at
11          111.  As discussed above, the pistol whipping was one of the provocative acts to
       support the murder conviction.
12

13          Petitioner now theorizes that while attempting to pistol whip Parovel, petitioner
       was actually hitting Pina by mistake.  Amended Petition at 123.  Petitioner relies
14          on the autopsy report that shows Pina had blunt force injury to the face including
       an orbital bone fracture.  Amended Petition, Exh. L at 3.  Petitioner contends that
15          Parovel only had minor injuries to his face following the incident.  Amended
       Petition, Exh. N, O.  Petitioner also notes that it was dark in the house and Pina
16          and Parovel were struggling so petitioner could have mistakenly hit the wrong
       person.

17          Petitioner's theory and argument is tenuous at best and petitioner has failed to
       show that trial counsel was deficient.  It is not clear what would have been gained
18          by impeaching Parovel, when petitioner admitted to pistol whipping him in his
       admission to police.  Petitioner admittedly was trying to pistol whip Parovel and
19          this was not the only action that qualified as a provocative act, as petitioner
       admitted to holding Rozadilla in a head lock with a gun to her head.  Whether
20          petitioner accidently hit his co-defendant is not pertinent.  Trial counsel's strategy
       focused on petitioner's alleged brain dysfunction and that there were insufficient
21          provocative acts.  RT 489-504.  A tactical decision by counsel with which the
       defendant later disagrees is not a basis for a claim of ineffective assistance of
22          counsel.  Guam v. Santos, 741 F.2d 1167, 1169 (9th Cir. 1984).

23          It is important to note that trial counsel did address the pistol whipping in detail
       and emphasized the minor injuries to Parovel's face in her attempt to show that
24          the pistol whipping was not a provocative act.  RT at 490-91, 500.  However, the
       jury was not convinced by this argument.  Even if petitioner could show that trial
25          counsel's performance was deficient, petitioner has failed to show any prejudice
       as a result.  Petitioner's theory involves too much speculation and trial counsel
26          made similar arguments to no avail.  Petitioner is not entitled to an evidentiary

1    hearing.  Accordingly, this claim should be denied.

2  July 28, 2009, order, pp. 20-21.

3         For the reasons stated above, this claim should be denied.  After an independent

4  review of the record, the undersigned finds that the denial of this claim by the California

5  Supreme Court was not an unreasonable application of clearly established Supreme Court

6  authority.

7         K.  <u>Claim 14</u>

8         Petitioner alleges that counsel was ineffective for failing to investigate and present

9  evidence related to the criminal investigation of Parovel.  Amended Petition, p. 126.  In

10  particular, petitioner argues that evidence suggested that Parovel's testimony was tainted because

11  he was subject of a criminal investigation by the same police investigator and prosecuting

12  authority that was investigating and prosecuting the Pina homicide case.  Petitioner argues that

13  given this fact, Parovel had a motive to shade his testimony in favor of the prosecutor's case

14  against petitioner.

15         On July 28, 2009, the undersigned denied petitioner's request for an evidentiary

16  hearing as to this claim.  For the reasons stated in that order, this claim should be denied:

17         In claim [14], petitioner alleges that trial counsel was ineffective for failing to
       adequately investigate and present evidence regarding Parovel's drug dealing and
18       an alleged investigation of Parovel by the police.  Petitioner contends that there
       must have been a deal between Parovel and the district attorney's office for
19       Parovel to testify and not be investigated and prosecuted for the marijuana in his
       house.  Petitioner supports this arguments by citing the existence of a laboratory
20       report confirming that the substance in Parovel's house was marijuana and that
       Parovel admitted to selling marijuana.  Petitioner concludes that the investigation
21       was stopped in return for Parovel's testimony.

22         Petitioner relies on speculation and cites no evidence that there was an agreement
       between Parovel and the district attorney's office.  Petitioner has not shown that
23       the existence of a laboratory report confirming the existence of marijuana in
       Parovel's house means the police were conducting an investigation for drug sales
24       that conveniently ended.  That trial counsel did not investigate this theory or place
       the laboratory report in evidence is not ineffective assistance of counsel,
25       considering Parovel admitted the substance was marijuana.  As stated in claim 6,
       there was ample evidence of Parovel's drug dealing from direct and cross
26       examination and additional evidence was denied by the trial court as being more

                                        98

1    prejudicial than probative.

2    Petitioner's argument relies on too much speculation to support a finding of
     ineffective assistance of counsel.  Trial counsel was not ineffective for failing to
3    present an argument that had no evidentiary support.  Petitioner cannot show that
     he was deprived of a fair trial, thus this claim is denied.
4

5    July 28, 2009, order, pp. 21-22.

6            For the reasons discussed above, this claim should be denied.  After an

7    independent review of the record, the undersigned finds that the denial of this claim by the

8    California Supreme Court was not an unreasonable application of clearly established Supreme

9    Court authority.

10           L.   Claim 16

11           Petitioner alleges that he was denied his right to effective assistance of counsel on

12   appeal based on counsel's failure to raise on appeal the issue of ineffective assistance of counsel

13   based on counsel's failure to effectively confront and cross-examine Parovel regarding his

14   testimony that he had been pistol-whipped by petitioner and to present evidence that Parovel was

15   under criminal investigation, as set forth in claims 13 and 14 of the instant petition.

16           A claim of ineffective assistance of appellate counsel utilizes the same Strickland

17   standard that is applied to trial counsel.  Smith v. Robbins, 528 U.S. 259, 287, 120 S. Ct. 746,

18   765 (2000).

19           In reviewing ineffective assistance of counsel claims, California courts apply the

20   Strickland test set forth above.  See People v. Ledesma, 43 Cal.3d 171, 216 (1987)(applying the

21   Strickland test).  Based on the reasoning above finding that claims 13 and 14 are without merit, it

22   is very likely that had these claims been raised on appeal by appellate counsel, they would have

23   been denied.  For that reason, the instant claim of ineffective assistance of appellate counsel is

24   without merit.

25           After an independent review of the record, the undersigned finds that the denial of

26   this claim by the California Supreme Court was not an unreasonable application of clearly

                                                    99

1    established Supreme Court authority.

2              M.  Claim 10: Cumulative Error

3              Finally, petitioner raises a claim of cumulative error.  "The Supreme Court has

4    clearly established that the combined effect of multiple trial court errors violates due process

5    where it renders the resulting criminal trial fundamentally unfair."  Parle v. Runnels, 505 F.3d

6    922, 927 (9th Cir. 2007), citing Chambers v. Mississippi, 410 U.S. 284, 298, 302-03, 93 S.Ct.

7    1038 (1973) (combined effect of individual errors "denied [Chambers] a trial in accord with

8    traditional and fundamental standards of due process" and "deprived Chambers of a fair trial").

9    "The cumulative effect of multiple errors can violate due process even where no single error rises

10   to the level of a constitutional violation or would independently warrant reversal."  Id., citing

11   Chambers, 410 U.S. at 290 n. 3, 93 S.Ct. 1038.

12             "Under traditional due process principles, cumulative error warrants habeas relief

13   only where the errors have 'so infected the trial with unfairness as to make the resulting

14   conviction a denial of due process.'"  Id., quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643,

15   94 S.Ct. 1868 (1974).  "Such 'infection' occurs where the combined effect of the errors had a

16   'substantial and injurious effect or influence on the jury's verdict.'"  Id., quoting Brecht v.

17   Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710 (1993) (internal quotations omitted).  "In

18   simpler terms, where the combined effect of individually harmless errors renders a criminal

19   defense 'far less persuasive than it might [otherwise] have been,' the resulting conviction violates

20   due process."  Id., citing Chambers, 410 U.S. at 294, 302-03, 93 S.Ct. 1038.

21             As discussed above, the undersigned has found no errors of constitutional

22   magnitude.  For that reason, petitioner's claim of cumulative error should be denied.  After an

23   independent review of the record, the undersigned finds that the denial of this claim by the

24   California Supreme Court was not an unreasonable application of clearly established Supreme

25   Court authority.

26   \\\\\

Conclusion

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.  If petitioner files objections, he shall also address if a certificate of appealability should issue and, if so, as to which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The certificate of appealability must "indicate which specific issue or issues satisfy" the requirement.  28 U.S.C. § 2253(c)(3).

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: 04/15/2010

/s/ Gregory G. Hollows
_____
bri2175.157                              UNITED STATES MAGISTRATE JUDGE